DESAI LAW FIRM, P.C.
Aashish Y. Desai, Esq. (SBN 187394)
Adrianne De Castro, Esq. (SBN 238930)
3200 Bristol Ave., Suite 650
Costa Mesa, CA 92626
Tel:  (949) 614-5830
Fax:  (949) 271-4190
aashish@desai-law.com
adrianne@desai-law.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

JORDAN OROZCO MADERO and
ESTEBAN OROSCO on behalf of
themselves and all others similarly
situated,

              Plaintiffs,

v.

McLANE FOODSERVICE, INC., a
Texas Corporation, and DOES 1-10,
inclusive,

              Defendants.

Case No. 5:24-cv-00073-KK-DTB

**PLAINTIFFS' NOTICE AND MOTION FOR PARTIAL SUMMARY AJUDICATION**

**(1) NOTICE OF MOTION**

**(2) MEMORANDUM OF POINTS AND AUTHORITIES**

**(3) DECLARATION OF AASHISH DESAI**

[*Plaintiffs' Separate Statement of Uncontroverted Facts & Conclusions of Law; Declarations of Jordan Orozco Madero, Esteban Orosco, Donald Lyon, Jose Rea, Anthony Klish, and Lenny Fleshler filed and [Proposed] Order lodged concurrently herewith*]

**HEARING:**

Judge:     Hon. Kenly Kiya Kato
Date:      September 19, 2024
Time:     9:30 a.m.
Location:  Courtroom 3

Complaint Filed:  January 12, 2024

# NOTICE OF MOTION

**TO THE HONORABLE KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE, AND TO DEFENDANT AND ITS COUNSEL OF RECORD:** NOTICE IS HEREBY GIVEN that on September 19, 2024, at 9:30 a.m., in Courtroom 3 (3rd Floor) of the George E. Brown, Jr. United States Courthouse, 3470 12th Street, 3rd Floor, Courtroom 3, Riverside, CA 92501, Plaintiffs Jordan Orozco Madero and Esteban Orosco (collectively, "Plaintiffs") hereby move pursuant to F.R.C.P. Rule 56(a) for partial summary adjudication as to McLane Foodservice, Inc.'s ("McLane" or "MFS") liability on their claim for overtime under FLSA, 29 U.S.C. § 207; the issue of damages to be decided by the Court after an appropriate hearing or trial. McLane cannot meet its burden by "clear and convincing" evidence to establish its affirmative defense that Plaintiffs were exempt from the FLSA under the Motor Carrier Act ("MCA") exemption, 29 U.S.C. § 213(b)(1). Plaintiffs did not drive outside of California when delivering goods to the in-state franchises and the goods Plaintiffs transported within the state of California were not part of a continuous movement in interstate commerce. As such, the Court should grant this Motion for Summary Adjudication on the issue of *liability* on the FLSA, 29 U.S.C. § 207 claim.

This Motion is made following the required conference of counsel pursuant to Local Rule 7-3 and pursuant to the Court's Order staying this matter to allow the parties to explicitly conduct "limited discovery" on the Motor Carrier Act defense,

i

an exemption from the FLSA that McLane asserted prevented the claims altogether. ECF. No. 23 (March 13, 2024 Order). Also pursuant to the Court's Order stating that it expects the parties to file Motions for Partial Summary Judgment addressing the Motor Carrier exemption.  *Id.*

The Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, the concurrently-filed supporting Declaration of Aashish Y. Desai, the Court's file and records in this action, and such other evidence and arguments as may be made or presented at or before the hearing on this Motion.

Respectfully submitted,

Dated:  August 21, 2024                    DESAI LAW FIRM, P.C.

By: */s/ Aashish Y. Desai*
Aashish Y. Desai
Adrianne DeCastro
Attorneys for Plaintiffs

# **TABLE OF CONTENTS**

NOTICE OF MOTION ............................................................................................. i

TABLE OF AUTHORITIES ................................................................................. iv

I.  INTRODUCTION .......................................................................................... 1

II.  STATEMENT OF MATERIAL FACTS ....................................................... 2

    A.  The Parties ........................................................................................... 2

    B.  Defendant Did Not Pay an Overtime Premium for Overtime Hours Worked When Plaintiffs worked in excess of 40 Hours per Workweek ......................................................................................... 2

    C.  Defendant Cannot Demonstrate that Plaintiffs are Exempt Under the MCA Exemption to the FLSA ....................................................... 3

        1.  Plaintiffs Did Not Drive Outside the State of California When Delivering Goods to the In-State Franchises ……….....................….3

        2.  Plaintiffs Solely Intrastate Transportation Was Not Part of a "Continuous Movement in Interstate Commerce."……………….…4

III.  ARGUMENT ................................................................................................. 9

    A.  Standard of Review for Sumary Judgment on a FLSA Exemption ............................................................................................. 9

    B.  Defendant Cannot Meet the Elements of the MCA Exemption ......... 10

        1.  Plaintiffs never "transported" goods in interstate Commerce.……………………………………………………….11

        2.  Plaintiffs Purely Intrastate Transportation Was Not Part of a Continuous Movement in Interstate Commerce……………………..12

            *i. Defendant Admits its Shippers Did Not Maintain the Requisite Fixed and Persistent Transportation Intent to assert the MCA Exemption*……………………………....……12

        3.  McLane Fails the Legal Test to Determine if Purely Intrastate Transportation is in Interstate Commerce ……………………….…13

        4.  Plaintiffs Were Not Reasonably Expected to Cross State Lines…………………………………………………………….15

        5.  The Goods Had Come to Rest in California before Plaintiffs' Involvement…………………………………………….19

IV.  CONCLUSION............................................................................................. 22

WORD COUNT CERTIFICATION ...................................................................... 23

DECLARATION OF AASHISH Y. DESAI ......................................................... 24

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .......................................................................... 10

*Arnold v. Ben Kanowski Inc.,*
   361 U.S. 388 (1960) ............................................................................ 9

*Baird v. Wagoner Transp. Co.,*
   425 F.2d 407 (6th Cir. 1970) ......................................................... 11, 13

*Baltimore & OSWRR v. Settle,*
   260 U.S. 166 (1922) .......................................................................... 12

*Barrentine v. Arkansas-Best Freight Sys., Inc.,*
   450 U.S. 728 (1981) ............................................................................ 9

*Bishop v. Petro-Chemical Transp., LLC,*
   582 F. Supp. 2d 1290 (E.D. Cal. 2008) ............................. 15, 16, 17, 18

*Donovan v. Nekton, Inc.,*
   703 F.2d 1148 (9th Cir. 1983) ......................................................... 1, 9

*Martin v. Indiana Michigan Power Co.,*
   381 F.3d 574 (6th Cir. 2004) ............................................................. 9

*McGee v. Corporate Express Delivery Sys,*
   2003 U.S. Dist. LEXIS 20855 (N.D. Ill., Nov. 20, 2003) ................... 17

*McLeoad v. Threlkeld,*
   319 U.S. 491, 494 (1943) .................................................................. 20

*Morris v. McComb,*
   332 U.S. 422 (1947) .......................................................................... 16

*Musarra v. Digital Dish, Inc.,*
   454 F.Supp.2d 692 (S.D. Ohio 2006) ................................................ 12

*Reich v. Am. Driver Serv., Inc.,*
   33 F.3d 1153 (9th Cir. 1994) ................................................. 15, 16, 18

*S. Pac Trans. Co. v. ICC*,
  565 F.2d 615 (9th Cir. 1977) ................................................................. 14

*Veliz v. Cintas Corp.*,
  No. C 03-1180 RS, 2009 U.S. Dist LEXIS 36328 (N.D. Cal. Apr. 23, 2009) ..... 18

*Walling v. Jacksonville Paper Co.*,
  317 U.S. 564 (1943) ............................................................... 19, 20, 21

*Watkins v. Ameripride Services*,
  375 F.3d 821 (9th Cir. 2004) ................................................................. 21

R<span style="font-variant:small-caps">ULES</span>

29 U.S.C. § 207 ...................................................................... 1, 21

29 U.S.C. § 213(b)(1) ................................................................. 1, 10

29 U.S.C. §§ 206(a), 207(a) .............................................................. 20

29 USC §207(a)(1) ......................................................................... 9

49 U.S.C. § 13102(15) ..................................................................... 3

49 U.S.C. § 13501 ........................................................................ 10

49 U.S.C. § 13501(1)(A) .................................................................. 11

49 U.S.C. § 31502 ........................................................................ 10

FRCP 56(a) ................................................................................ 8

R<span style="font-variant:small-caps">EGULATIONS</span>

29 C.F.R. § 782.2(a) ..................................................................... 10

29 CFR § 782(b)(2) ....................................................................... 13

29 CFR 782.2(d) .......................................................................... 10

29 CFR 782.7(b)(2) ....................................................................... 12

46 Fed. Reg. 37.902, 37.903 (1981) ...................................................... 18

## MEMORANDUM OF POINTS AND AUTHORIES

### I.    INTRODUCTION

This is an action for unpaid overtime wages brought pursuant to the Fair Labor Standards Act ("FLSA"). *See* ECF No. 1. Plaintiffs worked for Defendant McLane Foodservice, Inc. ("Defendant" or "McLane") as delivery drivers who delivered food and other products to Defendant's customers in California. Defendant failed to pay Plaintiffs an overtime premium for hours worked over 40 in any given workweek throughout their employment. Defendant asserts as an affirmative defense that Plaintiffs were exempt from the FLSA under the Motor Carrier Act ("MCA") exemption, 29 U.S.C. § 213(b)(1).

The undisputed material facts demonstrate Defendant cannot meet its burden of proof by "clear and convincing" evidence and cannot establish that Plaintiffs meet each and every element of the MCA exemption affirmative defense. *Donovan v. Nekton, Inc.*, 703 F.2d 1148, 1151 (9th Cir. 1983). First, Plaintiffs never drove outside of California when delivering goods to the in-state franchises. Second, Defendant cannot meet the so-called "interstate prong" of the MCA exemption because the goods Plaintiffs transported within the state of California were not part of a continuous movement in interstate commerce. As such, the Court should grant this Motion for Summary Adjudication on the issue of *liability* on the FLSA, 29 U.S.C. § 207 claim – the issue of damages to be decided by the Court after an appropriate hearing or trial.

## II.    STATEMENT OF MATERIAL FACTS

### A.    The Parties

Defendant, McLane, is a Texas-based logistics and transpiration company that, inter alia, "purchas[es] food and other products from Suppliers for resale and distribution to retail outlets." *See* Answer, ECF No. 46, ¶ 2; Corporate FRCP 30(b)(6) Representative Jeff Hayes Deposition ("Hayes Dep."), attached at **Exh. A**, 13:7-16, 14:7-14, 17:15-23. Plaintiff Madero worked for McLane from January 2019 to September 2023 as an employee within the meaning of the FLSA out of Defendant McLane's Riverside distribution center. Plaintiff Orosco worked for McLane from July 2018 to November 10, 2023 as an employee within the meaning of the FLSA out of Defendant McLane's Riverside distribution center. Plaintiffs' primary duty was to safely drive trucks and pick-up food and other products <u>from</u> McLane's "general inventory" at its *in-state* distribution center and deliver those products <u>to</u> *in-state* retail franchisees.

### B.    Defendant Did Not Pay an Overtime Premium for Overtime Hours Worked When Plaintiffs worked in Excess of 40 Hours per Workweek

Defendant compensated Plaintiffs on a piece-rate formula, primarily based upon the miles driven and stops made. Plaintiffs worked in excess of forty hours in one or more workweeks during the relevant time period. Declaration of Jordan Orozco Madero ("Madero Decl.") ¶ 12; Declaration of Esteban Orosco, ("Orosco Decl.") ¶ 11; Declaration of Donald Lyons ("Lyons Decl."), ¶ 8; Rea Decl. ¶ 10; MFS0000546-549 (samples of Orosco's paystubs showing no OT pay for OT hours);

MFS 00004057, 4065, 5077, 4089 (samples of Madero's paystubs showing no OT pay for OT hours). Defendant did not compensate its drivers, including Plaintiffs, overtime premium pay of time-and-a-half their regular rate of pay when they worked overtime hours. *Id.*

### C. Defendant Cannot Demonstrate that Plaintiffs are Exempt Under the MCA Exemption to the FLSA

Defendant asserts that its drivers are exempt from the FLSA's overtime provisions based on the MCA exemption. *See* Answer, ECF No. 46; Def's Responses to Interrogatories, No. 8, attached at **Exh. F**.

#### 1. Plaintiffs Did Not Drive Outside the State of California When Delivering Goods to the In-State Franchises

Defendant is a Motor Private Carrier as defined in 49 U.S.C. § 13102(15). Hayes Dep., 25:21-26:15 (McLane pays for all product itself, then resells and delivers it by private motor carrier at prices that include its own internal costs -i.e., a profit); Answer, ECF No. 46.

Plaintiffs accepted an assignment for an interstate route at the outset of their employment. However, since March 2, 2022 for Plaintiff Madero, and since November 2021 for Plaintiff Orosco, they were assigned local routes and **_never_** drove outside of California when delivering goods to the in-state franchises. Madero Decl., ¶ 4; Orosco Decl., ¶ 5; HOS records attached to Tiblier Decl. ISO McLane's MTD, Exh. C.; Tiblier Dep., 66:15-22[1] (local routes have "no possibility of going out of

---

[1] Deposition transcript of Defendant's corporate representative Marcus Tiblier is attached to Desai Decl., as **Exh. B**.

state"). Defendant assigns routes based upon a seniority system. It is not random. Tiblier Dep., 17:19-18; MFS-0006128 (Riverside DC 103 Spring 2023 Route Bidding Guidelines; "bidding by length of service."; "teammates are NOT allowed to swap their routes with on-call teammates"). The overwhelming majority of Defendant's routes are local: 30-40 out-of-state routes compared to 280-290 local routes. Tiblier Dep., 20:12-21. Drivers place individual "bids" for assignments to their preferred routes based upon a seniority system. Tiblier Dep., 17:19-18:8. Routes are assigned for six-month periods. And drivers are expected to fulfill their obligations and finish each six-month assignment. Tiblier Dep., 29:19-31:1. Drivers do not have to bid on interstate routes – it is voluntary. Tiblier Dep., 21:6-17; 22:11-19 (no discipline for not taking such routes). In fact, there is no evidence that Defendant's drivers are expected to take any route assigned. Tiblier Dep., 21:6-17, 22:11-19, 25:12-20, 29:2-25.

### 2. Plaintiffs Solely Intrastate Transportation Was Not Part of a "Continuous Movement in Interstate Commerce."

Defendant owns and operates a distribution center in Riverside, California. Tiblier Dep., 36:24-37:10. Plaintiffs began their workday by loading their trucks from Defendant's Riverside distribution center. Tiblier Dep., 36:16-20. After numerous discovery hearings to obtain information as to whether the products Plaintiffs transported were part of the "continuous movement in interstate commerce," Defendant agreed to prepare and produce a "sample custom report

reflecting the movement of products, from origin location to customer, that were

transported by Plaintiffs." *See* ECF No. 66, pg. 2 (Def's Status Report).

| C_NAME | CUST_ID | CUST_NM | STATE | SHIP_DT | DELV_DT | RTE_NUM | STOP_NUM | ORDER | VNDR_ID | VNDR_NM | VNDR_CITY | VNDR_STATE |
|--------|---------|---------|-------|---------|---------|---------|----------|-------|---------|---------|-----------|-----------|
| VERSIDE | 295241 | #3463 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 20 | 57818575 | 353233 | SIMMONS FOODS INC | GENTRY | AR |
| VERSIDE | 287958 | KFC #C301034 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 80 | 57818686 | 298322 | PEPSI COLA COMPANY | BERNARDINO | CA |
| VERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 352700 | LAMB WESTON SALES INC | BOARDMAN | OR |
| VERSIDE | 273771 | PIZZA HUT #024894 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 90 | 57820756 | 112851 | GENERAL MILLS INC | JOPLIN | MO |
| VERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 305602 | CARGILL INC | FULLERTON | CA |
| VERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 305620 | DARIFAIR FOODS INC | PHOENIX | AZ |
| VERSIDE | 295937 | TACO BELL #028721 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 70 | 57818010 | 293652 | FOODSERVICE INC | HAMMOND | IN |
| VERSIDE | 129980 | TACO BELL #002763 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 40 | 57813090 | 293652 | FOODSERVICE INC | HAMMOND | IN |
| VERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 10 | 57808569 | 274005 | MONIN | LARGO | FL |
| VERSIDE | 287958 | KFC #C301034 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 80 | 57818686 | 358642 | J R SIMPLOT COMPANY | CALDWELL | ID |
| VERSIDE | 334541 | PIZZA HUT #024839 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 30 | 57819075 | 344480 | KINEXO RT | RIVERSIDE | CA |

Defendant's supplemental production MFS-0006942.[2]

    The shippers identified by Defendant are separate entities with no corporate

affiliation or ties to Defendant. Hayes Dep., 44:8-19 (everybody is their own entity,

independent of each other). Defendant's corporate representative while explaining

the sample custom report identifies the **shipper** of various products to Defendant's

Riverside distribution center:

    Q:   Okay. And Simmons Food *shipped* these products **directly** to the Riverside distribution center, correct?

    A:   As far as I know, to my expertise, **yes**.

Tiblier Dep., 40:22-24.

    Q:   Okay. Simmons Foods *shipped* the product **directly** to the distribution, **not to the individua**l Buffalo Wild Wings store, correct?

    A:   **Correct**.

---

[2] McLane intends to file an application to submit this document under seal. (MFS-0006942).

Tiblier Dep., 43:4-7.

Q:   Okay. And that **same process** is true for **any of the shippers** if I went down the list, correct?

A:   **Correct**.

***

Q:   And all those **shippers** follow the **same pattern** that we just talk about, correct?

A:   **Correct**.

Q:   Okay. And the pattern I'm talking about is that they will *ship* it **directly** to the distribution center. The distribution center will take those products. It will Inventory it. It will take **control** over it. It will then **store them**. And then based upon the **separate orders** it gets from the individual stores, it will then put them on a truck and then distribute them, correct?

A:   **Correct**.

Tiblier Dep., 47:4-24.

For example, Defendant explained that shipper, Simmons Foods, Inc. ("Simmons Foods") according to **one order** ships boxes of chicken wings from Gentry, Arkansas **directly to** Defendant's distribution center in Riverside, California. Tiblier Dep., 43:4-7, 46:4-24, 48:4-10. In general, Defendant McLane receives, inventories, and stores the shipped products at its Riverside distribution center. Thereafter, McLane **resells** and delivers the products – i.e., chicken wings, subject to **separate orders** from Defendant McLane's retail customers like Buffalo Wild Wings. Hayes Dep., 24:2-5 (all products are for resale); Taub Dep., 36:3-7 (same); Tiblier Dep., 46:22-47:24.

As such, Simmons Foods (like every other shipper) lacks the requisite fixed and persistent intent for a **continuous** movement in interstate commerce concerning

any goods that Plaintiffs transported *beyond* the distribution center. Tiblier Dep. 40:22-24, 43:4-7, 46:4-24, 47:4-24, 48:4-10; Hayes Dep., 24:2-5 (all products are for resale); Taub Dep., 36:3-7 (same). In fact, Defendant admits that products it receives at its Riverside distribution center remain in "general inventory" *unless and until* the local franchises in California place *separate* orders for those products, which McLane then **resells** on the retail market for a profit. *See* Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Corporate FRCP 30(b)(6) Representative Mike Taub Deposition ("Taub Dep."), attached at **Exh. C**, 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7.

For example, Defendant's retail customer Buffalo Wild Wings Director of Human Resources for SC Wings Buena Park, LLC, a franchisee of Buffalo Wild Wings testified that his stores places separate orders "via an online system" where a restaurant employee "looks at the inventory in their individual store and then determines what products are needed to replenish the inventory based upon needs and expected business." Declaration of Anthony Klish, ¶3.[3]

There are no pre-orders. Dec of Anthony Klish, ¶3 (restaurants "do not have pre-set orders to McLane for products"); Declaration of Lenny Flesher, ¶¶2-6 (same for Chick-fil-A, Inc.). Once the goods are shipped by shippers to Defendant's distribution center, they are under Defendant's control, and are inventoried and stored. Hayes Depo., 17:15-23, 33:15-18; Tiblier Dep., 44:1-17. Defendant does not

---

[3] All third-party declarations are filed concurrently.

track or otherwise maintain even the most basic records regarding the interstate journey of any of its products – i.e., the date a shipper starts delivery of a particular product from outside the state of California to its Riverside distribution center. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18.

Defendant admits that even after it receives and stores the shipped products, it does not track the actual products on their interstate journey (only the pallets or boxes they come in) or maintain chain of custody – i.e., know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 36:8-25; Tiblier Dep., 61:21-62:18.

Defendant's customers **do not pre-order products**. Rather the retail franchises have scheduled visits and **purchase** the products via an application over the internet from Defendant McLane's "general inventory." Put another way, the determination as to what products a particular customer wants to order on a scheduled visit is made at the retail customer's location with a **separate and independent retail order** based upon the particular needs of the particular store. Hayes Depo., 14:7-14, 17:15-23, 18:20-21:13, 37:11-14; Taub Depo., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7; Dec. of Anthony Klish, ¶ 3; Dec. of Lenny Fleshler, ¶¶ 2-6. Defendant admits the same process applies to all the products it receives and delivers. Tiblier Dep., 47:4-24.

//

//

8

### III.   ARGUMENT

#### A.   Standard of Review for Summary Judgment on a FLSA Exemption

Generally, FRCP 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The purpose of the FLSA is to protect workers from substandard wages and oppressive working hours. *Barrentine v. Arkansas-Best Freight Sys., Inc*., 450 U.S. 728, 739 (1981). The FLSA requires employers to pay its employees "at least a rate not less than one and one-half times the regular rate" for work exceeding forty hours per week. *See* 29 USC §207(a)(1). Here, Defendant did not pay Plaintiffs an overtime premium, and asserts as an affirmative defense that Plaintiffs are exempt from the FLSA under the MCA. See ECF. No. No. 46 (Answer, No. 13).

FLSA exemptions *are* "**narrowly construed against the employers** seeking to assert them and their application limited to those establishments **plainly and unmistakably** within their terms and sprit." *Arnold v. Ben Kanowski Inc*., 361 U.S. 388, 392 (1960) (emphasis supplied). Defendant bears the burden of proving the MCA exemption applies. *Donovan v. Nekton, Inc*., 703 F.2d 1148, 1151 (9th Cir. 1983).

"The employer bears not only the burden of proof, but also the burden on each element of the claimed exemption." *Martin v. Indiana Michigan Power Co*., 381 F.3d 574, 578 (6th Cir. 2004). "**Because the burden of proof is shifted, (Plaintiff) is**

**entailed to summary judgment <u>unless</u> the defendant can come forward with evidence at least creating a genuine issue of material fact as to whether (Plaintiff) meets <u>each and every</u> element of the exemption**." *Id.* at 578 (emphasis supplied). A "mere existence of a scintilla of evidence" in support of the non-movant's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B. Defendant Cannot Meet the Elements of the MCA Exemption

An exemption to the FLSA overtime provisions exists for certain employees over whom the Secretary of Transportation ("SOT") has power to establish qualifications and maximum hours of service pursuant to 49 U.S.C. § 31502. *See* 29 U.S.C. § 213(b)(1). The MCA exemption is triggered, if two requirements are met:

> (1) the employee is employed by a carrier "whose transpiration of passengers or property by motor vehicle is subject to the jurisdiction under section 204 of the" MCA; **and** (2) the employee "engage(s) in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]."

29 C.F.R. § 782.2(a). The first prong is at issue here. The SOT has jurisdiction over such "transportation" of property transported by motor private carriers "(1) between a place in (A) a State and a place in another state:" and "(B) a State and another place in the same State **through** another State …" 49 U.S.C. § 13501 (emphasis supplied). "Thus, the activities of drivers … in connection with transportation which is not in

interstate [] commerce within the meaning of the [MCA] provide no basis for

exemption under section 13(b)(1) of the [FLSA]," 29 CFR 782.2(d).

### 1. Plaintiffs Never "Transported" Goods in Interstate Commerce

Here, it is undisputed that Plaintiffs **never** drove outside the state of California

when delivering goods to the in-state franchises. Madero Decl., ¶ 4; Orosco Decl., ¶

5; HOS records attached to McLane's Motion to Dismiss, Decl. of Marcus Tiblier

Decl, Exh. C.; Tiblier Dep., 66:15-22 (local routes have "no possibility of going out

of state"). Rather, Plaintiffs were assigned purely local routes *only after* the goods

had come to rest at McLane's in-state distribution center. *See* Hayes Depo., 17:15-

23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-

22:14, 36:3-7. Tiblier Dep., 44:1-17 (confirming products McLane receives at its

Riverside distribution center remain in "general inventory" *unless and until* the local

franchises in California place *separate* orders for those products.). Other "opt-in"

drivers confirm that they too drove exclusively local routes, worked overtime hours

but did not receive premium overtime compensation: indeed, Defendant claims a

blanket MCA exemption for all its *local routes*. *See* ECF Nos. 32, 34, 38, 44,

(Consent to Join forms); Answer, ECF No. 46. Accordingly, Plaintiffs did not

"transport" any property as defined in 49 U.S.C. § 13501(1)(A) from California to

another state when delivering goods to the in-state franchises.

//

//

11

### 2. Plaintiffs' Purely Intrastate Transportation Was Not Part of a Continuous Movement in Interstate Commerce

#### i. Defendant Admits its Shippers Did Not Maintain the Requisite Fixed and Persistent Transportation Intent to Assert the MCA Exemption

The MCA exemption applies to drivers whose purely intrastate transportation is "part of a continuous movement in interstate commerce." *Baird v. Wagoner Transp. Co*., 425 F.2d 407, 410 (6th Cir. 1970). The Court explained:

> The Interstate Commerce Commission has held that transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor or water from an origin in a different State is not in interstate or foreign commerce within the meaning of Part II of the Interstate Commerce Act if the **shipper** has no fixed and persisting transportation intent **beyond** the terminal storage point **at the time of shipment**.

*Id*. at 410; 29 CFR 782.7(b)(2) (emphasis supplied). Thus, to assert the MCA exemption affirmative defense, Defendant will need to prove by "clear and affirmative evidence" that its shippers, like Simmons Foods, maintains a fixed and persistent transportation intent *at the time of shipment* of its goods from Arkansas **beyond** McLane's California warehouse (i.e., to McLane's customer's through Plaintiffs' transportation) to claim Plaintiffs' purely intrastate driving was a "**continuous** movement in interstate commerce" from Arkansas. *See Musarra v. Digital Dish, Inc*., 454 F.Supp.2d 692, 796 (S.D. Ohio 2006) ("[A] crucial factor in determining the character of a particular shipment is the 'original and persisting intention of the shippers.'") citing *Baltimore & OSWRR v. Settle*, 260 U.S. 166, 174 (1922). Here, Defendant admits that its shippers, including Simmons Foods, do not maintain a "fixed and persistent transportation intent" at the time of shipment *beyond*

its shipment to McLane's in-state distribution center. Tiblier Dep. 40:22-24, 43:4-7, 46:4-24, 47:4-24, 48:4-10; Hayes Dep., 24:2-5 (all products are for resale); Taub Dep., 36:3-7 (same). Accordingly, Plaintiffs are not subject to the MCA exemption.

### 3. McLane Fails the Legal Test to Determine if Purely Intrastate Transportation is in Interstate Commerce

As shown, Plaintiffs are not subject to the MCA exemption, nonetheless we address the remaining factors below for purposes of summary judgment. Courts use the following test to determine whether purely intrastate transportation is in interstate commerce:

> The Commission has specifically found that there is no fixed and persisting intent where (i) **at the time of shipment** there is no **specific order** being filled for a **specific quantity** of a given product to be moved through to a specific destination **beyond** the terminal storage, and (ii) the terminal storage is a **distribution point** or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of the distribution within the single State is specifically arranged only **after sale or allocation from storage**.

*Baird*, 425 F.2d at 410-11; *see also* 29 CFR § 782(b)(2). If there is no such intent on the part of the shipper, the interstate movement of commodities under the MCA ends with delivery to the storage facility, here Defendant's in-state distribution center. *Id.* at 410-11.

With respect to the first factor, "at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage." Rather, Defendant admits: (1) its retail customers **do not pre-order** products, but rather the determination as to what

products a particular in-state franchisee (Taco Bell, KFC, Chick-fil-A) wants to order is made by separate order depending on individual store needs;[4] (2) the food and other product shippers' intent is to send shipments **directly to McLane's in-state distribution center** and not to a "specific destination beyond" the warehouse; and (3) the goods are stored as "general inventory" at McLane's in-state distribution center unless and until there is a *subsequent* order from an in-state franchisee. *S. Pac Trans. Co. v. ICC*, 565 F.2d 615, 617 (9th Cir. 1977) (holding that the "essential nature" of the shipment is determined by the **shipper's** "fixed and persisting transportation intent" **at the time of shipment**).

Factor two. Defendant concedes and produced documentation that Defendant's warehouse in California is a distribution point. Tiblier Depo, 36:24-37:10 (McLane owns distribution center). Moreover, once Simmons Foods (or any other shipper) ships their goods to Defendant's warehouse, the goods are under Defendant McLane's control and inventoried. Hayes Dep., 25:21-26:15; (McLane purchases products from supplier and Participant (i.e. restaurant) purchases from McLane); Hayes Dep., 25:21-26:15 (McLane pays for all product itself, then resells and delivers it by private motor carrier at prices that include its own internal costs - i.e., a profit). Defendant then further takes the goods out of the *continuous* "stream of commerce" when it **resells** all the food and other products from its in-state

---

[4] There are no pre-orders. Dec of Anthony Klish, ¶3 (restaurants "do not have pre-set orders to McLane for products"); Declaration of Lenny Fleshler, ¶¶2-6 (same for Chick-fil-A, Inc.).

14

distribution center to in-state franchises. Hayes Dep., 24:2-5 (all products are for resale); Taub Dep., 36:3-7 (same).

As for the third factor, the transportation in furtherance of distribution within California of the shippers' goods is specifically arranged *after* sale or allocation from storage. Defendant's in-state retail customers do not pre-order products; rather, Defendant McLane's customers have scheduled visits, and **separately order** the products out of McLane's "general inventory" via the internet based solely on the particular needs of the store. Thus, the goods are arranged for final disposition well *after* their shipment from shippers like Simmons Foods; there is no "specific order being filled" for a "specific quantity of a given product" to be moved through to a specific destination *beyond* the terminal storage.

**4.  Plaintiffs Were Not Reasonably Expected to Cross State Lines**

"A driver is considered to be driving in interstate commerce if the driver is called upon to drive in interstate commerce as part of the driver's regular employment, or, even if the driver has not personally driven in interstate commerce, if because of company policy and activity, the driver could reasonably be expected to drive in interstate commerce." *Bishop v. Petro-Chemical Transp., LLC,* 582 F. Supp. 2d 1290, 1298 (E.D. Cal. 2008). "As such, if a carrier does interstate work and assigns drivers randomly to that driving, all of its drivers are considered subject to the Motor Carrier Safety Act." *Id*. However, the driver is not subject to the MCSA if "there is no possibility of driving interstate, or the possibility is remote." *Reich*, 33

F.3d at 1156 (stating that "if the employee's minor involvement can be characterized as de minimis, that employee may not be subject to the Secretary of Transportation's jurisdiction at all.").

Determining the character of interstate driving involves an analysis of "the method by which the employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intrastate employee activity." *Bishop*, 582 F.Supp.2d at 1298.

Ever since *McComb*, courts have recognized the significance of the indiscriminate assignment of interstate trips. *Morris v. McComb*, 332 U.S. 422, 433-34 (1947); *See Reich*, 33 F.3d at 1154 ("[Defendant] indiscriminately assigned any interstate travel to its drivers using a 'first in, first out' method, and therefore, all of its drivers reasonably could have been expected to engage in interstate commerce"); *Bishop*, 582 F.Supp.2d at 1301-02 (noting the significance of indiscriminate assignment of interstate routes). Here, the interstate routes were not "indiscriminately assigned" or subject to random selection. Instead, the routes were **all voluntarily** based upon a bidding process where seniority was a prime factor. Tiblier Dep., 17:19-18:8. No driver was forced to bid on or accept an interstate route. Tiblier Dep., 21:6-17. And once drivers accepted their local routes, they were expected to stay on that route for a six-month period during which it would be impossible to simultaneously drive out-of-state. Tiblier Dep., 29:19-31:1.

Defendant McLane's business model entails "purchasing food and other products from Suppliers for resale and distribution to retail outlets" – as such, the bulk of McLane's business involves local in-state retail distribution. Accordingly, and consistent with this conclusion, the percentage of interstate-to-intrastate routes shows that any possibility of interstate driving is remote. Tiblier Dep., 20:12-21 (only 30-40 interstate routes compared with 280-290 intrastate routes: little over 10% interstate versus 90% local). These factors also support finding that Plaintiffs were not reasonably expected to cross state lines. *Cf. Bishop*, 582 F.Supp.2d at 1298.

Defendant may argue that certain emergency situations might require Plaintiffs (and other local drivers) to "be ready to travel" interstate "at all times." Nonsense. First, Defendant's corporate witness testified that McLane has a separate pool of drivers that assist with unexpected situations, much like a voluntary "substitute teacher" pool – situations that rarely arise since all routes (including interstate) are voluntarily assigned through the bidding process. Tiblier Dep., 25:12-20. Second, Plaintiffs were expected to continue their local routes for **six-month terms** so they could not have accepted any interstate route during this time period. But third, and perhaps most important, "[t]hat unexpected vacancies may be filed indiscriminately does not establish that all drivers could at some time travel interstate routes." *McGee v. Corporate Express Delivery Sys,* 2003 U.S. Dist. LEXIS 20855 at *6 (N.D. Ill., Nov. 20, 2003). Here, Plaintiffs did not reasonably expect to travel out-of-state due to any of the policies McLane had in place. Just the opposite: McLane instituted a

bidding process, gave its drivers a choice of whether to accept out-of-state trips, never required drivers to accept such routes, never disciplined anyone for refusing such routes, and had plenty of out-of-state drivers ready to handle the minimal interstate routes on its docket – that is *not* mandatory, indiscriminate scheduling. *Bishop*, 582 F.Supp.2d at 1301-02.

Finally, because Plaintiffs drove an interstate route at the beginning of their employment, Defendant will likely argue that they were subject to driving interstate runs "at all times" as part of their "regular job duties." To begin, that is not true for all the reasons discussed above. But even if the MCA exemption applied, it would not carry the day *forever*; instead, the MCA exemption is only triggered for a **four-month period**. *Reich v. Am. Driver Serv., Inc*., 33 F.3d 1153, 1156 (9th Cir. 1994) (quoting 46 Fed. Reg. 37.902, 37.903 (1981)) ("Evidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to [DOT Jurisdiction] for a 4-month period from the date of the proof."); *Veliz v. Cintas Corp.,* No. C 03-1180 RS, 2009 U.S. Dist. LEXIS 36328, *36-37 (N.D. Cal. Apr. 23, 2009) (using the four-month test to determine whether plaintiffs participated in interstate commerce to apply MCA exemption).

Here, Plaintiffs Madero and Orosco's last out-of-state trip was on March 3, 2022 and November 28, 2021 respectively. Madero Decl., ¶ 4; Orosco Decl., ¶ 5; HOS records attached to Tiblier Decl. ISO McLane's MTD, Exh. C. Given that

18

Madero's employment ended on September 11, 2023, and Orosco's ended on November 10, 2023, each would have 18 months and 23 months where they *only drove local runs*. *Id.* As such, using the four-month test, Defendant McLane would have FLSA liability for Plaintiff Madero for **14 months** (18-4), and Plaintiff Orosco for **19 months** (23-4). *Riech*, 33 F.3d at 1156. Of course, McLane's corporate witness testified that DOT driving records could easily show which drivers accepted interstate trips during which period, making application of this test fairly simple for any driver who "opts-in" to this case under 29 U.S.C. § 216(b). Tiblier Dep.,65:17-20, 69:8-13. Thus, this attack fails as well.

### 5. The Goods Had Come to Rest in California before Plaintiffs' Involvement

The facts establish that the interstate journey (if any) of the goods Plaintiffs transported ended *prior to* and *independent* of Plaintiffs' involvement with those goods. In fact, some products were from California and some out-of-state. But McLane does not keep, nor does it know the breakdown between in-state versus out-of-state products that Plaintiffs transported on their local routes. Tiblier Dep., 38:21-39:14. Their involvement with those goods commenced only *after* the goods had come to rest in California, where they sat until franchises in California placed orders for the goods. Because Plaintiffs never crossed state lines when delivering goods to the in-state franchises, Plaintiffs are not "engaged in foreign or interstate commerce" for purposes of the MCA.

The Supreme Court has drawn a clear line between goods moved from "manufactures or suppliers without the state, through [a] warehouse and on to customers whose *prior order or contracts* are being filed," *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943) (emphasis supplied), and goods "acqui[red] by a merchant for *general local disposition*." *McLeoad v. Threlkeld*, 319 U.S. 491, 494 (1943) (emphasis supplied). The former are "engaged in" interstate commerce, while workers handling the latter are not. *Walling*, 317 U.S. at 566 (quoting 29 U.S.C. §§ 206(a), 207(a); *McLeod*, 319 U.S. at 493 (same).

In *Walling*, a wholesaler imported out-of-state paper products for sale to in-state customers. 317 U.S. at 569. SCOTUS held that products obtained to fill "*prior orders or contracts*" remained in the stream of commerce for purposes of the FLSA until final delivery to the customer, even if those products were temporarily held at the wholesaler's warehouse. *Id*. (emphasis supplied). By contrast, the Supreme Court held that products obtained and held at the wholesaler's warehouse for *subsequent* order and delivery to in-state customers were no longer in the stream of commerce – and that the workers making those deliveries were therefore not "engaged in [interstate] commerce." *Id*. at 569-70. The Court reached this conclusion despite acknowledging that the wholesaler's manager "ha[d] a fair idea of when and to whom the merchandise w[ould] be sold" "before placing his orders"; the manager was "able to estimate with considerable precision the immediate needs of his customers even where they d[id] not have contracts calling for future deliveries"; "most of the

customers form[ed] a fairly stable group"; and the "orders [we]re recurrent as to the kind and amount of merchandise." *Id.* at 569. For this Court, that evidence was simply insufficient to demonstrate "that the goods in question were different from goods acquired and held by a local merchant for local disposition." *Id*. at 570.

Here, no "prior orders or contracts are being filled." *Walling*, 317 U.S. 569. Instead, the undisputed record shows that the products shipped to Defendant McLane's Riverside distribution center are held in "general inventory" until and – most crucially – *unless* they are *subsequently* ordered by the in-state stores. *See* Hayes Depo., 14:7-14, 17:15-23, 18:20-21:13, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Since the Plaintiffs are not directly involved moving products across state lines, they are not engaged in interstate commerce, even if the goods they deliver previously crossed state lines, and even if the intended recipients of those goods are predictable or well-defined. *See Walling*, 317 U.S. at 569-70; *Watkins v. Ameripride Services*, 375 F.3d 821, 827 (9th Cir. 2004) (uniforms that came from out of state to fill subsequent, in-state orders placed by in-state customers were not delivered in interstate commerce because the uniforms "were taken from general inventory after the customer made an order"). As such, the interstate journey of the products (if any) ended when the products were placed in "general inventory" at McLane's in-state distribution center *prior to* and *independent* of Plaintiffs' involvement with those goods.

//

1

## IV.    CONCLUSION

2

3

Plaintiffs, therefore, respectfully request the Court grant their Motion for

4

Summary Adjudication on the issue of *liability* on the FLSA, 29 U.S.C. § 207 claim

5

– the issue of damages to be decided by the Court after an appropriate hearing or trial.

6

7

Respectfully submitted,

8

Dated:  August 21, 2024                    DESAI LAW FIRM, P.C.

9

10

By:  */s/ Aashish Y. Desai*

11                                                        Aashish Y. Desai
                                                          Adrianne DeCastro
12                                                        Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATION**

The undersigned, counsel of record for Plaintiffs, hereby certifies that this brief

contains 5,112 words, which complies with the word limit of L.R. 11-6.1.


                                              _/s/ Aashish Y. Desai_
                                              Aashish Y. Desai

## <u>DECLARATION OF AASHISH Y. DESAI</u>

I, Aashish Y. Desai, declare as follows:

1.      I am managing partner of Desai Law Firm, P.C., lead counsel for Plaintiffs in the above-entitled action. I am admitted to practice before all state courts throughout California and Texas. I am also admitted to practice before numerous federal courts throughout the nation, including the Central District of California, the Ninth Circuit Court of Appeals, and the United States Supreme Court. If called as a witness, I could, and would testify to the following matters, which are based upon my personal knowledge. I submit this declaration in support of Plaintiffs' Motion for Partial Summary Adjudication.

2.      Attached here to as **Exhibit A** are true and correct copies of excerpts from the deposition of Defendant's corporate representative Jeff Hayes.

3.      Attached here to as **Exhibit B** are true and correct copies of excerpts from the deposition of Defendant's corporate representative Marcus Tiblier.

4.      Attached here to as **Exhibit C** are true and correct copies of excerpts from the deposition of Defendant's corporate representative Mike Taub.

5.      Attached here to as **Exhibit D** are true and correct copies of excerpts from Defendant's document production.

6.      Attached here to as **Exhibit E** are true and correct copies of excerpts from Plaintiffs' document production.

7.    Attached here to as **Exhibit F** is a true and correct copy of Defendant's Responses to Special Interrogatories.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this declaration was executed this 21st day of August at Costa Mesa, California.

*/s/ Aashish Y. Desai*
Aashish Y. Desai, Declarant

# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    JORDAN OROZCO MADERO and      )
     ESTEBAN OROSCO on behalf of  )
5    themselves and all others    )
     similarly situated,          )
6                                 )        CERTIFIED COPY
                    Plaintiffs,   )
7                                 )
       vs.                        )  Case No.
8                                 )  5:24-cv-00073-KK-DTB
     McLANE FOODSERVICE, INC., a  )
9    Texas Corporation, and DOES  )
     1-10, inclusive,             )
10                                )
                    Defendants.   )
11   _____)

12

13

14

15      VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

16                      JEFF HAYES

17                   AUGUST 15, 2024

18

19

20

21

22

23
     Reported by:
24   VICTORIA A. GIFFORD
     CSR 10328
25   No. 24-140533A

```
 1          Q.    Okay.  It administers purchasing programs and
 2    other projects for KFC National Purchasing Co-op,
 3    Pizza Hut National Purchasing Co-op, and Taco Bell
 4    National Purchasing Co-op, collectively the
 5    concept co-ops; right?
 6          A.    Yes.
 7          Q.    Okay.  And then the third "Whereas" is where
 8    you finally get to what McLane does; right?
 9          A.    Yes.
10          Q.    Okay.  So distributor --
11                And that's McLane; right?
12          A.    Yes.
13          Q.    -- is in the business of purchasing food and
14    other products from suppliers for resale and
15    distribution to retail outlets; correct?
16          A.    Yes.
17          Q.    Okay.  How does that work, exactly?
18          A.    They have the relationship, they negotiate
19    with suppliers, they select suppliers and tell us at
20    what price and from whom to purchase.
21          Q.    Who is the "they"?
22          A.    RSCS.
23          Q.    Okay.  So you purchase -- McLane originally
24    purchased food through RSCS to be distributed -- or to
25    be shipped to the distribution center; correct?
```

08:33  5
08:34  10
08:34  15
08:34  20
08:35  25

| | 1 | MR. KANE:  Objection.  Misstates his |
| | 2 | testimony.  He did not refer to -- |
| | 3 | THE REPORTER:  He did not refer to what? |
| | 4 | MR. KANE:  Food. |
| 08:35 | 5 | BY MR. DESAI: |
| | 6 | Q.   You can answer. |
| | 7 | A.   We purchase items for the restaurants as |
| | 8 | designated by the purchasing co-op, the RSCS. |
| | 9 | Q.   Okay.  And then it says that it -- you |
| 08:35 | 10 | purchase it for resale; correct? |
| | 11 | A.   Correct. |
| | 12 | Q.   And who do you resell it to? |
| | 13 | A.   KFC, Taco Bell, Pizza Hut restaurants. |
| | 14 | Q.   Okay.  Let's keep going. |
| 08:36 | 15 | Now, I think the next-to-last "Whereas," it |
| | 16 | says, RSCS both negotiates agreements with suppliers |
| | 17 | providing for the price and other terms pursuant to |
| | 18 | which suppliers will sell products to operators and |
| | 19 | their designated distributors for resale to operators |
| 08:36 | 20 | for use in the retail outlets; correct? |
| | 21 | A.   Correct. |
| | 22 | Q.   Is that how the process works, according to |
| | 23 | you? |
| | 24 | A.   Yes. |
| 08:36 | 25 | Q.   Okay.  So when they're talking about their |

14

THE SULLIVAN GROUP OF COURT REPORTERS

```
 1    understand it, but --

 2              THE REPORTER:  One moment.

 3              (Record read as follows:

 4              Q.  When the products are being

 5              shipped to the distribution

 6              center in Riverside, California,

 7              they're not being shipped for a

 8              specific customer retail order;

 9              correct?)

10              MR. KANE:  Same objections.

11              THE WITNESS:  Yeah, I'm not sure that I

12    understand the -- I'm not sure I understand the

13    question.

14         BY MR. DESAI:

15         Q.  As the products go to the Riverside

16    distribution center, all the products are inventoried

17    and stored at the Riverside distribution center;

18    correct?

19         A.  Correct.

20         Q.  After that, pursuant to a separate order for

21    resale for a specific quantity, they are then shipped

22    or delivered to their specific destination; correct?

23         A.  Correct.

24         Q.  So no order at the distribution center is

25    being made for, example, 14 boxes of chicken wings from
```

08:40    5
08:40    10
08:40    15
08:41    20
08:41    25

|   |   |   |
|---|---|---|
| | 1 | Simmons Food for Buffalo Wild Wings, Store No. 103 in |
| | 2 | Rancho Cucamonga; correct? |
| | 3 |         MR. KANE:  Objection.  Outside the scope of |
| | 4 | the witness's 30(b)(6) topic. |
| 08:41 | 5 |         You can answer if you understand and know the |
| | 6 | answer. |
| | 7 |         THE WITNESS:  Yeah, I don't. |
| | 8 |     BY MR. DESAI: |
| | 9 |     Q.   You don't understand the question? |
| 08:41 | 10 |     A.   Yeah, I do not. |
| | 11 |     Q.   Okay.  If a Buffalo Wild Wings store in |
| | 12 | Rancho Cucamonga wanted a -- 14 boxes of chicken wings, |
| | 13 | they would have to make a separate order for that to |
| | 14 | McLane; correct? |
| 08:42 | 15 |         MR. KANE:  Same objection. |
| | 16 |         THE WITNESS:  Correct. |
| | 17 |     BY MR. DESAI: |
| | 18 |     Q.   And as the goods are sitting in the retail -- |
| | 19 | scratch that. |
| 08:42 | 20 |         As the goods are sitting in the distribution |
| | 21 | center, unless and until there's an order from retail, |
| | 22 | the products stay at the Riverside distribution center; |
| | 23 | correct? |
| | 24 |         MR. KANE:  Same objection. |
| 08:42 | 25 |         THE WITNESS:  In most cases, but not all. |

<pre>
      1            BY MR. DESAI:

      2            Q.   Explain that answer.

      3            A.   I'm probably not the subject matter expert on

      4       that.

08:43 5            MR. KANE:  Counsel, for the record, this line

      6       of questioning falls squarely within Deponent No. 3's

      7       designated topic for this afternoon.  I'm not exactly

      8       sure why you're asking this witness about it.  If you

      9       have questions about the terms of the distribution and

08:43 10      other service agreements, can you please ask them?

      11           MR. DESAI:  Matt, please allow the deponent

      12      to answer if he knows.

      13           MR. KANE:  He's answered.

      14      BY MR. DESAI:

08:43 15           Q.   What's your response?

      16           MR. KANE:  You can have the court reporter

      17      read his response back?  He's not --

      18           MR. DESAI:  Matt, please don't engage in --

      19           MR. KANE:  He's not going to answer over and

08:44 20      over again.  You've got his answer.

      21      BY MR. DESAI:

      22           Q.   What was your answer again?

      23           MR. KANE:  You can get it from the court

      24      reporter.

08:44 25           MR. DESAI:  Matt, I don't want to fight with
</pre>

```
 1   you on the record.  We're in Federal Court.  No

 2   speaking objections.

 3              MR. KANE:  This is not a speaking objection.

 4   You're -- you asked your question.  He gave you his

 5   answer.  Ask your next question or get the court

 6   reporter to read it back to you.

 7              MR. DESAI:  Let's read back the last question

 8   and answer, please.

 9              THE REPORTER:  One moment.  It's a little bit

10   more than the last question and answer.

11              (Record read as follows:

12              Q.  As the goods are sitting in

13              the distribution center, unless

14              and until there's an order from

15              retail, the products stay at the

16              Riverside distribution center;

17              correct?

18              MR. KANE:  Same objection.

19              THE WITNESS:  In most cases, but

20              not all.

21              BY MR. DESAI:

22              Q.  Explain that answer.

23              A.  I'm probably not the subject

24              matter expert on that.)

25   ///
```

08:44
08:44
08:45
08:45
08:45

```
 1        BY MR. DESAI:
 2        Q.   What do you mean by "most cases, but not
 3   all"?
 4        A.   Again, I'm not the subject matter expert on
 5   that.
 6        Q.   But, in most cases, the product will stay
 7   there until there -- unless and until there's an order
 8   from the retail store to have it delivered; correct?
 9             MR. KANE:  Objection.  Asked and answered at
10   least two times now.
11        BY MR. DESAI:
12        Q.   You can answer.  Is that correct?
13        A.   Correct.
14        Q.   How long are the items stored before they are
15   actually delivered?
16             MR. KANE:  Objection.  Outside the scope of
17   this witness's 30(b)(6) topic.
18        BY MR. DESAI:
19        Q.   You can respond.
20        A.   Yeah, I wouldn't -- I wouldn't, again, be the
21   subject matter expert on that.
22        Q.   I mean, does McLane know how long a
23   particular product is on the shelf before they're
24   actually picked up by a specific driver to be
25   delivered?
```

```
 1   that to anybody other than to who they're supposed to;

 2   correct?

 3        A.   We do not.

 4        Q.   Okay.  Let's move on.  I'll call it page 4

 5   here, but it's McLane Foodservice 6213.  This is

 6   another section of the Master Distribution Agreement.

 7             MR. KANE:  There's many sections on this

 8   page.  Which one are you referring to?

 9             MR. DESAI:  I'm referring to -- just a

10   minute, Matt.  I will tell him.

11        BY MR. DESAI:

12        Q.   "Payments to Suppliers."  Do you see that

13   section?

14        A.   Yes -- sorry, no.  Wait a minute.  We just

15   lost it.  All right.  We're back.  Yes.

16        Q.   Okay.  It says, Distributor shall promptly

17   pay suppliers for products pursuant to the payment

18   terms set forth in the applicable SBRA as communicated

19   to distributor by the -- that group that gets together

20   and purchases things.

21             So McLane actually pays for all these

22   products that it has at its distribution center?

23        A.   Yes.

24        Q.   And then it resells that product to the

25   retail outlets and gets the price back for that?
```

08:51  (line 5)
08:51  (line 10)
08:52  (line 15)
08:52  (line 20)
08:52  (line 25)

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
|          | 1  | A.    Yes.                                              |
|          | 2  | Q.    So when the products are shipped to the          |
|          | 3  | distribution center, who pays for the transportation   |
|          | 4  | charges?                                                |
| 08:52    | 5  | A.    We would pay that, initially.                    |
|          | 6  | Q.    You would pay that, and then you would get        |
|          | 7  | reimbursement from the resale?                          |
|          | 8  | A.    Yes.                                              |
|          | 9  | Q.    Or that would be sort of baked into the          |
| 08:53    | 10 | price?                                                  |
|          | 11 | A.    Correct.                                          |
|          | 12 | Q.    It's not a line item, in other words.  The       |
|          | 13 | cost of transportation is just another cog of doing    |
|          | 14 | business; correct?                                      |
| 08:53    | 15 | A.    Correct.                                          |
|          | 16 | Q.    Is it -- to me, this is sort of sounding a       |
|          | 17 | little bit like a -- a grocery store for the retail    |
|          | 18 | outlets.  Is that a good way of looking at it?         |
|          | 19 | A.    No.  I wouldn't characterize it that way.        |
| 08:53    | 20 | Q.    Okay.  Why not?  Where did my analogy fail?      |
|          | 21 | A.    We are bringing products only specifically       |
|          | 22 | for their needs and the specific products that they    |
|          | 23 | have designated.  So they're not shopping a book of    |
|          | 24 | products.  We are bringing the specific products that  |
| 08:54    | 25 | they ask us to stock for them.                         |

1    the wrong page.  Got it.  Go ahead.

2        BY MR. DESAI:

3        Q.   Okay.  Do you see where it says "Pallets" up

4    there kind of towards the top?

09:04    5        A.   Yes.

6        Q.   Okay.  What is that section talking about?

7    I'll let you read it if you need to.

8        A.   Yeah, give me -- when product is shipped from

9    a supplier into our distribution center, the -- there

09:05   10   is a cost the supplier charges for the pallet that the

11   product sits on.  So we pay the supplier for that.  We

12   typically would resell those.  And they, being the

13   customer, get the benefit of the value of that.  It's

14   subtracted from -- from the -- from the overall price.

09:05   15       Q.   Once the shipper sends the product to the

16   Riverside distribution center, McLane takes control of

17   that product from there?

18       A.   Yes.

19       Q.   Okay.  Moving on to page 9, 6218, it says,

09:06   20   "Distributor Price Updates and GPS."  I'll let you take

21   a look at that, and I'm going to ask you to explain

22   that to me as well.  Let me know when you're ready.

23       A.   Okay.  Just a second.  So GPS is the

24   electronic tool that the purchasing co-op for Yum! uses

09:07   25   to notify us of who -- the supplier they have selected

|    |    |
|----|----|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:13 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:13 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:13 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:14 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 09:14 | 25 |

1   this.  Participants shall place orders by telephone or

2   by electronic order system in a manner reasonably

3   acceptable to participants and distributor.  Right?

4        A.   Yes.

5        Q.   This is what I was talking about earlier

6   where the retail outlets place their orders, using

7   computers, to the distribution center.  Agreed?

8        A.   Agreed.

9        Q.   Is that what this section is talking about?

10       A.   Yes, it is.

11       Q.   Okay.  So until the participants place their

12   order, the goods sit at the distribution center;

13   correct?

14       A.   Correct.

15       Q.   All right.  Moving on to the next page, which

16   is 13, Bates stamp 6222, "Deliveries."  Do you see

17   that?

18       A.   Yes.

19       Q.   And it says, Distributor --

20            That's, McLane; right?

21       A.   Yes.

22       Q.   -- shall deliver ordered products to the

23   applicable retail outlets in accordance with the

24   applicable brand schedule or otherwise mutually agreed

25   in writing by the distributor and any applicable

```
 1
 2                    (CONFIDENTIAL PORTION ENDS.)
 3               MR. DESAI:  Okay.  Go to page 35, Matt, 6244.
 4               MR. KANE:  One sec.
09:28  5               THE WITNESS:  Went the wrong way.  There we
 6  go.
 7      BY MR. DESAI:
 8      Q.   Okay.  "Relationship of the Parties."  Take a
 9  look at that.  It says, Distributor -- that's McLane --
09:28 10  is an independent contractor with respect to the
11  performance of its obligations hereunder.  Correct?
12      A.   Yes.
13      Q.   And nothing shall create a partner, principal
14  and agent, or joint venture between the parties;
09:28 15  correct?
16      A.   Correct.
17      Q.   Everybody is their own entity, independent of
18  each other; correct?
19      A.   Correct.
09:29 20      Q.   Okay.  And let's go towards the end, page 38.
21  There's a signature page there; correct?
22      A.   Yes.
23      Q.   And it's signed by the Restaurant Supply
24  Chain Solutions, LLC; correct?
09:29 25      A.   Yes.
```

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

JORDAN OROZCO MADERO and ESTEBAN )
OROSCO on behalf of themselves   )
and all others similarly         )
situated,                        )
                                 )
             Plaintiffs,         )
                                 )
     vs.                         )        Case Number
                                 )   5:24-cv-00073-KK-DTB
McLANE FOODSERVICE, INC., a      )
Texas Corporation, and           )
DOES 1-10, inclusive,            )
                                 )
             Defendants.         )
_____  )

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF

MARCUS TIBLIER

COSTA MESA, CALIFORNIA

AUGUST 9, 2024

Reported by:
WENDI J. VALLARINO
CSR 9337, RPR, CRR
Number 24-140466

```
 1        A    Yes.

 2        Q    It's very important that you give me truthful

 3   answers to these questions.

 4             You understand that; correct?

 5        A    Yes.

 6        Q    If you don't understand a question, you can

 7   ask me to rephrase and I'll rephrase.

 8             Do you understand that?

 9        A    I understand.

10        Q    If you need to take a break to use the

11   restroom, let me know and I'll take a break to use the

12   restroom.

13             Do you understand that?

14        A    Yes.  And I appreciate it.

15        Q    Okay.

16             But if you respond to a question, I'm going to

17   assume you understood it; is that fair?

18        A    That's fair.

19        Q    Could you explain the bid process to me.

20        MR. KANE:  Objection.  Vague and ambiguous.

21        THE WITNESS:  The bid process is how teammates or

22   drivers are assigned work.

23        Q    BY MR. DESAI:  Okay.  And could you be a

24   little more specific than that.

25        A    Okay.  Happens roughly every six months.
```

09:49  5
09:49  10
09:50  15
09:50  20
09:50  25

```
 1   Drivers get to pick routes that are available to them
 2   based on seniority.
 3       Q    Okay.  So drivers get to bid on a particular
 4   route that they may want to accept?
 5       A    Yes.
 6       Q    And these routes are assigned for six-month
 7   periods, you say?
 8       A    Roughly.
 9       Q    Other than seniority, what else are the
10   biddings based on?
11       A    That's the main driving -- that's the main
12   driving factor of bidding is seniority.
13       Q    So if I get that right, the longer you've been
14   there, the higher up the bid process you are, the
15   sooner you get to bid on the route that you may want?
16       A    Yeah.
17       Q    In other words, it's a preferred position to
18   be one of the first to get to be able to bid --
19       A    Yes.
20       Q    -- on a route?
21            Okay.  Do you know the routes that the
22   plaintiffs bid on when they were employed at McLane?
23       A    Through a report, yes, I can find that.
24       Q    But did you run that report?
25       A    Yeah.
```

09:51   5
09:51   10
09:51   15
09:51   20
09:52   25

18

```
 1    not yet been marked as an exhibit.
 2        THE WITNESS:  I can't tell by the report which one
 3    this is for.
 4        Q    BY MR. DESAI:  Okay.  But you do know 118 is a
 5    local route; correct?
 6        A    I do.
 7        Q    Okay.
 8             And so when the plaintiffs took the local
 9    route, it -- they never drove out of the state of
10    California while they were on route 118; correct?
11        A    Correct.
12        Q    How many interstate routes does McLane have?
13        A    It varies.  Routes change.  Route -- the
14    amount of routes change from bid to bid.
15        Q    Approximately, as compared to the local
16    routes.
17        A    30 to -- between 30 and 40, depending.
18        Q    30 and 40 out-of-state routes?
19        A    Yeah.
20        Q    And how many local routes?
21        A    I'd say 280, 290, depending.
22        Q    Okay.  So af- -- if you're in the bidding
23    process, where in the process do the out-of-state trips
24    get taken, if there is any?
25        A    Throughout the whole process.
```

09:53    5
09:53   10
09:54   15
09:54   20
09:54   25

```
  1       Q    Excuse me?

  2       A    Throughout the whole process.

  3       Q    Okay.  No rhyme or reason to this; they get

  4  taken when they get taken?

  5       A    Yeah.

  6       Q    Okay.  And the drivers are not required to bid

  7  on an out-of-state route; correct?

  8       A    No.

  9       Q    They can bid on whatever route they want?

 10       A    Whatever is available.

 11       Q    Okay.  Drivers are never forced to take an

 12  interstate route, are they?

 13       A    Yes.

 14       Q    When?

 15       A    The only instance where that could happen is

 16  if they are the last person on call and an interstate

 17  route needs to be covered.

 18       Q    Has that ever happened?

 19       A    Yes.

 20       Q    When?

 21       A    For these two individuals?

 22       Q    Yeah.  For those two individuals.

 23       A    I can't recall specifically.  It's just a

 24  practice we have.

 25       Q    So for those two individuals, they've never
```

|  | 1 | had to be the last person there to accept an interstate |
|  | 2 | route? |
|  | 3 | MR. KANE:  Objection.  Misstates his testimony. |
|  | 4 | Asked and answered. |
| 09:55 | 5 | Q    BY MR. DESAI:  You can answer. |
|  | 6 | A    I don't know if they've been in that position. |
|  | 7 | Q    You've never seen it; correct? |
|  | 8 | MR. KANE:  Same objection. |
|  | 9 | THE WITNESS:  I -- I can't recall specifically if |
| 09:56 | 10 | they have or not. |
|  | 11 | Q    BY MR. DESAI:  Has McLane ever disciplined a |
|  | 12 | driver for not taking an interstate route? |
|  | 13 | A    Not specifically for taking [verbatim] an |
|  | 14 | interstate route but if they refuse the route and |
| 09:56 | 15 | they're last on call. |
|  | 16 | Q    I'm talking about an interstate route.  Has |
|  | 17 | any -- has McLane ever disciplined a driver for not |
|  | 18 | accepting an interstate route? |
|  | 19 | A    Not unless they were last on call, no. |
| 09:56 | 20 | Q    Has that ever happened, that someone was last |
|  | 21 | on call and you told them that they had to take the |
|  | 22 | interstate route -- |
|  | 23 | A    Mm-hmm. |
|  | 24 | Q    -- and they said no and they were disciplined? |
| 09:56 | 25 | That you recall. |

          1       A    Very hard to deliver.  Very time consuming,

          2   hard parking.  Takes a very experienced, competent

          3   driver to get in and out of casinos.

          4       Q    Okay.  So you've had a situation where that

09:59     5   route was not accepted?

          6       A    Mm-hmm.

          7       Q    Because it was too hard?

          8       A    Mm-hmm.

          9       Q    Then what do you do?

09:59    10       A    Then it goes to the on-call bracket drivers

         11   and it gets assigned daily.

         12       Q    On-call bracket?

         13       A    Yeah.  Bracket drivers are just drivers that

         14   didn't have any routes during the bid.  So they just

09:59    15   have a position every day that they get called to say,

         16   "This is what's available to be covered today.  Pick

         17   what you may."  And it has its own small seniority

         18   based on what position they are in the brackets.

         19       Q    Kind of like a substitute teacher for the day?

09:59    20       A    Yeah.

         21       Q    Can you have a route that you bid on and also

         22   be a driver for the on-call bracket?

         23       A    Mm-hmm.

         24       Q    You have to answer --

09:59    25       A    Yes.  I'm sorry.  Yes.

25

```
        1        A     Yes.
        2        Q     Okay.  And if that route by the end of the bid
        3   process is not selected, will McLane assign that route
        4   to someone or will it continue to ask for volunteers?
10:03   5        A     It gets assigned daily.
        6        Q     Okay.  So at that point, McLane will step in
        7   and assign the route daily to drivers, saying this is
        8   what needs to happen?
        9        A     It just goes into the bracket drivers.
10:03  10        Q     Oh.
       11        A     So --
       12        Q     Okay.
       13        A     Yeah.
       14        Q     And the bracket driver, again, a volunteer
10:03  15   group of drivers who primarily didn't have a bid route
       16   accepted and so they're willing to do just the daily
       17   drives that they can get, you know, catch-as-catch-can?
       18        A     Yeah.
       19        Q     Okay.
10:04  20              McLane expects its drivers to complete the
       21   route assignments for a six-month period; correct?
       22        A     Roughly six months.
       23        Q     But they expect the drivers to complete it
       24   from beginning to end; correct?
10:04  25        A     Correct.
```

29

          1        Q    Drivers cannot accept the routes for a month,

          2   for example, or two months at a time.  If you accept

          3   the route, you accept it for six months?

          4        A    With one contingency.

10:04     5        Q    What's that?

          6        A    They can drop a route.

          7        Q    Okay.  Other than dropping a route, they can't

          8   change the time duration of the route?

          9        A    No.

10:04    10        Q    In other words, the terms are not negotiable

         11   in the bid process by McLane?

         12        MR. KANE:  Objection.  Vague and ambiguous as to

         13   "terms."

         14            You can answer if you understand.

10:05    15        THE WITNESS:  I don't really understand.

         16        Q    BY MR. DESAI:  I mean the -- the amount that

         17   you pay for the bid and the fact that they have to

         18   accept the route for a six-month period of time, those

         19   terms are not negotiable?

10:05    20        A    Correct.

         21        Q    Just to put a point on it, a driver can't come

         22   in and say I'll -- I'll accept that bid but for just

         23   three months and then I'll take another job for another

         24   two months and then maybe I'll take another job for

10:05    25   another month?

1    A    No.

2        MR. KANE:  Objection.  Vague and ambiguous as to

3    "job."

4            You can answer if you understand.

10:05  5    Q    BY MR. DESAI:  A route.

6    A    That's not allowed.  It's not standard.

7    Q    What about the trucks?  How are the trucks

8    assigned to the drivers?

9    A    Trucks are assigned -- let me see the easiest

10:06  10   way to explain this.

11           Trucks are classified based on mileage.  So

12   usually there's an A class, a B class, and a C class.

13   And the reason we do that is to rotate the trucks to

14   keep the same mileage on them.  So we don't send the

10:06  15   same trucks far over and over again and then generate

16   more mileages in less time.  So depending on the

17   mileage that the -- the driver's bid runs, the complete

18   mileage, they qualify for a certain class of tractor to

19   pick from.

10:06  20   Q    Do drivers pick a new truck every time or do

21   they get assigned one for the duration of the route?

22   A    Explain "every time."

23   Q    If it's a six-month route, every day, every

24   time they take the trip, daily.

10:07  25   A    Once they go through the tractor bid process,

        1       A    There's two in Riverside, including us.

        2       Q    Is that the complete list?

        3       MR. KANE:  Same objection.  Outside the scope of

        4    his 30(b)(6) topics.

10:13   5       THE WITNESS:  They just changed the names of all of

        6    them recently.  There's one called Inland, but I'm not

        7    exactly sure of the city.

        8       Q    BY MR. DESAI:  What do you do at the

        9    distribution center?

10:13  10       A    Transportation manager.

       11       Q    Tell me generally what that means.

       12       A    I'm in charge of all things in the

       13    transportation department; so managing the drivers,

       14    managing any employee that falls under the

10:13  15    transportation department, managing supervisors,

       16    day-to-day operations for trans.

       17       Q    What else?

       18       A    I go to a lot of meetings.  A lot.  The scope

       19    of my job is to manage all operations under the

10:14  20    transportation wing of the building.

       21       Q    And how long have you been doing that?

       22       A    Officially in the transportation manager

       23    title, six months.

       24       Q    Okay.  The Riverside distribution center is

10:15  25    owned and operated by McLane; correct?

1        MR. KANE:  Objection.  Vague and ambiguous as to

2    "McLane."

3        Q    BY MR. DESAI:  McLane Foodservice.

4        A    Yes.

10:15    5        Q    McLane Foodservice sets the rules for the

6    Riverside distribution center?

7        MR. KANE:  Objection.  Vague and ambiguous as to

8    "the rules."

9            You can answer if you understand it.

10:15   10        THE WITNESS:  Yes.

11        Q    BY MR. DESAI:  Is there any processing or

12    substantial product modification that occurs at the

13    distribution center?

14        A    No.

10:15   15        Q    Tell me generally what you do at the

16    distribution center, what -- what it functions for

17    McLane Foodservice.

18        MR. KANE:  Objection.  Asked and answered.

19        THE WITNESS:  I think we're the receiving products

10:16   20    and the last mile stop to our customers, delivering

21    last mile to our customers.

22        Q    BY MR. DESAI:  You also provide storage

23    services?

24        MR. KANE:  Objection.  Vague and ambiguous as to

10:16   25    "storage services."

```
           1              Do you see that?
           2      A       Simmons Foods?
           3      Q       The first line entry.
           4      A       For the vendor.
10:18      5      Q       Okay.
           6      A       Mm-hmm.
           7      Q       So this shipper is located in Gentry,
           8    Arkansas?
           9      A       As the report states, yes.
10:18     10      Q       Okay.  And they shipped -- does it look like
          11    chicken wings -- right? -- fresh?
          12      A       Yes, sir.
          13      Q       Is that the product?
          14      A       Yes, sir.
10:19     15      Q       That's in the item description.
          16              Do you see that?
          17      A       Yes, sir.
          18      Q       And then there's a quantity too, 32.  What
          19    does that mean?
10:19     20      A       That was the amount of items on the -- that
          21    particular route.
          22      Q       Okay.  And Simmons Food shipped these products
          23    directly to the Riverside distribution center; correct?
          24      A       As far as I know, to my expertise, yes.
10:19     25      Q       Okay.  And do we know what date Simmons Foods
```

|  |  |
|---|---|
| | 1 |             You can answer if you understand.  I certainly |
| | 2 | don't. |
| | 3 |     THE WITNESS:  No. |
| | 4 |     Q    BY MR. DESAI:  Okay.  Simmons Foods shipped |
| 10:22 | 5 | the product directly to the distribution, not to the |
| | 6 | individual Buffalo Wild Wings store; correct? |
| | 7 |     A    Correct. |
| | 8 |     Q    Do the shippers, Simmons Food, track its load |
| | 9 | or product in any way? |
| 10:23 | 10 |     A    I don't have an answer to that.  I don't know. |
| | 11 |     Q    You don't have that information at McLane, |
| | 12 | whether it was tracked or not? |
| | 13 |     A    I don't know. |
| | 14 |     Q    So then McLane would have no way of knowing |
| 10:23 | 15 | which particular customer received which particular |
| | 16 | chicken wing from Gentry, Arizona [verbatim], to any |
| | 17 | individual particular store; correct? |
| | 18 |     A    I don't know. |
| | 19 |     Q    That's correct that McLane would not know that |
| 10:23 | 20 | information; correct? |
| | 21 |     A    No.  I'm saying I don't know if McLane would |
| | 22 | know that information. |
| | 23 |     Q    Do you know that information speaking on |
| | 24 | behalf of McLane? |
| 10:23 | 25 |     A    I don't have that information. |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Q    Okay.  Once the food item gets to McLane, what          |
|       | 2  | happens at that point?                                       |
|       | 3  | A    It gets labeled and dated as received and               |
|       | 4  | moved into a lot to be picked from.                          |
| 10:24 | 5  | Q    Is it inventory?                                         |
|       | 6  | A    Is it inventory?  Yeah.  Anything we receive            |
|       | 7  | is potentially inventory.                                    |
|       | 8  | Q    Is it tracked?                                           |
|       | 9  | A    When it gets received, yes.                             |
| 10:24 | 10 | Q    And it is stored -- correct? -- for shipping?           |
|       | 11 | A    Correct.                                                 |
|       | 12 | Q    When the products arrive at the distribution            |
|       | 13 | center, McLane then takes control of the products?          |
|       | 14 | A    Yes.                                                     |
| 10:24 | 15 | Q    So Simmons Food is out of the picture at that           |
|       | 16 | point; correct?                                              |
|       | 17 | A    Yes.                                                     |
|       | 18 | Q    Okay.  In this particular case, McLane has no           |
|       | 19 | tracking information for the shipment that Simmons           |
| 10:25 | 20 | Foods sent over, the 32 boxes of chicken wings;             |
|       | 21 | correct?                                                      |
|       | 22 | MR. KANE:  Objection.  Asked and answered.                   |
|       | 23 | He's already told you he doesn't know.                        |
|       | 24 | THE WITNESS:  I don't know.                                   |
| 10:25 | 25 | MR. DESAI:  Matt, do not testify.                            |

```
 1       Q    Okay.  So Pepsi-Cola also -- in this
 2  particular case, do you know how many products they
 3  shipped?
 4       A    Do I know how many we shipped to the customer
 5  or we received from Pepsi?
 6       Q    No.  You received from Pepsi.
 7       A    It comes on a large truckload.  I don't know
 8  the count of which the truckload is.
 9       Q    I'm saying can you use this -- can we use this
10  document to show any of that?
11       A    To show how big the order was that came in?
12       Q    Yes.
13       A    No.
14       Q    It says quantity here, weight, 54.2.
15            What does that mean?
16       A    That's how much they ordered.  It looks like
17  one of the -- the Pepsi BNB, and the weight of that one
18  box is 54.2 pounds.
19       Q    And that box was shipped directly to the
20  distribution center in Riverside; correct?
21       A    Yes.
22       Q    Okay.  From there, it is inventoried and
23  stored by McLane at its distribution center; correct?
24       A    Correct.
25       Q    And when separate orders come in for that
```

1    product, it is separately put on a truck and then

2    delivered to those customers; correct?

3        A    Correct.

4        Q    Okay.  And that same process is true for any

10:27    5    of the shippers if I went down the list; correct?

6        A    Correct.

7        Q    And so there's a General Mills, for example,

8    says dough.  There's potato waffles that are sent in by

9    Lamb Weston.

10:28    10        Do you see that?

11        A    Mm-hmm.  I do.

12        Q    And all those shippers follow the same pattern

13    that we just talked about; correct?

14        MR. KANE:  Objection.  Vague and ambiguous.

10:28    15        THE WITNESS:  Correct.

16        Q    BY MR. DESAI:  Okay.

17            And the pattern I'm talking about is that they

18    will ship it directly to the distribution center.  The

19    distribution center will take those products.  It will

10:28    20    inventory it.  It will take control over it.  It will

21    then store them.  And then based upon the separate

22    orders it gets from the individual stores, it will then

23    put them on a truck and then distribute them; correct?

24        A    Correct.

10:28    25        Q    Okay.  By the way, as -- let's stick -- go

1   back to the Simmons Food example --

2       A    Okay.

3       Q    -- on your sheet.

4            When Simmons Food sends over the chicken wings

10:29   5   to the distribution center, who pays for that, the

6   transportation, to get it from Arkansas to Riverside,

7   California?

8       A    I would imagine McLane, but I don't know.  I

9   don't know the specific entity that covers the

10:29  10   paychecks.

11      Q    Do you know how it is transported, i.e., by

12   common carrier?

13      A    Explain "common carrier."

14      Q    Interstate trucking.  I thought McLane was a

10:29  15   common carrier.  I was going to ask you that later.

16   But if you don't know --

17      A    Yeah.  I've never heard that term.  That term

18   is unfamiliar to me.

19      Q    How does the product get there?  Do you know?

10:29  20   I mean, they handle the shipping themselves?

21      MR. KANE:  You're asking about the chicken wings

22   from Simmons Foods --

23      MR. DESAI:  Correct.

24      MR. KANE:  -- specifically?

10:29  25      Q    BY MR. DESAI:  Specifically those, that.

```
 1   another Pizza Hut delivery.
 2        A    Line 12.
 3        Q    Line 12.  And it's the same item; right?
 4        A    No.  No, it's not.  It's a different item.
 5        Q    Different items.  Okay.
 6             But they made that delivery --
 7        A    At stop 3.
 8        Q    Okay.
 9             I guess my question is there's no way to know
10   what particular chicken wing from Gentry, Arkansas,
11   went to which particular Buffalo Wild Wings store;
12   correct?
13        MR. KANE:  Objection.  Outside the scope of the
14   witness's designated topics.
15        THE WITNESS:  No.  I don't -- yeah.  No.
16        Q    BY MR. DESAI:  And that's because the product
17   was never tracked by the shipper coming into the
18   Riverside district, the DC; correct?
19        A    Again, I told you I don't know if that's
20   shipped or not -- if it's tracked or not.
21        Q    Okay.  But McLane doesn't track or know which
22   McLane customer received a particular piece of chicken
23   purchased from Simmons Food; correct?
24        A    Down to the box, no.  To the lot it came in
25   on, yes.
```

Timestamps (left margin): 10:45 (line 5), 10:45 (line 10), 10:45 (line 15), 10:46 (line 20), 10:46 (line 25)

```
 1      Q    Okay.  Tracks the lot but not the box;
 2  correct?
 3      A    As far as I know, yes.
 4      Q    And that's true for all the products; correct?
 5      A    As far as I know.
 6      Q    Okay.
 7           So McLane wouldn't know which particular paper
 8  product or chicken breast or pizza dough it got and
 9  went to any particular individual customer?
10      MR. KANE:  Objection.  Asked and answered.  Also,
11  outside the scope of his designated 30(b)(6) topics.
12      THE WITNESS:  They can trace it back to the lot.
13      Q    BY MR. DESAI:  Not the product; correct?
14      A    Not the individual item is what you're asking
15  for?
16      Q    Yes.
17      A    Not that I'm aware of.
18      Q    Okay.
19      MR. DESAI:  Okay.  Why don't we take a short break.
20      THE VIDEOGRAPHER:  Stand by.
21           The time is 10:46 a.m.  We're off the record.
22           (A recess was taken from 10:47 a.m. to 10:59
23  a.m.)
24      THE VIDEOGRAPHER:  The time is 10:59 a.m.  We're
25  back on the record.
```

Timestamps in left margin: 10:46 (line 5), 10:46 (line 10), 10:47 (line 15), 10:47 (line 20), 11:00 (line 25)

1      A    I do not.

2      Q    You would be surprised to know if it was July

3    of 2018 to November of 2023; correct?  Does that sound

4    about right?

11:03    5      A    I don't know.

6      Q    You wouldn't dispute that, would you?

7      A    No.

8      Q    And Esteban, when he first started, took some

9    out-of-state routes; correct?

11:03   10      A    I believe so, yes.

11      Q    But then towards the end of his employment, he

12    only had a local route; correct?

13      A    Without reviewing his complete route history,

14    I couldn't tell you if that's correct or not.

11:03   15      Q    And when Esteban drove local 118, that was a

16    local route with no possibility of going out of state;

17    correct?

18      A    Correct.

19      Q    The same is true with Jordan Madero; correct?

11:04   20    He's got driving records that will show when he went

21    out of state and when he stayed in state; correct?

22      A    Correct.

23      Q    And, again, the records show that early in his

24    career, he took a couple of out-of-state routes; but

11:04   25    then at the end of his employment, he only took local

# EXHIBIT C

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    JORDAN OROZCO MADERO and      )
     ESTEBAN OROSCO on behalf of   )
5    themselves and all others     )
     similarly situated,           )
6                                  )        CERTIFIED COPY
                      Plaintiffs,  )
7                                  )
       vs.                         )  Case No.
8                                  )  5:24-cv-00073-KK-DTB
     McLANE FOODSERVICE, INC., a   )
9    Texas Corporation, and DOES   )
     1-10, inclusive,              )
10                                 )
                      Defendants.  )
11   _____)

12

13

14

15      VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

16                     MIKE TAUB

17                 AUGUST 15, 2024

18

19

20

21

22

23

     Reported by:
24   VICTORIA A. GIFFORD
     CSR 10328
25   No. 24-140533B

```
 1              MR. KANE:  Okay.

 2              MR. DESAI:  Sonia, can you come here for a

 3  second?  I'm looking for this.

 4              MS. NAVA:  Oh, not MS -- Madero -- oh, it's

 5  there.

 6              MR. DESAI:  Take a minute while she's

 7  uploading.  She got the right Bates-stamp number, but

 8  not the right person.  So we're looking for MFS-241.

 9              MR. KANE:  I had a feeling you were going to

10  say that.  That will save a lot of "I don't knows."

11              MR. DESAI:  Good.  Good.

12              MR. KANE:  Maybe.

13      BY MR. DESAI:

14      Q.   While she's doing that, Mike, could you just

15  tell me, generally, how McLane orders the food that it

16  resells?

17      A.   How we order the food?

18      Q.   Correct.

19      A.   We place purchase orders to our suppliers,

20  um, they deliver or we go -- we bring them to the

21  distribution center, and then we receive them in

22  inventory.

23      Q.   And once they're -- after they're in general

24  inventory, do you then get another order to then have

25  them delivered to the retail stores?
```

10:38  (line 5)
10:38  (line 10)
10:39  (line 15)
10:39  (line 20)
10:39  (line 25)

```
1        A.    The restaurants place orders that we deliver

2    to the restaurants.

3        Q.    The items that you deliver to the individual

4    restaurants, they're from the general inventory at the

10:40  5    Riverside distribution center?

6        A.    Help me understand what you're referring to

7    by "general inventory."

8        Q.    In other words, all the products that come

9    into the distribution center are all inventory.

10:40  10        A.    The products that we receive go into our

11    inventory.

12        Q.    That's what I mean by "general inventory."

13        A.    Okay.

14        Q.    Any time you get a shipment from anybody at

10:40  15    the Riverside distribution center, it has to go through

16    a -- the inventory process; correct?

17        A.    Depending on what the products would be.  The

18    products that we sell to our restaurants, yes.

19        Q.    Are there some products that do not get

10:40  20    inventoried?

21        A.    There would be, yeah.

22        Q.    What type of products are those?

23        A.    Supplies for the DC, shrink wrap and such.

24        Q.    Okay.  So other than what you might need to

10:41  25    just run the distribution center, all the items that
```

```
 1    come in from the suppliers that are used for the retail

 2    stores are all inventory and put into general inventory

 3    or -- or stored into general inventory?

 4         A.   They should be received into general

 5    inventory, yes.

 6         Q.   And from there, McLane then further processes

 7    the order based upon a separate order from the retail

 8    outlet that then tells you, specifically, what products

 9    they need, for example, for the week?

10         A.   The -- the restaurants would place orders to

11    the distribution center.  We would fulfill them and

12    deliver them to the restaurants.

13         Q.   Okay.  All right.  Let's see if we have this

14    up.

15              Aha.  Do you see now MFS-241?

16              MR. KANE:  Yes.

17         BY MR. DESAI:

18         Q.   Okay.  Could you explain what's going on

19    there?

20              MR. KANE:  With which page?  Oh, 241, you

21    said?

22              MR. DESAI:  241.

23              MR. KANE:  Okay.

24              THE WITNESS:  Can I -- help me, please,

25    again.  What are you -- what are you asking?
```

Timestamps: 10:41 (line 5), 10:41 (line 10), 10:42 (line 15), 10:42 (line 20), 10:42 (line 25)

1          BY MR. DESAI:

2          Q.   If you could -- first of all, have you ever

3      seen this document before?  It's a flow chart of sorts.

4          A.   I have.

10:42   5          Q.   Okay.  Could you explain it to me?

6          A.   I did not create it.  Um, but it looks like

7      the process and procedures for receiving and tracking,

8      um, inventory through our distribution center on the

9      inbound side, and then it says delivery to the

10:43  10     restaurant.

11         Q.   Okay.  So let's go through it one by one.  It

12     says, Scan unique McLane pallet label to track moves.

13              What does that mean?

14         A.   That's -- that's not the start of it.  But

10:43  15     it's -- after we -- after the first part, which is

16     receiving, which puts a label on the pallet, then our

17     warehouse teammates would scan the pallet label when

18     they're moving it from one location to another in the

19     distribution center.

10:43  20         Q.   Okay.  Let's start there.  Let's start with

21     242.  I think there's a slide that says "Receiving."

22              Do you see that?

23         A.   Yes.

24         Q.   Okay.  And it says the receiver records one

10:44  25     scan per expiration date for each pallet.  Correct?

|       |    |                                                                     |
|-------|----|---------------------------------------------------------------------|
|       | 1  | A.    That's what it says.                                          |
|       | 2  | Q.    Okay.  What does that mean?                                   |
|       | 3  | A.    It means the -- taken literal, it means the                  |
|       | 4  | receiver is going to scan one expiration date per                  |
| 10:44 | 5  | pallet with his hand-held.                                          |
|       | 6  | Q.    Okay.  So the -- once the items come in from                 |
|       | 7  | whoever is shipping it to you, you guys track the                  |
|       | 8  | pallet as soon as it comes in?                                     |
|       | 9  | A.    Yes, that's fair.                                            |
| 10:44 | 10 | Q.    Do you also track the individual products                    |
|       | 11 | that are contained within that pallet?                             |
|       | 12 | A.    When we receive and label the pallet, it                    |
|       | 13 | records a case count on the label.                                 |
|       | 14 | Q.    But not the individual products; correct?                   |
| 10:45 | 15 | A.    I'm not sure I understand the question.                     |
|       | 16 | Q.    Let's say you have a pallet and it has a lot                |
|       | 17 | of different items on it.  Let's say 36 boxes of                   |
|       | 18 | chicken wings.  Do you track each chicken wing                     |
|       | 19 | separately?                                                        |
| 10:45 | 20 | A.    Is it the same chicken wing with the same                   |
|       | 21 | code date?                                                         |
|       | 22 | Q.    I don't know.  I'm just asking.                             |
|       | 23 | A.    If the answer is yes, then we track it with                |
|       | 24 | one label.  If the answer is the code dates or the                |
| 10:45 | 25 | chicken wings are not the same product, then the answer           |

```
 1   is no.
 2        Q.   What do you mean by "the same code dates"?
 3        A.   Manufacturer date, expiration date.  If
 4   you're talking chicken wings, it would callously be
 5   called a kill date or a process date when it went from
 6   a chicken to a chicken wing.
 7        Q.   Typically, let's say -- you're familiar with
 8   Simmons Foods?
 9        A.   I have heard of them, yes.
10        Q.   Okay.  They ship chicken wings to the
11   distribution center in Riverside?
12        A.   They used to.  I don't think they do anymore.
13   They might.  I'm not aware if they do or not.
14        Q.   For Buffalo Wild Wings?
15        A.   Um, they used to.  I don't think they do
16   anymore, but I could be mistaken.
17        Q.   Do you know how Buffalo Wild Wings gets its
18   shipment today?
19        A.   For -- for chicken wings?  Um, I believe I
20   know who the supplier is, but I do not recall who
21   delivers them to us.
22        Q.   Okay.  Who is the supplier?
23        A.   I believe it's Peco Foods.
24        Q.   Okay.  So, as they send shipment in, do you
25   track each individual shipment from Peco Foods -- in
```

10:45   5

10:46   10

10:46   15

10:46   20

10:46   25

```
 1   received.

 2        Q.   And that's done for each product that, um,

 3   McLane receives; correct?

 4        A.   That we receive for restaurants, yes.

 5        Q.   Okay.  Moving on.  There's another slide that

 6   says "Inventory Movements," Bates-stamped 244.  Tell me

 7   what this means.

 8        A.   It means every time we move a pallet, we can

 9   scan the label with a from and a to, so we know where

10   it went and where we put it or where it came from and

11   where we put it.

12        Q.   Okay.  And so after you guys receive these

13   items, you give it -- you put a new label on it, and

14   then you go store it somewhere; correct?

15        A.   We put it away in a rack somewhere.

16        Q.   General inventory, in other words?

17        A.   Yes.  Yes, sir.

18        Q.   And so -- well, let's keep going.

19             Then selection time comes.  Bates stamp

20   No. 245.  And explain this slide to me.

21        A.   When we are going through selection, the

22   selector scans the case.  So he uses his, um -- his

23   wrist device.  Um, it's got a pointer.  He scans the

24   label on the case, um, and it prints labels for him

25   that he puts on the cases.
```

10:53  5
10:54 10
10:54 15
10:54 20
10:55 25

1        Q.    Okay.   When you say "selector," this is when

2    the retail grocery store -- not grocery, but the --

3    let's say the Taco Bell, for example.   They want

4    product.   They will put a specific order in.   When they

10:55    5    put a specific order in, you guys go in there and pick

6    out whatever they need from the general inventory;

7    correct?

8        A.    Yes.

9        Q.    And unless and until there's an order from

10:55   10    the retail outlet, those items would stay in general

11   inventory; correct?

12       A.    Not necessarily.

13       Q.    Where would they go?

14       A.    Well, if -- if you mean in the building,

10:56   15   yes --

16       Q.    I'm just saying they're not delivered,

17   they're not going anywhere unless they're subject to a

18   separate order.

19       A.    That's correct.   They -- well, I suppose the

10:56   20   other option is we could send them to another

21   distribution center.   We could -- what we call an

22   internal transfer.   We could do that.

23       Q.    They stay in McLane's control and possession

24   until and unless there is a separate order from a

10:56   25   retail outlet in which case then you deliver it to that

1    store; correct?

2         A.   Unless we transfer it to another distribution

3    center, and it could be out of our control in between

4    that break component.

10:56    5         Q.   So is my proposition correct with that

6    caveat?

7         A.   Can you repeat it, please?

8         Q.   Unless you ship it to another distribution

9    center, McLane will keep the items in the general

10:56    10   inventory unless and until there is a separate order

11   from a retail store asking for those items; correct?

12        A.   One other disclaimer is if, for some reason,

13   the product is expired and we can no longer ship it,

14   um, or, um, the brand entity tells us to stop shipping

10:57    15   it and we might throw it away or return it to the

16   supplier.  But other than that, yes.

17        Q.   Let's make sure it's clean.  So with the two

18   caveats, if it's expired or you have to move it to a

19   new distribution center, besides that, whenever the

10:57    20   products get to the distribution center in Riverside,

21   they're placed in general inventory, and they are not

22   moved unless and until there's a separate order from a

23   retail store to have those products delivered; correct?

24        A.   The other caveat is if it goes back to the

10:57    25   supplier.  So for some reason, it could be picked up

|    |    |
|----|----|
| | 1 | and returned to the supplier.  So if it's not |
| | 2 | transferred, expired and disposed, or returned to a |
| | 3 | supplier, then, yes, it stays in our inventory until it |
| | 4 | goes to a restaurant. |
| 10:58 | 5 | Q.   So I'll ask you one more time.  We got three |
| | 6 | caveats now.  If it has not been expired, if it is not |
| | 7 | moved to another distribution center or -- |
| | 8 | What's your third exemption? |
| | 9 | A.   Returned to a vendor or another third party. |
| 10:58 | 10 | Q.   -- or returned to a vendor or third party, |
| | 11 | the goods or items that get to the distribution center |
| | 12 | stay there unless and until there's a separate order |
| | 13 | from a retail store for those products; correct? |
| | 14 | A.   Yes. |
| 10:58 | 15 | Q.   Let's move on to delivery.  246. |
| | 16 | It says the driver scans the location bar |
| | 17 | code and then the selection label on each case |
| | 18 | delivered. |
| | 19 | What does that mean? |
| 10:58 | 20 | A.   Every restaurant has a location bar code, or |
| | 21 | two.  So when the driver shows up, he scans the |
| | 22 | restaurant that says he's at the right place.  It says |
| | 23 | "yes," and then he scans the labels on the cases. |
| | 24 | Q.   Bar codes and links and data captured? |
| 10:59 | 25 | A.   Correct. |

|  | 1 | but I'm certain we would review those projections as |
|  | 2 | well based on our experience. |
|  | 3 | Q.   All the food that McLane purchases, though, |
|  | 4 | is for resale; correct? |
| 11:17 | 5 | A.   All of the items we deliver to our |
|  | 6 | restaurants, yes, they would be delivered to our |
|  | 7 | restaurants. |
|  | 8 | Q.   And, once again, I am -- just want to get |
|  | 9 | back to this tracking thing because I just don't |
| 11:17 | 10 | understand it.  If -- if I were to ask you -- could |
|  | 11 | McLane track a particular bottle of water or chicken |
|  | 12 | wing or box of waffle fries to a particular retail |
|  | 13 | store? |
|  | 14 | A.   Generally, not -- well, not the individual |
| 11:18 | 15 | bottle of water or the individual chicken wing.  We can |
|  | 16 | generally track the cases to a retail store, yes. |
|  | 17 | Q.   But not the particular bottle of water or |
|  | 18 | particular chicken wing or particular waffle fry; |
|  | 19 | correct?  You can -- you only track the boxes? |
| 11:18 | 20 | MR. KANE:  Objection.  Asked and answered |
|  | 21 | about 14 times now. |
|  | 22 | BY MR. DESAI: |
|  | 23 | Q.   Is that true? |
|  | 24 | A.   If the item is shipped as a master case, we |
| 11:19 | 25 | do not track the individual products inside them. |

# EXHIBIT D



Welcome. You are not signed in.

**JOB SEARCH   MY JOBPAGE**

   |   All Jobs

Job 23 out of 39 Previous 21 22 23 24 25 Next

**APPLY ONLINE**

**ADD TO MY JOB CART**

SHARE

# DRIVER

- (2204515)

McLane Drivers safely deliver and unload product from our distribution centers to our customers, and they earn great pay and benefits.

McLane promotes earning, learning, and living a great life. We are a team, and we want to work with you. So, here's the details:

- Pay Rate: Up to $95,000 for qualified candidates depending on experience/position.
- Sign-on bonus: $10,000 for qualified candidates depending on experience.
- Training available to drivers with a commercial license who need more road time.
- Many route options available including a traveling driver option with premium pay.
- Shuttle, yard drivers, linehaul and part-time are also available.
- Comprehensive benefits including medical, dental, vision, company-paid life insurance, and more.

MFS-0000001

- Discount programs.
- 401(k) with annual company match.
- Paid holidays, vacation time, sick leave accrual, tuition reimbursement program, and more.

**MINIMUM QUALIFICATIONS & REQUIREMENTS:**

- At least 21 years of age.
- Have a Commercial Driver License (CDL Class A, Class B, or Class C) with a clean driving record.
- Recent CDL graduate drivers.
- Must meet McLane's MVR and risk rating qualifications.

Candidates may be subject to a background check and drug screen, in accordance with applicable laws.

All qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran.

Primary Location United States-California-Riverside

Work Locations FS103 DC Riverside 14813 Meridian Pkwy.  Riverside 92518

Job Delivery Driver

Schedule Full-time

Shift 3rd - Overnight

Employee Status Regular



APPLY ONLINE

ADD TO MY JOB CART

SHARE

Job 23 out of 39 Previous 21 22 23 24 25 Next

Accessibility Statement

MFS-0000002

# Job Description



| | | | |
|---|---|---|---|
| **Job Title:** | Driver I | **Job Code:** | 2090 |
| **Business Unit:** | Foodservice | **FLSA:** | Non-Exempt |
| **Approved Division(s):** | All | **Grade:** | 1 |
| **Department:** | Transportation Drivers | **Approved:** | Terry Cameron |
| **Supervisor's Title:** | Manager, Transportation | **Date Approved:** | 7/12/2010 |

## JOB SUMMARY / GENERAL DESCRIPTION:

This position is responsible for the accurate and timely distribution of food staples, food specialty products and restaurant supplies to various customer locations. Tenure class is 0-4 months.

## ESSENTIAL JOB FUNCTIONS / PRINCIPAL ACCOUNTABILITIES:

Other duties may be assigned.  A teammate in this position must have the ability to:

- Drive tractor, maneuvering into position to attach trailer and handle lines to secure.
- Inspect tractor-trailer for defects pre/post trip and submit DOT inspection report indicating condition.
- Inspect bill of lading and store keys for accuracy in off-hour delivery. Inspect trailer to ensure product is secure for undamaged transport of product.
- Drive tractor-trailer to destination, applying knowledge of commercial driving regulations and skill in maneuvering vehicle on the road and on customer premises.
- Maintain driver log (Manual or Peoplenet) according to DOT regulations, documenting delivery receipt, product temperatures and exceptions.
- Unload trailer, delivering product into customer premises.
- Perform any other duties as necessary.
- Meet this position's physical demands.
- Ability and willingness to select/load/unload and/or deliver ALL products that may be ordered by our customers.

## MINIMUM QUALIFICATIONS AND REQUIREMENTS:

A teammate in this position must:

- Have a High School Diploma or GED.
- Be at least 21 years of age.
- Possess a CDL Class A License; minimum driving experience of 1 year or 50,000 miles tractor-trailer experience (If less, additional training time will be required at the discretion of the RVP) or successful completion of the McLane Driver Training Program.
- Not have more than two moving violations in past 3 years.
- Not have been convicted of a DWI/DUI within the past 5 years in any vehicle, public or private.
- Be able to read and comprehend labels, instructions, and bills of lading.
- Be able to perform mathematical calculations to verify quantities of product.
- Be able to use a Tractor-trailer, 2 wheel dolly, ramp, and on-board Peoplenet device.
- Be able to lift maximum of 100 lbs, and frequent lifting/carrying of up to 50 lbs.

## WORKING CONDITIONS:

- The environment encompasses all areas of a Distribution Center, Transportation Department, or Transportation Shop.
- The environment includes the tractor trailer.
- The environment includes customer facilities.

MFS-0000053



**Riverside DC103
Transportation Operations
Route Bid Procedures**

**SPRING 2023 –Route Bidding Guidelines
Bidding by Length of Service Begins on Monday 04/24/23**

o   Provide teammates with flexibility in selecting their workdays and routes, while allowing the company to meet its business needs.
o   Continual improvement of performance to meet/exceed customer expectations.
o   Provide consistent deliveries to our customers while balancing the schedule to optimize fleet usage.

**BID PROCESS**
o   Teammates 1 to 60: Select block of days and input routes into those days
o   Teammates 60 to 100: **BLOCK RESET** to ensure **ROUTE** coverage. Select block of days and input routes into those days
o   Teammates 101 to 141 : Select from block bids of pre-determined schedules.

**BID TYPES**
1)   **Regular Route:** Teammates select routes/schedules that will be scheduled on the same days weekly, EXCEPT during Holidays, Natural Disasters, and Emergencies, in which delivery dates may be altered.

2)   **Bracket Day:** Teammates cover open routes due to vacation, call-offs, injuries, etc. (This may also include stand-by and on call). Days will be the same each week and may include overnight routes for single bracketed teammates.

3)   **OPEN ROUTES EXCEPTION**: If a bracket driver is unable to cover an open route on their own, the route is to be offered to the next driver capable of covering.

**GENERAL BID INFORMATION & Hours of Service (HOS)**
- It is the teammate's responsibility, when bidding, to ensure he has a minimum of 11hrs off duty between routes so that service to the customer will not be compromised.
- Teammate's bidding 5 local routes must ensure that the 5 routes do not exceed 60 hours of service (HOS).
- Teammates whose desired bid will exceed 60 HOS will be allowed to do so **only if their historical unload rates** substantiate their ability to successfully complete their bided schedule within the 60 HOS.
- HOS Calculation -Driver Teammates are responsible for calculating and keeping track of their HOS. If a driver does not have the HOS to run their route, they may be removed from the route.
- Teammates are NOT allowed to swap their route with an on-call teammate.
- Teammates with bracket days are expected to cover any open route, including layover or local routes, backhauls, line hauls, meet & greet shuttles, and yard work.
- Bracketed Teammates -Teammates working a bracket day covering for another teammate need to cover the route "as is", and may include any Backhaul that may be assigned to the route.
- **It is highly recommended** all drivers carry an overnight bag in the event they must cover an overnight route -even if they are scheduled to be off the following day. Additionally, overnight route drivers are expected to dispatch with a clear understanding of where their planned layover will be and what hotel options are available. While McLane provides the convenience of Corporate Lodging, unexpected (reimbursable) hotel expenses can occur. Drivers should be prepared.
- **Route Volume**: All routes are subject to change.  Routes are presented with relative case volume and weight.  Spikes in volume, promotions and reductions are unpredictable.
- **Stops or Backhauls may be added/ deleted** from routes due to volume, new business, customer needs, etc.
- **Permanent Sequence Changes**: Sequence changes must be submitted in written form and must be approved by the routing manager prior to the change taking effect.
- **Layover Routes**: Teammates may not bid a layover route with the intent of moving 2nd day stores to the first day. Second day deliveries are assigned as such and teammates are expected to meet the scheduled routed times.
- **Swapping delivery days**: See Sequence Change rule.
- **Bidding During Leaves of Absence**: If a teammate is out on leave during a re-bid, the teammate is required to submit documentation supporting that he will be able to come back to work full-duty within 30 days from the start of the bid; otherwise, he will forgo his bided position.

**DRIVER/DRIVER Routes**
- **When Bidding: BOTH DRIVERS will be required to have 11 Hours "OFF DUTY".**

MFS-0006128



**Backhauls**
- Backhaul Drivers will be Required to Fill Out all necessary Paperwork in accordance with the BACKHAUL & QA requirements, code dates, temp, etc.
- Failure to do the Required Paperwork will result in Disciplinary action and/or Removal of the Backhaul.

**Open / Unassigned routes**
- Open routes will be bided down to the next driver seniority.
- Routes will be offered to drivers that only have routes/bracket on that particular route series.
- Bidding will stop with on first bracket of the route day series

**Additional Clarification**
- Teammates should not select a route with the intention of dropping stops or needing assistance.
- Teammates are not permitted to drop routes. Under extreme circumstances, they will be reviewed by management on a case by case basis.
- Teammates requiring frequent rescues because they are not meeting offload rates, under normal work circumstances, will be subject to having routes pulled or reassigned as needed.
- Teammates who "call off" from a scheduled overnight route will be placed at the bottom of the bracketed drivers list if they decide to make themselves available for work on the 2nd or 3rd day.

## Route Sequencing and DISPATCH TIMES
- ANY CHANGES TO DISPATCH TIME WILL HAVE TO BE APPROVED BY Transportation Routing  SUPERVISOR.
- Every effort is made to sequence the routes in the most logical way.  If a teammate bids a route and presents cause for a sequence change, prior to running the route, they must submit the sequencing change within 5 days of the time the route was bid. If the teammate is unfamiliar with the stores, it will be required they run the route before requesting changes. Permanent sequence change requests must be reviewed and approved by a Transportation Routing Supervisor.
- Once customers have been notified of their assignments on MONDAY  MARCH 7, 2023, no changes will be made prior to the driver running the route the first time.
- ALL SEQUENCE CHANGES DUE FRIDAY MARCH 4, 2023.

### ROUTE CONFIRMATION
- Teammates are required to verify their route information the morning prior to dispatch.
- Teammates returning from route will review their next day's route information and confirm the route with a Supervisor.
- Teammates not dispatched on a route should attempt to contact the Transportation Office by 1100 AM each morning.

### SPLITTING 5th WORKDAY
- Drivers bidding a 5th workday will have the option to split 1 set work day with another driver.
- Split will be based off a 13-period calendar; senior driver will have the pick of either weeks 1&3 or weeks 2&4.
- 5th day split will be limited to 2 routes per route series.
- To eliminate confusion to the process drivers may not switch days or opt out of working and have the co-bided driver cover the bided day. Benefit or VTO must be used if you cannot cover your bided schedule.
- Route sequencing will go to the senior driver only.

NOTE: All 5-day split bids will be considered a 4-10 work week (Time Off and Sick Time will be paid in 10-hour increments).

**Disclaimer**
While every attempt is made to keep bided routes intact, changes in routing and sequencing can occur due to fluctuations in business conditions including volume spikes, promotions, customer openings/closures, road & weather conditions, and other unforeseeable variables. SPRING 2023 revision bid guidelines will supersede all previous versions.

Transportation Department

2

Updated: Fall

2022 Revision

| ▲▲ McLANE | McLane Foodservice, Inc.<br>4747 McLane Parkway, P.O. Box 6115<br>Temple, TX 76504<br>951/867-3555 | Payroll: FDC-Bi-Weekly Drivers CA<br>Pay Begin Date: 01/03/2021<br>Pay End Date: 01/16/2021 | Business Unit: FS103<br>Advice #: 000000008793736<br>Advice Date: 01/22/2021 |
|---|---|---|---|

| Jordan Orozco Madero | Employee ID: 000093360<br>Department: 10002-Transportation Drivers<br>Location: FS103 DC Riverside<br>Job Title: Driver III<br>Base Pay Rate: $34.279063 Hourly | TAX DATA: | Federal | CA State |
|---|---|---|---|---|

## HOURS AND EARNINGS

| | ----- Pay Period ----- | | ----- Current ----- | | ----- YTD ----- | |
|---|---|---|---|---|---|---|
| **Description** | **Begin Date** | **End Date** | **Rate** | **Hrs/Units** **Earnings** | **Hrs/Units** | **Earnings** |
| Break | | | 6.000000 | 26.00  156.00 | 46.00 | 277.00 |
| Cases | | | 0.160000 | 4,749.00  759.84 | | 1,100.97 |
| CA Layover | | | 14.000000 | 17.82  249.48 | 43.04 | 594.99 |
| Hol Adj | | | | -8.00  0.00 | -8.00 | 0.00 |
| HOL Payout | 12/27/2020 | 01/02/2021 | 25.000000 | 16.00  400.00 | 16.00 | 400.00 |
| Drvr Hours | | | 14.000000 | 84.28  1,179.92 | 143.94 | 1,997.27 |
| Line Haul | | | 24.000000 | 3.00  72.00 | 3.00 | 72.00 |
| LO Shu Mil | | | 0.055000 | 823.09  45.27 | | 45.27 |
| Init Med | | | 4.000000 | 0.50  2.00 | 1.00 | 4.15 |
| Per Diem | | | | 20.00 | | 20.00 |
| Prize | 11/22/2020 | 12/05/2020 | | 39.22 | | 39.22 |
| Miles | | | 0.200000 | 893.00  178.60 | | 274.20 |
| Stops | | | 2.230000 | 41.00  91.43 | | 151.64 |
| **CONTINUED ON NEXT PAGE** | | | | | | |

### TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 207.19 | 310.03 |
| Fed MED/EE | 46.37 | 80.19 |
| Fed OASDI/EE | 198.25 | 342.88 |
| CA Withholdng | 168.90 | 253.92 |
| CA OASDI/EE | 31.97 | 55.29 |
| **TOTAL:** | **652.68** | **1,042.31** |

### BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| | | 290.88 |
| | | 33.52 |
| | | 12.82 |
| | | 174.81 |
| **TOTAL:** | **278.91** | **512.03** |

### AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Other Offset | 25.00 | 25.00 |
| **TOTAL:** | **25.00** | **25.00** |

### EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| | | 627.75 |
| | | 15.41 |
| | | 1.53 |
| | | 1.25 |
| | | 0.80 |
| | | 1.08 |
| *TAXABLE | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 3,395.86 | 3,097.56 | 652.68 | 303.91 | 2,439.27 |
| YTD | 5,886.33 | 5,355.55 | 1,042.31 | 537.03 | 4,306.99 |

| YEAR-TO-DATE | TIME OFF/ VACATION | HOLIDAY | SICK** | NET PAY DISTRIBUTION | |
|---|---|---|---|---|---|
| Start Balance | 0.00 | 16.00 | 0.00 | | **Amount** |
| + Earned | 80.00 | 24.00 | 8.16 | Advice #000000008793736 | 2,439.27 |
| - Taken | 0.00 | 24.00 | 0.00 | | |
| + Adjustments | 0.00 | -8.00 | 0.00 | | |
| **End Balance** | **80.00** | **8.00** | **8.16** | **TOTAL NET PAY DISTRIBUTIONS:** | **2,439.27** |

**Sick time available for use after 90th day of employment.

See the Drivers Payroll Weekly Summary Report, for a detailed explanation of the applicable piece rate, hourly and/or flat rate pay.

MESSAGE:

MFS-0004065

**McLane Foodservice, Inc.**
4747 McLane Parkway, P.O. Box 6115
Temple, TX 76504
951/867-3555

| Pay Group: | FDC-Bi-Weekly Drivers CA |
| Pay Begin Date: | 01/03/2021 |
| Pay End Date: | 01/16/2021 |

| Business Unit: | FS103 |
| Advice Date: | 01/22/2021 |

| | TAX DATA: | Federal | CA State |

**Jordan Orozco Madero**

| Employee ID: | 000093360 |
| Department: | 10002-Transportation Drivers |
| Location: | FS103 DC Riverside |
| Job Title: | Driver III |
| Base Pay Rate: | $34.279063 Hourly |

## HOURS AND EARNINGS

| Description | Pay Period Begin Date | End Date | Rate | Current Hrs/Units | Earnings | Hrs/Units | YTD Earnings |
|---|---|---|---|---|---|---|---|
| Team Cases | | | 0.115000 | 1,296.00 | 149.04 | | 280.37 |
| Team Miles | | | 0.095000 | 380.00 | 36.16 | | 131.96 |
| Team Stops | | | 2.120000 | 8.00 | 16.96 | | 38.16 |
| Backhaul | | | | 0.00 | | 3.00 | 72.00 |
| CA YD Work | | | | 0.00 | | 8.77 | 103.49 |
| HOLIDAY FS | | | | 0.00 | | 8.00 | 200.00 |
| SH L Miles | | | | 0.00 | | | 83.64 |

| **TOTAL:** | | | | | **3,395.86** | | **5,886.33** |

**Tot Wrk Hrs: 84.28   Tot Ben Hrs: 0.00**

## TAXES

| Description | Current | YTD |
|---|---|---|

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |

MFS-0004066

| ITEM | ITEM_DESCR | DC | DC_NAME | CUST_ID | CUST_NM | STATE | SHIP_DT | DELV_DT | RTE_NUM | STOP_NUM | ORDER | PACK_SIZE | SHP_QTY | SO_ACTL_WGT | PO_NUM | SO_LOT_ID | VNDR_ID | VNDR_NM | VNDR_CITY | VNDR_STATE | ACTL_RCVD_DT | EXPIR_DT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 330933 | CHICKEN WNGS FRESH | 103 | RIVERSIDE | 295241 | BUFFALO WILD WINGS #3463 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 20 | 57818575 | 4/10 LB BC | 32 | 1341.44 | 6566549 | F21042300390 | 353233 | SIMMONS FOODS INC | GENTRY | AR | 4/23/21 | 5/8/21 |
| 31028 | BEV PEPSI BNB 5 GAL | 103 | RIVERSIDE | 287958 | KFC #C301034 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 80 | 57818686 | 5 GL/BX | 1 | 54.2 | 6561740 | F21041602330 | 298322 | PEPSI COLA COMPANY | SAN BERNARDINO | CA | 4/16/21 | 7/26/21 |
| 560000 | POTATO WAFFLE FRIES ZERO TF | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 6/5 LB BC | 19 | 617.5 | 6554143 | F21041900101 | 352700 | LAMB WESTON SALES INC | BOARDMAN | OR | 4/19/21 | 1/7/22 |
| 73211 | DOUGH RECTANGLE 2 DAY | 103 | RIVERSIDE | 273771 | PIZZA HUT #024894 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 90 | 57820756 | 36 EA/CA | 1 | 37 | 6558554 | F21041301085 | 112851 | GENERAL MILLS INC | JOPLIN | MO | 4/13/21 | 5/27/21 |
| 560449 | OIL CANOLA | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 35 LB JUG | 4 | 146.096 | 6555831 | F21041601906 | 305602 | CARGILL INC | FULLERTON | CA | 4/16/21 | 1/3/22 |
| 560037 | MILK CHOCOLATE LOW FAT CAL | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 24/7 OZ CT | 2 | 26.16 | 6559373 | F21041600764 | 305620 | DARIFAIR FOODS INC | PHOENIX | AZ | 4/16/21 | 7/16/21 |
| 29312 | CARRIER DRINK 4 CUP 2012 | 103 | RIVERSIDE | 295937 | TACO BELL #028721 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 70 | 57818010 | 300 EACH/CASE | 1 | 25.13 | 6560895 | F21042201109 | 293652 | HUHTAMAKI FOODSERVICE INC | HAMMOND | IN | 4/22/21 | 5/21/24 |
| 29312 | CARRIER DRINK 4 CUP 2012 | 103 | RIVERSIDE | 129980 | TACO BELL #002763 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 40 | 57813090 | 300 EACH/CASE | 1 | 25.13 | 6560895 | F21042201109 | 293652 | HUHTAMAKI FOODSERVICE INC | HAMMOND | IN | 4/22/21 | 5/21/24 |
| 560165 | SYRUP FRENCH VANILLA | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/28/21 0:00 | 4/26/21 0:00 | 118 | 10 | 57808569 | 4/1 LT BT | 1 | 12.4 | 6552341 | F21041401312 | 274005 | MONIN | LARGO | FL | 4/14/21 | 8/18/22 |
| 32251 | FRIES STRAIGHT CUT | 103 | RIVERSIDE | 287958 | KFC #C301034 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 80 | 57818686 | 6/5LB BC/CA | 3 | 96 | 6558500 | F21042200701 | 358642 | J R SIMPLOT COMPANY | CALDWELL | ID | 4/22/21 | 3/27/23 |
| 71175 | MAGNESOL M PKTS | 103 | RIVERSIDE | 334541 | PIZZA HUT #024839 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 30 | 57819075 | 30 EA/CA | 1 | 38.8 | 6551474 | F21041201152 | 344480 | KINEXO ITI | RIVERSIDE | CA | 4/12/21 | 3/23/22 |
| 58785 | LID 30 OZ NEXT GEN | 103 | RIVERSIDE | 129980 | TACO BELL #002763 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 40 | 57813090 | 1770 | 1 | 12 | 6554121 | F21041901159 | 340521 | BERRY GLOBAL INC | MADISONVILLE | KY | 4/19/21 | 5/18/24 |
| 561046 | BISCUIT MIX SM 2.625LB 2018 | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 12/2.625LB BC | 1 | 33.5 | 6546044 | F21040700658 | 311576 | GRIFFITH FOODS INC | LITHONIA | GA | 4/7/21 | 7/23/21 |
| 560047 | CHEESE FTHR MONT/CHED BLN | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 4/5 LB BC | 1 | 21.5 | 6559390 | F21041300026 | 355931 | ARMADA WAREHOUSE SOLUTIONS | PHOENIX | AZ | 4/13/21 | 7/31/21 |
| 58176 | SEASONING RED CHILI | 103 | RIVERSIDE | 295937 | TACO BELL #028721 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 70 | 57818010 | 48 PH | 1 | 26.95 | 6542957 | F21033101605 | 276956 | SARATOGA FOOD SPECIALTIES | BOLINGBROOK | IL | 4/1/21 | 11/28/21 |
| 53987 | SIERRA MIST TWIST HY 5 GAL | 103 | RIVERSIDE | 129983 | TACO BELL #003120 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 50 | 57819122 | 5 GL/BX | 1 | 54.5 | 6558583 | F21041200285 | 298322 | PEPSI COLA COMPANY | SAN BERNARDINO | CA | 4/12/21 | 7/19/21 |
| 10450 | CANLINER 33GAL CLEAR HD | 103 | RIVERSIDE | 273771 | PIZZA HUT #024894 | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 90 | 57820756 | 250 EA/CS | 1 | 12.2 | 6561732 | F21042101631 | 257347 | OMEGA EXTRUDING CORP OF CA | COMPTON | CA | 4/21/21 | 1/1/00 |
| 330847 | CHICKEN BRST BNLS FRT CHNK | 103 | RIVERSIDE | 295241 | BUFFALO WILD WINGS #3463 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 20 | 57818575 | 6/5 LB BC | 12 | 381 | 6553173 | F21041200438 | 351616 | PECO FOODS INC | WEST POINT | MS | 4/12/21 | 4/7/22 |
| 561280 | LID NO 16 PAPER BOWL GPI | 103 | RIVERSIDE | 305170 | CHICK-FIL-A #002697 | CA | 4/26/21 0:00 | 4/25/21 0:00 | 118 | 10 | 57808569 | 9/50 EACH | 2 | 21 | 6553176 | F21042000523 | 354833 | GRAPHIC PACKAGING INTERNATIONAL PARTNERS | KENTON | OH | 4/20/21 | 4/21/22 |
| 58912 | BAG PAPER LRG KINETIC | 103 | RIVERSIDE | 129980 | TACO BELL #002763 (ALTA) | CA | 4/26/21 0:00 | 4/26/21 0:00 | 118 | 40 | 57813090 | 500 CT | 1 | 24.9 | 6560849 | F21042201669 | 112288 | RONPAK INC | MIRA LOMA | CA | 4/22/21 | 5/21/24 |

INV0005A Item Sales Detail by L.

**McLANE.**

McLane Foodservice, Inc.
4747 McLane Parkway, P.O. Box 6115
Temple, TX 76504
951/867-3555

Payroll: FDC-Bi-Weekly Drivers CA
Pay Begin Date:   03/28/2021
Pay End Date:   04/10/2021

Business Unit:   FS103
Advice #:   000000008822769
Advice Date:   04/16/2021

| TAX DATA: | Federal | CA State |
|---|---|---|

**Jordan Orozco Madero**

Employee ID:   000093360
Department:   10002-Transportation Drivers
Location:   FS103 DC Riverside
Job Title:   Driver IV
Base Pay Rate:   $40.497979 Hourly

## HOURS AND EARNINGS

| Description | Rate | Current Hrs/Unts | Earnings | YTD Hrs/Unts | YTD Earnings |
|---|---|---|---|---|---|
| Break Time Pay | 6.000000 | 21.00 | 126.00 | 164.00 | 985.00 |
| Cases | 0.195000 | 8,596.00 | 1,676.23 | | 8,553.31 |
| Driver Hours | 14.000000 | 82.52 | 1,155.28 | 597.67 | 8,349.49 |
| Initial Medical | 4.000000 | 0.50 | 2.00 | 5.47 | 22.03 |
| Route Miles | 0.245000 | 962.00 | 235.71 | | 1,593.99 |
| Stops | 2.650000 | 66.00 | 174.90 | | 994.54 |
| Time Off w/ OT – Scheduled | 38.786833 | 10.00 | 387.87 | 20.00 | 730.66 |
| Backhaul | | | 0.00 | 3.00 | 72.00 |
| CA Layover | | | 0.00 | 57.71 | 800.37 |
| California Yard Work | | | 0.00 | 8.77 | 103.49 |
| Holiday FS | | | 0.00 | 8.00 | 200.00 |
| Holiday Adjustment | | | 0.00 | -8.00 | 0.00 |
| Holiay Annual Payout | | | 0.00 | 16.00 | 400.00 |
| **CONTINUED ON NEXT PAGE** | | | | | |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 246.46 | 1,426.81 |
| Fed MED/EE | 51.91 | 346.56 |
| Fed OASDI/EE | 221.97 | 1,481.85 |
| CA Withholdng | 204.63 | 1,179.38 |
| CA OASDI/EE | 42.95 | 286.74 |
| **TOTAL:** | **767.92** | **4,721.34** |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| | | 1,226.28 |
| | | 134.08 |
| | | 49.72 |
| | | 757.99 |
| **TOTAL:** | **291.55** | **2,168.07** |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Other Offset | 0.00 | 25.00 |
| **TOTAL:** | **0.00** | **25.00** |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| | | 2,604.21 |
| | | 51.83 |
| | | 6.32 |
| | | 5.46 |
| | | 2.88 |
| | | 4.32 |
| | | *TAXABLE |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 3,467.99 | 3,467.30 | 767.92 | 291.55 | 2,698.52 |
| YTD | 25,325.36 | 23,142.75 | 4,721.34 | 2,193.07 | 18,410.95 |

| YEAR-TO-DATE | TIME OFF/ VACATION | HOLIDAY | SICK** | NET PAY DISTRIBUTION | |
|---|---|---|---|---|---|
| Start Balance | 0.00 | 16.00 | 0.00 | | **Amount** |
| + Earned | 80.00 | 24.00 | 32.64 | | 2,698.52 |
| - Taken | 20.00 | 24.00 | 19.50 | | |
| + Adjustments | 0.00 | -8.00 | 0.00 | | |
| **End Balance** | **60.00** | **8.00** | **13.14** | **TOTAL NET PAY DISTRIBUTIONS:** | **2,698.52** |

**Sick time available for use after 90th day of employment.

See the Drivers Payroll Weekly Summary Report, for a detailed explanation of the applicable piece rate, hourly and/or flat rate pay.

MESSAGE:

| McLane Foodservice, Inc. | Pay Group: | FDC-Bi-Weekly Drivers CA | Business Unit: | FS103 |
| 4747 McLane Parkway, P.O. Box 6115 | Pay Begin Date: | 03/28/2021 | Advice #: | 000000008822769 |
| Temple, TX 76504 | Pay End Date: | 04/10/2021 | Advice Date: | 04/16/2021 |
| 951/867-3555 | | | | |

|  |  | **TAX DATA:** | **Federal** | **CA State** |

| Jordan Orozco Madero | Employee ID: | 000093360 |
| | Department: | 10002-Transportation Drivers |
| | Location: | FS103 DC Riverside |
| | Job Title: | Driver IV |
| | Base Pay Rate: | $40.497979 Hourly |

## HOURS AND EARNINGS

| | | | Current | | YTD | | **TAXES** | | |
|---|---|---|---|---|---|---|---|---|---|
| **Description** | **Rate** | **Hrs/Units** | **Earnings** | **Hrs/Units** | **Earnings** | **Description** | **Current** | **YTD** |
| Line Haul | | 0.00 | | 3.00 | 72.00 | | | |
| Layover Shuttle Miles | | 0.00 | | | 45.27 | | | |
| Per Diem | | 0.00 | | | 20.00 | | | |
| Prizes and Gifts | | 0.00 | | | 39.22 | | | |
| Retro | | 0.00 | | | 505.26 | | | |
| Shuttle Local Miles | | 0.00 | | | 83.64 | | | |
| Sick w/ OT - Scheduled | | 0.00 | | 19.50 | 692.45 | | | |
| Team Cases | | 0.00 | | | 699.90 | | | |
| Team Route Miles | | 0.00 | | | 260.98 | | | |
| Team Stops | | 0.00 | | | 101.76 | | | |
| **TOTAL:** | | | **3,757.99** | | **25,325.36** | | | |

Tot Wrk Hrs: 82.52   Tot Ben Hrs: 10.00

| **BEFORE-TAX DEDUCTIONS** | | | **AFTER-TAX DEDUCTIONS** | | | **EMPLOYER PAID BENEFITS** | | |
|---|---|---|---|---|---|---|---|---|
| **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** |

MFS-0004078

**McLane Foodservice, Inc.**
4747 McLane Parkway, P.O. Box 6115
Temple, TX 76504
951/867-3555

FDC-Bi-Weekly Drivers CA
Pay Begin Date:    06/20/2021
Pay End Date:    07/03/2021

| | |
|---|---|
| Business Unit: | FS103 |
| Advice #: | 000000008852140 |
| Advice Date: | 07/09/2021 |

**Jordan Orozco Madero**

| | |
|---|---|
| Employee ID: | 000093360 |
| Department: | 10002-Transportation Drivers |
| Location: | FS103 DC Riverside |
| Job Title: | Driver IV |
| Base Pay Rate: | $48.490458 Hourly |

TAX DATA:    Federal    CA State

## HOURS AND EARNINGS

| | | Current | | YTD | |
|---|---|---|---|---|---|
| **Description** | **Rate** | **Hrs/Unts** | **Earnings** | **Hrs/Unts** | **Earnings** |
| Break Time Pay | 6.000000 | 32.00 | 192.00 | 306.00 | 1,837.00 |
| Cases | 0.126749 | 1,098.00 | 139.17 | | 12,049.25 |
| CA Layover | 14.000000 | 18.40 | 257.60 | 93.11 | 1,295.97 |
| Extra Day Incentive | | | 300.00 | | 300.00 |
| Driver Hours | 14.000000 | 104.59 | 1,464.26 | 860.77 | 12,032.89 |
| Line Haul | 24.000000 | 3.00 | 72.00 | 6.00 | 144.00 |
| Layover Shuttle Miles | 0.072500 | 684.97 | 49.66 | | 94.93 |
| Initial Medical | 4.000000 | 0.50 | 2.00 | 7.97 | 32.03 |
| Per Diem | | | 20.00 | | 40.00 |
| Route Miles | 0.245000 | 831.00 | 203.61 | | 2,161.94 |
| Stops | 2.650000 | 56.00 | 148.40 | | 1,392.04 |
| Team Cases | 0.115000 | 2,704.08 | 310.97 | | 1,478.69 |
| Team Route Miles | 0.095000 | 761.05 | 72.30 | | 454.79 |

**CONTINUED ON NEXT PAGE**

## TAXES

| **Description** | **Current** | **YTD** |
|---|---|---|
| Fed Withholdng | 319.90 | 3,069.80 |
| Fed MED/EE | 61.06 | 672.95 |
| Fed OASDI/EE | 261.08 | 2,877.44 |
| CA Withholdng | 267.24 | 2,509.32 |
| CA OASDI/EE | 50.51 | 556.77 |
| **TOTAL:** | **959.79** | **9,686.28** |

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** |
| | | 2,161.68 | Other Offset | 0.00 | 25.00 | | | 4,580.67 |
| | | 234.64 | | | | | | 88.25 |
| | | 86.62 | | | | | | 12.20 |
| | | 1,465.25 | | | | | | 12.52 |
| | | | | | | | | 5.43 |
| | | | | | | | | 7.56 |
| **TOTAL:** | **310.46** | **3,948.19** | **TOTAL:** | **0.00** | **25.00** | *TAXABLE | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 4,408.38 | 4,079.30 | 959.79 | 310.46 | 3,138.13 |
| YTD | 48,920.78 | 44,945.11 | 9,686.28 | 3,973.19 | 35,261.31 |

| YTD | TIME OFF / VACATION | HOLIDAY | SICK** | ST COVID | NET PAY DISTRIBUTION | |
|---|---|---|---|---|---|---|
| Start | 0.00 | 16.00 | 0.00 | 0.00 | | **Amount** |
| + Earned | 80.00 | 32.00 | 40.00 | 80.00 | Advice #000000008852140 | 3,138.13 |
| - Taken | 50.00 | 24.00 | 36.50 | 10.00 | | |
| +Adjust | 0.00 | -8.00 | 0.00 | 0.00 | | |
| **Balance** | **30.00** | **16.00** | **3.50** | **70.00** | **TOTAL NET PAY DISTRIBUTIONS:** | **3,138.13** |

**Sick time available for use after 90th day of employment.

See the Drivers Payroll Weekly Summary Report, for a detailed explanation of the applicable piece rate, hourly and/or flat rate pay.

MESSAGE:

MFS-0004089

| **McLane Foodservice, Inc.** 4747 McLane Parkway, P.O. Box 6115 Temple, TX 76504 951/867-3555 | Pay Group: FDC-Bi-Weekly Drivers CA Pay Begin Date: 06/20/2021 Pay End Date: 07/03/2021 | Business Unit: FS103 Advice #: 000000008852140 Advice Date: 07/09/2021 |
|---|---|---|

| | | TAX DATA: | Federal | CA State |
|---|---|---|---|---|
| Jordan Orozco Madero | Employee ID: 000093360 Department: 10002-Transportation Drivers Location: FS103 DC Riverside Job Title: Driver IV Base Pay Rate: $48.490458 Hourly | | | |

| **HOURS AND EARNINGS** | | | | | | **TAXES** | | |
|---|---|---|---|---|---|---|---|---|
| | | | Current | | YTD | | | |
| Description | Rate | Hrs/Units | Earnings | Hrs/Units | Earnings | Description | Current | YTD |
| Team Stops | 2.120000 | 17.00 | 36.04 | | 197.16 | | | |
| Cases | 0.195000 | 5,848.00 | 1,140.37 | | 0.00 | | | |
| Alternate Division Incentive | | | 0.00 | | 500.00 | | | |
| Alternate Division Pay | | | 0.00 | | 9,492.00 | | | |
| Backhaul | | | 0.00 | 3.00 | 72.00 | | | |
| CA Double Time | | | 0.00 | 0.80 | 29.60 | | | |
| California Yard Work | | | 0.00 | 8.77 | 103.49 | | | |
| Holiday FS | | | 0.00 | 8.00 | 200.00 | | | |
| Holiday Adjustment | | | 0.00 | -8.00 | 0.00 | | | |
| Holiay Annual Payout | | | 0.00 | 16.00 | 400.00 | | | |
| Local Backhaul | | | 0.00 | 8.00 | 92.00 | | | |
| Yard Work OT | | | 0.00 | 4.00 | 97.00 | | | |
| Prizes and Gifts | | | 0.00 | | 39.22 | | | |
| Retro | | | 0.00 | | 505.26 | | | |
| Shuttle Local Miles | | | 0.00 | | 83.64 | | | |
| Sick w/ OT - Scheduled | | | 0.00 | 36.50 | 1,393.70 | | | |
| State Mandated COVID Sick | | | 0.00 | 10.00 | 423.24 | | | |
| Time Off w/ OT - Scheduled | | | 0.00 | 50.00 | 1,963.86 | | | |
| Training CA | | | 0.00 | 3.77 | 15.08 | | | |
| **TOTAL:** | | | **4,408.38** | | **48,920.78** | | | |

Tot Wrk Hrs: 104.59   Tot Ben Hrs: 0.00

| **BEFORE-TAX DEDUCTIONS** | | | **AFTER-TAX DEDUCTIONS** | | | **EMPLOYER PAID BENEFITS** | | |
|---|---|---|---|---|---|---|---|---|
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
| | | | | | | | | |

MFS-0004090

| ▲▲ McLANE. | McLane Foodservice, Inc.<br>4747 McLane Parkway, P.O. Box 6115<br>Temple, TX 76504<br>951/867-3555 | Pay Group: FDC-Bi-Weekly Drivers CA<br>Pay Begin Date: 11/22/2020<br>Pay End Date: 12/05/2020 | Business Unit: FS103<br>Advice #: 000000008778763<br>Advice Date: 12/11/2020 |
|---|---|---|---|

| Jordan Orozco Madero | Employee ID: 000093360<br>Department: 10002-Transportation Drivers<br>Location: FS103 DC Riverside<br>Job Title: Driver III<br>Base Pay Rate: $33.171979 Hourly | TAX DATA: | Federal | CA State |
|---|---|---|---|---|

### HOURS AND EARNINGS

| | ----- Pay Period ----- | | | Current | | YTD | | | TAXES | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Description** | **Begin Date** | **End Date** | **Rate** | **Hrs/Units** | **Earnings** | **Hrs/Units** | **Earnings** | **Description** | **Current** | **YTD** |
| Break | | | 6.050000 | 29.00 | 175.45 | 648.00 | 3,920.40 | Fed Withholdng | 208.86 | 3,024.76 |
| Cases | | | 0.160000 | 5,582.00 | 893.12 | | 6,085.70 | Fed MED/EE | 47.03 | 894.52 |
| CA Layover | | | 13.699901 | 10.13 | 138.78 | 590.90 | 8,095.35 | Fed OASDI/EE | 201.10 | 3,824.86 |
| CA YD Work | | | 11.799358 | 6.23 | 73.51 | 78.09 | 921.45 | CA Withholdng | 173.39 | 2,294.53 |
| HOLIDAY FS | | | 25.000000 | 8.00 | 200.00 | 40.00 | 1,000.00 | CA OASDI/EE | 32.42 | 616.80 |
| Drvr Hours | | | 13.700000 | 51.30 | 702.81 | 1,665.22 | 22,813.69 | | | |
| Drvr Hours | | | 13.700335 | 44.75 | 613.09 | | 0.00 | | | |
| Line Haul | | | 24.000000 | 3.00 | 72.00 | 39.00 | 936.00 | | | |
| LO Shu Mil | | | 0.055000 | 824.00 | 45.32 | | 1,809.67 | | | |
| Init Med | | | 4.300000 | 0.50 | 2.15 | 7.00 | 30.10 | | | |
| MissdMeal | 04/19/2020 | 04/25/2020 | 25.092706 | -1.00 | -25.09 | | 0.00 | | | |
| MissdMeal | 04/19/2020 | 04/25/2020 | 25.173945 | 1.00 | 25.17 | 1.00 | 25.17 | | | |
| **CONTINUED ON NEXT PAGE** | | | | | | | | **TOTAL:** | 662.80 | 10,655.47 |

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** |
| | | 3,374.50 | Other Offset | 0.00 | 25.00 | | | 7,458.50 |
| | | 419.00 | | | | | | 233.50 |
| | | 166.75 | | | | | | 17.40 |
| | | 1,968.04 | | | | | | 10.88 |
| | | | | | | | | 10.68 |
| | | | | | | | | 12.96 |
| **TOTAL:** | 260.45 | 5,928.29 | **TOTAL:** | 0.00 | 25.00 | *TAXABLE | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 3,421.22 | 3,141.46 | 662.80 | 260.45 | 2,497.97 |
| YTD | 67,094.12 | 59,723.17 | 10,655.47 | 5,953.29 | 50,485.36 |

| YTD | TIME OFF / VACATION | HOLIDAY | SICK** | ST COVID | NET PAY DISTRIBUTION | |
|---|---|---|---|---|---|---|
| Start | 0.00 | 8.00 | 0.00 | 0.00 | | **Amount** |
| +Earned | 73.34 | 56.00 | 40.00 | 80.00 | Advice #000000008778763 | 2,497.97 |
| - Taken | 73.34 | 40.00 | 40.00 | 10.00 | | |
| +Adjust | 0.00 | -8.00 | 0.00 | 0.00 | | |
| **Balance** | 0.00 | 16.00 | 0.00 | 70.00 | **TOTAL NET PAY DISTRIBUTIONS:** | 2,497.97 |

**Sick time available for use after 90th day of employment.

See the Drivers Payroll Weekly Summary Report, for a detailed explanation of the applicable piece rate, hourly and/or flat rate pay.

MESSAGE:

| McLane Foodservice, Inc.<br>4747 McLane Parkway, P.O. Box 6115<br>Temple, TX 76504<br>951/867-3555 | | | Pay Group:       FDC-Bi-Weekly Drivers CA<br>Pay Begin Date: 11/22/2020<br>Pay End Date:    12/05/2020 | Business Unit:  FS103<br>Advice #:         000000008778763<br>Advice Date:     12/11/2020 |

| | | | TAX DATA: | Federal | CA State |
| --- | --- | --- | --- | --- | --- |
| Jordan Orozco Madero | Employee ID: 000093360<br>Department: 10002-Transportation Drivers<br>Location: FS103 DC Riverside<br>Job Title: Driver III<br>Base Pay Rate: $33.171979 Hourly | | | | |

### HOURS AND EARNINGS

| | — Pay Period — | | | Current | | YTD | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Description | Begin Date | End Date | Rate | Hrs/Units | Earnings | Hrs/Units | Earnings |
| On Call | | | 13.700000 | 4.00 | 54.80 | 8.00 | 109.60 |
| Per Diem | | | | 20.00 | | | 1,100.00 |
| Miles | | | 0.200000 | 971.00 | 194.20 | | 1,811.20 |
| PrimReward | 02/02/2020 | 11/07/2020 | | | 133.33 | | 133.33 |
| Stops | | | 2.230000 | 46.00 | 102.58 | | 780.50 |
| AltDiv Inc | | | | | 0.00 | | 500.00 |
| Alt DC Pay | | | | | 0.00 | | 8,312.80 |
| Award Pay | | | | | 0.00 | | 300.00 |
| Backhaul | | | | | 0.00 | 45.00 | 1,080.00 |
| CCS O 500 | | | | | 0.00 | | 631.16 |
| Guarantee | | | | | 0.00 | | 492.49 |
| Hol Adj | | | | | 0.00 | -8.00 | 0.00 |
| I-Expense | | | | | 0.00 | | 50.00 |
| I-Expense | | | | | 0.00 | | 303.54 |
| Local BKH | | | | | 0.00 | 16.00 | 188.80 |
| Lump Sum | | | | | 0.00 | | 500.00 |
| Yrd Wrk OT | | | | | 0.00 | 5.84 | 143.37 |
| Prize | | | | | 0.00 | | 39.22 |
| RTM O 500 | | | | | 0.00 | | 796.25 |
| Sick Sched | | | | | 0.00 | 40.00 | 1,257.05 |
| STP O 500 | | | | | 0.00 | | 55.80 |
| ST COVID | | | | | 0.00 | 10.00 | 399.70 |
| Team Cases | | | | | 0.00 | | 129.03 |
| TO Sched | | | | | 0.00 | 73.34 | 2,154.73 |
| Training | | | | | 0.00 | 4.00 | 17.20 |
| Team Miles | | | | | 0.00 | | 47.50 |
| Team Stops | | | | | 0.00 | | 23.32 |
| ExtraRoute | | | | | 0.00 | | 100.00 |
| **TOTAL:** | | | | | **3,421.22** | | **67,094.12** |

Tot Wrk Hrs: 100.05  Tot Ben Hrs: 8.00

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
| | | | | | | | | |

MFS-0004058

# MCLANE FOODSERVICE TECHNOLOGY



**Selection and Loading**
Scan case labels at selection to capture item, supplier date and lot
Print unique barcode label

**Receiving and Inventory**
Scan vendor pallet or case label at receipt to capture item, date and lot

Scan unique McLane pallet label to track moves

**RESTAURANT**

**Argent**
Track each work assignment to manage performance

**PeopleNet**
Provide GPS tracking, delivery and driver communication

**Delivery**
Scan location and selection labels at delivery to confirm complete and accurate orders Send confirmation and temperatures to DC

©2019 McLane Company, Inc.

MFS-0000241

# RECEIVING

McLANE.

A Receiver records one scan per expiration date for each pallet. Multiple dates can be tied to the same internal lot number on a single pallet.



SCAN:
Pallet Barcode
(or case if no
pallet barcode)

CAPTURE:
GTIN, Quantity,
Lot and Date

OP185A – DSI Scanning Report
PT001A – Product Tracking – Inbound
& Inventory

©2019 McLane Company, Inc.

# RECEIVING

McLANE.

Received product is tracked using McLane's internal lot number that is unique for every pallet and linked to the supplier lot information scanned at receipt.



# INVENTORY MOVEMENTS

Each time the pallet is moved, the Lift Driver scans the unique internal Lot number and the rack location label to track where each product is in the distribution center.



**025110**   D-02-0269-1-   **45 BS**
FLOUR, BREADING, 2-25#
**BREADING FLOUR**   PO#: **4857710**
Lot: **F16042500283**   TI/HI: **9*5**
Conv: **1 BS = 1 BS**
Exp Dt: **04/19/17**   Rec ID: **TBREWE**   Door: 1

**SCAN:**
Internal Pallet
Label applied at
Receipt

**CAPTURE:**
Each Location and Time
that pallet is moved

Pallet is moved from Dock
to location D-31-3133-1-

Pallet is received into inventory
on the Dock

©2019 McLane Company, Inc.

# SELECTION



A Selector scans one case of each item as it is picked to a pallet for delivery to a store. The system prints the number of labels corresponding to the order quantity for that item and ties the captured lot and date to those selection labels.

TORT 6.5IN HP GTO    GIN: 0054289

Production Date: 05/10/19



SCAN:
Vendor Case Barcode(or rack if no case barcode)



CAPTURE:  GTIN, Lot, Date, Pick Date and Pick Time

**FT002A - Product Tracking - Invoiced & Selector Pro**

NOTE: Selector scans one case per route for Bulk items

# DELIVERY

A Driver scans the location barcode then the selection label on each case delivered.



SCAN:
Unique barcode
on selection label
on each case

CAPTURE:
Delivery Time, Location for each case

NOTE: Driver scans an item barcode and enters quantity as each load of a Bulk item is delivered into the restaurant



**McLane Foodservice, Inc.**
2085 Midway Rd
Carrollton, TX 75006

**MCLANE.**

Group: FDC-Bi-Weekly Drivers CA
Pay Begin Date: 09/30/2018
Pay End Date: 10/13/2018

Business Unit: FS103
Advice #: 000000008493129
Advice Date: 10/19/2018

| | | | TAX DATA: | Federal | CA State |
|---|---|---|---|---|---|
| **Esteban Orosco** | Employee ID: | 000088672 | Marital Status: | Married | S/M-2 inc |
| 23225 Shiday Ct. | Department: | 10002-Transportation Drivers | Allowances: | 0 | 0 |
| Moreno Valley, CA 92553 | Location: | FS103 DC Riverside | Addl. Percent: | | |
| | Job Title: | Driver 1 | Addl. Amount: | | |
| | Pay Rate: | $28.268813 Hourly | | | |

## HOURS AND EARNINGS

| | | Current | | YTD | | | TAXES | | |
|---|---|---|---|---|---|---|---|---|---|
| **Description** | **Rate** | **Hrs/Unts** | **Earnings** | **Hrs/Unts** | **Earnings** | **Description** | **Current** | **YTD** |
| Break Time Pay | 6.166111 | 36.00 | 221.98 | 152.00 | 937.23 | Fed Withholdng | 308.18 | 1,164.49 |
| CA Layover | 13.000000 | 24.33 | 316.29 | 105.59 | 1,372.67 | Fed MED/EE | 45.45 | 185.31 |
| Drivers in Training Layover | 3.690198 | 22.24 | 82.07 | 203.04 | 749.23 | Fed OASDI/EE | 194.34 | 792.38 |
| Drivers in Training | 11.970082 | 37.77 | 452.11 | 290.07 | 3,343.37 | CA Withholdng | 192.15 | 657.39 |
| Driver Hours | 13.000000 | 120.81 | 1,570.53 | 502.16 | 6,528.08 | CA OASDI/EE | 31.34 | 127.80 |
| Per Diem | | | | 40.00 | 180.00 | | | |
| Drivers in Training Layover | 3.689865 | 22.99 | 84.83 | | 0.00 | | | |
| Drivers in Training | 11.970118 | 38.15 | 456.66 | | 0.00 | | | |

| **TOTAL.:** | | | 3,224.47 | | 13,110.58 | **TOTAL:** | 771.46 | 2,927.37 |

Tot Wrk Hrs: 241.96      Tot Ben Hrs: 0.00

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** |
| Health Insurance | 43.09 | 129.27 | Accidental Injury Insurance | 1.86 | 5.58 | Health Insurance | 158.07 | 474.21 |
| Dental | 7.15 | 21.45 | | | | Dental | 6.23 | 18.69 |
| | | | | | | Company Paid Life | 0.81 | 3.37 |
| | | | | | | Company Paid Life* | 0.25 | 0.39 |
| | | | | | | Company Paid AD&D | 0.38 | 1.60 |
| **TOTAL.:** | 50.24 | 150.72 | **TOTAL.:** | 1.86 | 5.58 | *TAXABLE | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 3,224.47 | 3,134.48 | 771.46 | 52.10 | 2,400.91 |
| YTD | 13,110.58 | 12,780.25 | 2,927.37 | 156.30 | 10,026.91 |

| YEAR-TO-DATE | TIME OFF/ VACATION | HOLIDAY | SICK** | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|---|
| Start Balance | 0.00 | 0.00 | 0.00 | | **Account Type** | **Account Number** | **Amount** |
| + Earned | 0.00 | 0.00 | 20.40 | Advice #000000008493129 | Checking | 186383639 | 2,400.91 |
| - Taken | 0.00 | 0.00 | 0.00 | | | | |
| + Adjustments | 0.00 | 0.00 | 0.00 | | | | |
| **End Balance** | 0.00 | 0.00 | 20.40 | **TOTAL NET PAY DISTRIBUTIONS:** | | | 2,400.91 |

**Sick time available for use after 90th day of employment.

MESSAGE:

MFS-0000549

**McLANE.**

| McLane Foodservice, Inc. | | | | Business Unit: | FS103 |
|---|---|---|---|---|---|
| 2085 Midway Rd | Group: 301 FDC-Bi-Weekly Drivers CA | | | Advice #: | 000000008478744 |
| Carrollton, TX 75006 | Pay Begin Date: 08/19/2018 | | | Advice Date: | 09/07/2018 |
| | Pay End Date: 09/01/2018 | | | | |

| | | | | TAX DATA: | Federal | CA State |
|---|---|---|---|---|---|---|
| Esteban Orosco | Employee ID: | 000088672 | | Marital Status: | Married | S/M-2 inc |
| 23225 Shiday Ct. | Department: | 10002-Transportation Drivers | | Allowances: | 0 | 0 |
| Moreno Valley, CA 92553 | Location: | FS103 DC Riverside | | Addl. Percent: | | |
| | Job Title: | Driver 1 | | Addl. Amount: | | |
| | Pay Rate: | $11.806750 Hourly | | | | |

### HOURS AND EARNINGS

| | | Current | | YTD | | | TAXES | | |
|---|---|---|---|---|---|---|---|---|---|
| **Description** | **Rate** | **Hrs/Unts** | **Earnings** | **Hrs/Unts** | **Earnings** | **Description** | | **Current** | **YTD** |
| Break Time Pay | 6.166000 | 15.00 | 92.49 | 49.00 | 302.13 | Fed Withholdng | | 257.90 | 357.96 |
| CA Layover | 13.000000 | 21.91 | 284.83 | 21.91 | 284.83 | Fed MED/EE | | 39.37 | 63.22 |
| Drivers in Training Layover | 3.690107 | 25.17 | 92.88 | 48.01 | 177.16 | Fed OASDI/EE | | 168.36 | 270.33 |
| Drivers in Training | 11.970017 | 23.68 | 283.45 | 124.18 | 1,357.67 | CA Withholdng | | 149.29 | 181.53 |
| Driver Hours | 13.000000 | 105.11 | 1,366.43 | 172.18 | 2,238.34 | CA OASDI/EE | | 27.15 | 43.60 |
| Per Diem | | | 40.00 | | 40.00 | | | | |
| Break Time Pay | 6.166111 | 18.00 | 110.99 | | 0.00 | | | | |
| Drivers in Training Layover | 3.690018 | 22.84 | 84.28 | | 0.00 | | | | |
| Drivers in Training | 11.969788 | 33.43 | 400.15 | | 0.00 | | | | |
| **TOTAL:** | | | **2,755.50** | | **4,400.13** | **TOTAL:** | | **642.07** | **916.64** |

Tot Wrk Hrs: 210.23        Tot Ben Hrs: 0.00

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** |
| | | | | | | Company Paid Life | 0.41 | 1.14 |
| | | | | | | Company Paid AD&D | 0.20 | 0.55 |
| **TOTAL:** | **0.00** | **0.00** | **TOTAL:** | **0.00** | **0.00** | *TAXABLE | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 2,755.50 | 2,715.50 | 642.07 | 0.00 | 2,113.43 |
| YTD | 4,400.13 | 4,360.13 | 916.64 | 0.00 | 3,483.49 |

| YEAR-TO-DATE | TIME OFF/ VACATION | HOLIDAY | SICK** | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|---|
| Start Balance | 0.00 | 0.00 | 0.00 | | **Account Type** | **Account Number** | **Amount** |
| + Earned | 0.00 | 0.00 | 8.16 | Advice #000000008478744 | Checking | 186383639 | 2,113.43 |
| - Taken | 0.00 | 0.00 | 0.00 | | | | |
| + Adjustments | 0.00 | 0.00 | 0.00 | | | | |
| **End Balance** | **0.00** | **0.00** | **8.16** | **TOTAL NET PAY DISTRIBUTIONS:** | | | **2,113.43** |

**Sick time available for use after 90th day of employment.

MESSAGE:

MFS-0000546

**McLane Foodservice, Inc.**
2085 Midway Rd
Carrollton, TX 75006

**MCLANE.**

Group: FDC-Bi-Weekly Drivers CA
Pay Begin Date: 09/02/2018
Pay End Date: 09/15/2018

Business Unit: FS103
Advice #: 000000008483505
Advice Date: 09/21/2018

| | | |
|---|---|---|
| Esteban Orosco | Employee ID: 000088672 | |
| 23225 Shiday Ct. | Department: 10002-Transportation Drivers | |
| Moreno Valley, CA 92553 | Location: FS103 DC Riverside | |
| | Job Title: Driver 1 | |
| | Pay Rate: $22.875250 Hourly | |

**TAX DATA:** Federal / CA State
Marital Status: Married / S/M-2 inc
Allowances: 0 / 0
Addl. Percent:
Addl. Amount:

## HOURS AND EARNINGS

| Description | Rate | Current Hrs/Unts | Current Earnings | YTD Hrs/Unts | YTD Earnings |
|---|---|---|---|---|---|
| Break Time Pay | 6.166364 | 11.00 | 67.83 | 84.00 | 517.94 |
| CA Layover | 13.000000 | 35.35 | 459.55 | 57.26 | 744.38 |
| Drivers in Training Layover | 3.689867 | 21.12 | 77.93 | 112.93 | 416.72 |
| Drivers in Training | 11.969805 | 11.26 | 134.78 | 157.75 | 1,759.50 |
| Driver Hours | 13.000000 | 98.74 | 1,283.62 | 270.92 | 3,521.96 |
| Per Diem | | | 60.00 | | 100.00 |
| Break Time Pay | 6.165833 | 24.00 | 147.98 | | 0.00 |
| Drivers in Training Layover | 3.690183 | 43.80 | 161.63 | | 0.00 |
| Drivers in Training | 11.969969 | 22.31 | 267.05 | | 0.00 |
| **TOTAL:** | | | **2,660.37** | | **7,060.50** |

Tot Wrk Hrs: 197.23    Tot Ben Hrs: 0.00

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | 238.05 | 596.01 |
| Fed MED/EE | 36.98 | 100.20 |
| Fed OASDI/EE | 158.11 | 428.44 |
| CA Withholdng | 132.37 | 313.90 |
| CA OASDI/EE | 25.50 | 69.10 |
| **TOTAL:** | **591.01** | **1,507.65** |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Health Insurance | 43.09 | 43.09 |
| Dental | 7.15 | 7.15 |
| **TOTAL:** | **50.24** | **50.24** |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Accidental Injury Insurance | 1.86 | 1.86 |
| **TOTAL:** | **1.86** | **1.86** |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| Health Insurance | 158.07 | 158.07 |
| Dental | 6.23 | 6.23 |
| Company Paid Life | 0.66 | 1.80 |
| Company Paid AD&D | 0.31 | 0.86 |

*TAXABLE

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 2,660.37 | 2,550.13 | 591.01 | 52.10 | 2,017.26 |
| YTD | 7,060.50 | 6,910.26 | 1,507.65 | 52.10 | 5,500.75 |

| YEAR-TO-DATE | TIME OFF/VACATION | HOLIDAY | SICK** | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|---|
| Start Balance | 0.00 | 0.00 | 0.00 | | **Account Type** | **Account Number** | **Amount** |
| + Earned | 0.00 | 0.00 | 12.24 | Advice #000000008483505 | Checking | 186383639 | 2,017.26 |
| - Taken | 0.00 | 0.00 | 0.00 | | | | |
| + Adjustments | 0.00 | 0.00 | 0.00 | | | | |
| **End Balance** | **0.00** | **0.00** | **12.24** | **TOTAL NET PAY DISTRIBUTIONS:** | | | **2,017.26** |

**Sick time available for use after 90th day of employment.

MESSAGE:

MFS-0000547

**McLANE.**

| McLane Foodservice, Inc. | | Group: FDC-Bi-Weekly Drivers CA | Business Unit: | FS103 |
|---|---|---|---|---|
| 2085 Midway Rd | | Pay Begin Date: 09/16/2018 | Advice #: | 000000008488309 |
| Carrollton, TX 75006 | | Pay End Date: 09/29/2018 | Advice Date: | 10/05/2018 |

| | | | TAX DATA: | Federal | CA State |
|---|---|---|---|---|---|
| **Esteban Orosco** | Employee ID: | 000088672 | Marital Status: | Married | S/M-2 inc |
| 23225 Shiday Ct. | Department: | 10002-Transportation Drivers | Allowances: | 0 | 0 |
| Moreno Valley, CA 92553 | Location: | FS103 DC Riverside | Addl. Percent: | | |
| | Job Title: | Driver 1 | Addl. Amount: | | |
| | Pay Rate: | $26.085042 Hourly | | | |

## HOURS AND EARNINGS

| | | Current | | YTD | | | TAXES | | |
|---|---|---|---|---|---|---|---|---|---|
| **Description** | **Rate** | **Hrs/Unts** | **Earnings** | **Hrs/Unts** | **Earnings** | **Description** | | **Current** | **YTD** |
| Break Time Pay | 6.166111 | 18.00 | 110.99 | 116.00 | 715.25 | Fed Withholdng | | 260.30 | 856.31 |
| CA Layover | 13.000000 | 24.00 | 312.00 | 81.26 | 1,056.38 | Fed MED/EE | | 39.66 | 139.86 |
| Drivers in Training Layover | 3.690117 | 23.17 | 85.50 | 157.81 | 582.33 | Fed OASDI/EE | | 169.60 | 598.00 |
| Drivers in Training | 11.969925 | 35.91 | 429.84 | 214.15 | 2,434.60 | CA Withholdng | | 151.34 | 465.24 |
| Driver Hours | 13.000000 | 110.43 | 1,435.59 | 381.35 | 4,957.55 | CA OASDI/EE | | 27.36 | 96.46 |
| Per Diem | | | | 40.00 | 140.00 | | | | |
| Break Time Pay | 6.165714 | 14.00 | 86.32 | | 0.00 | | | | |
| Drivers in Training Layover | 3.690005 | 21.71 | 80.11 | | 0.00 | | | | |
| Drivers in Training | 11.969741 | 20.49 | 245.26 | | 0.00 | | | | |
| **TOTAL:** | | | **2,825.61** | | **9,886.11** | **TOTAL:** | | **648.26** | **2,155.91** |

| | Tot Wrk Hrs: 211.71 | | Tot Ben Hrs: 0.00 | | | |
|---|---|---|---|---|---|---|

| BEFORE-TAX DEDUCTIONS | | | AFTER-TAX DEDUCTIONS | | | EMPLOYER PAID BENEFITS | | |
|---|---|---|---|---|---|---|---|---|
| **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** | **Description** | **Current** | **YTD** |
| Health Insurance | 43.09 | 86.18 | Accidental Injury Insurance | 1.86 | 3.72 | Health Insurance | 158.07 | 316.14 |
| Dental | 7.15 | 14.30 | | | | Dental | 6.23 | 12.46 |
| | | | | | | Company Paid Life | 0.76 | 2.56 |
| | | | | | | Company Paid Life* | 0.14 | 0.14 |
| | | | | | | Company Paid AD&D | 0.36 | 1.22 |
| **TOTAL:** | **50.24** | **100.48** | **TOTAL:** | **1.86** | **3.72** | *TAXABLE | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current | 2,825.61 | 2,735.51 | 648.26 | 52.10 | 2,125.25 |
| YTD | 9,886.11 | 9,645.77 | 2,155.91 | 104.20 | 7,626.00 |

| YEAR-TO-DATE | TIME OFF/ VACATION | HOLIDAY | SICK** | NET PAY DISTRIBUTION | | | |
|---|---|---|---|---|---|---|---|
| Start Balance | 0.00 | 0.00 | 0.00 | | **Account Type** | **Account Number** | **Amount** |
| + Earned | 0.00 | 0.00 | 16.32 | Advice #000000008488309 | Checking | 186383639 | 2,125.25 |
| - Taken | 0.00 | 0.00 | 0.00 | | | | |
| + Adjustments | 0.00 | 0.00 | 0.00 | | | | |
| **End Balance** | **0.00** | **0.00** | **16.32** | **TOTAL NET PAY DISTRIBUTIONS:** | | | **2,125.25** |

**Sick time available for use after 90th day of employment.

MESSAGE:

MFS-0000548

# EXHIBIT E

# Third Fundamental

**Food Cost 101**

Knowing your food cost is essential to running a successful restaurant. One thing to keep in mind is that "Managing food is equal to managing waste." Here you will learn how to use the tools you have to better manage your waste.

- Cost of Sales (COS) is the actual cost of all the food that was sold and used. See Below.
  **\*NOTE:** Actual COS is beginning inventory + Purchased inventory - Ending inventory = Actual Cost
- Ideal Cost of Sales (ICOS) is how efficient you were at managing your food against the food recipes.
  > **Example of ICOS:**
  > You sold 800 tacos you should have used 1200 ounces of beef (the target of each taco is 1.5 of beef per taco). If you used 1500 ounces, that means you were negative 300 ounces, meaning you over-portioned tacos at 1.87 of beef per taco. If you used 900 ounces, you will be over 300 ounces meaning tacos were under-portioned – you served tacos with 1.12 of beef.
- The following formula calculates COS:
  **Ending Inventory / Net Sales \* 100 = Actual % Cost**
- Ideal Cost of Sales (ICOS) is calculated as follows:
  **Variance Dollars / Net sales \* 100 = ICOS Variance**
- This helps measure how your team executes the right portioning to ensure waste is reduced.

| Food Cost | | | |
|---|---|---|---|
| Opening | $6,368 | | |
| Purchase | $10,913 | | |
| Transfer In | 0 | | |
| Trsnfer out | 0 | | |
| Ending | $8,713 | | |
| Actual Use | $10,358 | | |
| Idea Use | $9,663 | | |
| Varince | $694 | | |
| Net sales | $46,789 | | |
| ICOS | 1.48% | 694/46789x100=1.15 | |
| Actual % Net | 18.62% | 8713/46789x100=18.16 | |



The gap between your goal of 17.5% and your actual (in this example, the Actual is 23.75%) is your waste and discounts. That includes employee meals, promotional items, deletions after, and refunds.

MADERO-000231

**Example 1:**
Store A is running a 24% food cost with a 0.03% variance.

**Example 2:**
Store B is running at 19% food cost with a variance of 1.5%

Looking at the example stores above, which store has better food cost? Store B is running a better food cost because they are closer to the 17.5% food cost goal, despite their 1.5% variance.

 ***Best Practice: Additional information on Managing food costs can be found on OneSource, see below.***



## Food & Paper Target Costs

 **Mission Critical:** Your focus should be your Actual Percent, not the variance, you can run high food costs with a very low variance.

**Total Food & Paper target cost 22.5%**

- Your Food target is 17%
- Your Paper & Syrup target is 5.5%

## Ordering

 When placing an order, it is important to have a McLane Order Guide and a Build-to with a buffer of ½ a day. These items are necessary for a successful order.

**Example:**
If you use 8 cases of beef daily and you place your order for 3 days, that is a total of 24 cases (8*3 = 24). Now plus your half-day buffer of 4 cases (8/2= 4), the ideal order for beef will be 28 cases of beef.

 **Above Restaurant Leaders** must know their store delivery dates

**How to Calculate your ordering budget**

- Your ordering budget will be calculated using your sales multiplied by the Food & Paper target.
- 22.5% x sales = budget dollar amount

**Example:**

**MADERO-000232**

Your store makes $40,000 weekly. $40,000 x 22.5% = $9,000 (budget). Divide this weekly budget by the number of deliveries per week. $9,000 ÷ 2 = $4,500. You will have a 4,500 budget per order.

- You can find the dates of your deliveries on your McLane calendar. Keep in mind promotions and holidays when creating the order. (**NOTE:** Schedule changes and holiday info can be found there).
- In order to create an __accurate__ order, schedule yourself for 45 minutes to 1 hour.

 **Mission Critical Point:** Build-to must be in place, and RGM must maintain an updated Build-to. Build-to should be revised with any increase or decrease of $3,000 in sales.

- New items for upcoming promotions will have to be added to the count sheet one week prior to the promotion starting.
- Once McLane orders have been submitted you should receive a confirmation post approximately 30 minutes after an order has been placed.
- Please ensure that this is used to confirm that McLane has received the order. Please double-check that no items have been zeroed out, as this would indicate that they are out of stock.

**Creating a Build-to**

**Mission Critical Point:** Creating a build-to


1. Log into Sabretooth. Go to "Reporting", click on "Inventory," and select "Weekly Variance Report."
2. Select last week's report.
    1. Convert stock units into case size by dividing "actual usage" by case count.
       **Example:**
       We used 1203 lbs. of beef. We purchase beef in 40lb cases. 1203/40= 30.07.
    2. Divide case usage by 7 days. 30.7 divided by 7 days =4.38 daily usage. If you are doing your order for 4 days, the amount needed will be 17.52 you will round up to 18 cases.



MADERO-000233

**How to add the build to on McLane Portal**

1. Go to Profile
2. Select the item
3. Add desired quantity on the Build to Qty
4. Save changes



**How to organize by sequence.**

Before continuing to organize by sequence, decide which option you would like to use on your storage.

**Option 1:**

With this option, you will be organizing by increments of 5. For example, Freezer (5), Walk-in (10), Back of the House (15), Office (20), etc. Organizing all Walk-in by sequence 10:

| 1st Wall | Sequence 11 | Cheese, 3-Cheese, Tomato, Lettuce, etc. |
|---|---|---|
| 2nd Wall | Sequence 12 | Beef, Chicken, Steak, Sour Cream, etc. |
| 3rd Wall | Sequence 13 | Water, Jalapeno Sauces, Tortilla Chips, Eggs, etc. |
| 4th Wall | Sequence 14 | Other ingredients |

*This will allow you to start every 5 increments with a new wall organization.*

**Option 2:**

If you would like a more detailed organization of your storage, you could use the following approach of organizing by the sequence of 100:

| Shelf 1 | Sequence 110 | Cheese, 3-Cheese, Tomato, Lettuce, etc. |
|---|---|---|
| Shelf 2 | Sequence 120 | Beef, Chicken, Steak, Sour Cream, etc. |
| Shelf 3 | Sequence 130 | Water, Jalapeno Sauces, Tortilla Chips, Eggs, etc. |
| Shelf 4 | Sequence 140 | Other ingredients |

Now that you have decided on an option, go to the McLane portal:

MADERO-000234

1. Go to Profile
2. Select the item
3. Under sequence organized by increments of 5 or 100
4. Save changes



*The picture below is an example of a **McLane Order Guide** organized by sequence and with a build-to*



| Item # | Description | Build-To Qty | Order Quantity 1 | 2 | 3 | 4 | 5 | Unit Of Measure | Case Price |
|--------|-------------|--------------|-----|---|---|---|---|-----------------|-----------|
| 58368 | BEEF STEAK SAVORY CHILE | 1 | | | | | | CA-32BC | $143.40 |
| 58834 | CHKN FRZN SAVORY BRST STR | 2 | | | | | | CA-32BC | $121.85 |
| 28259 | POTATO BITES RS | 2 | | | | | | CA-6BC | $31.05 |
| 54895 | BEANS BLACK | 1 | | | | | | CA-32BC | $58.66 |
| 56030 | CINNABON DONUT HOLES | 1 | | | | | | CA-480EA | $69.30 |
| 57310 | POTATO HASH BROWN PATTY | 0.5 | | | | | | CA-6BC | $31.66 |
| 58284 | SAUSAGE CRUMBLES | 0.5 | | | | | | CA-2BC | $17.11 |
| 58537 | EGGS FROZEN CF | 1 | | | | | | CA-18BC | $71.22 |
| 58884 | CRISPY CUT FRENCH FRY | 5 | | | | | | CA-6BC | $31.85 |

## Storage

- Safety belts must be stored in the manager's office. If you are missing a safety belt, RGM must contact the Above Store Leader.
- According to our Safety Guidelines, employees **must** wear a safety belt when organizing storage.

MADERO-000235



- RGM's must keep shelves neat and organized.
- With poster markers, on the top right corner of boxes, write the expiration date. Use the checkmark system as an indicator of how many deliveries the item has been on the shelf.



The picture to the left shows:

- Yellow circles indicate the checkmark rotation process.

- Red circles indicate the expiration dates.



**Best Practice:** organize your product boxes the day before delivery day and add a checkmark.

MADERO-000236



*Picture to the left is an example of over ordering. For example, The case with 1 checkmark has been sitting for one delivery. The box with 2 checkmarks has been sitting for 2 deliveries. The box with 3 checkmarks has been sitting for 3 past deliveries.*

*Call it out more -Add a green box with No check mark. Yellow box with a checkmark to indicate.*

 **Above Restaurant Leader:** as you do your walkthroughs check your products for the checkmarks system and provide feedback and guidance on ordering.

- Box tops are cut off, and boxes are arranged by size, and they should **always** have expiration days to help with food depletion awareness.
- Organize racks by placing like items together.
  **Example:**
  For ease of use, all cups and lids are near each other.
- FIFO- ensure all products are rotated ***FIRST IN FIRST OUT*** to ensure the product doesn't expire, causing waste.
- Shelves should be 12 inches off the floor for easy sweeping and mopping.
- Always store all heavy boxes over 25 lbs. in between the safety zone. Follow the storage shelf chart below.

**Delivery**

Two-step delivery verification:
1. When receiving the delivery, we should checkmark the invoice by 7 a.m.



MADERO-000237

2.  Complete the McLane Invoice Validation form by 11 a.m.

**McLane Invoice Validation Form**

Store: _____ Total weekly budget: _____

McLane- Tracy (1-209-221-7500) McLane's Riverside (1-800-737-0095)

All credits must be report before 10am. MIC must communicate with AC/DM and RO of any missing/ damaged items.

| Date | Total Invoice | Everything Received | Missing Item | Credit Reported | Case Number | Credit Received | MIC Signature |
|------|---------------|---------------------|--------------|-----------------|-------------|-----------------|---------------|
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |
|      |               |                     |              |                 |             |                 |               |

- According to our Safety Guidelines, employees **must** wear a safety belt when putting the delivery away.

 **Mission Critical Point:** The MIC, cleaning captain, or other team members should confirm that we received all ordered items.

- If there are any damaged products, put the product aside, mark "**Do Not Use**" and then call QA (1-800-767-5147). You will be given a confirmation number; you will then call McLane's for pick-up of damaged products.

  **\*NOTE:** Ice on the outside of boxes is a sign that product has thawed and been refrozen.

- If you are missing any food items during a delivery **MIC must call McLane's by 10:00 am** to receive credit. Contact information below:
  - **McLane's Tracy (1-209-221-7500)**
  - **McLane's Riverside (1-800-737-0095)**
- Once the invoice has been verified, the opening manager will go to McLane's Website and accept the food order.
  - **\*Note:** the system will not close at night if food orders are not accepted into the system.
- Complete the "McLane Invoice Validation Form" as seen below.

**Transfers**

 **Mission Critical Point:** It is the RGM's responsibility to do accurate ordering of food products for their store. If you run out, the restaurant level team is not authorized to drive to a close by store to borrow products. Only the AC/DM or higher is authorized to go pick up the product.
  - When you run out of products, call your AC/DM to get you the product.
  - AC/DM to explore the reason why the store ran out of products and take corrective action to prevent future occurrences.

MADERO-000238

# EXHIBIT F

**BAKER & HOSTETLER LLP**
Matthew C. Kane, SBN 171829
Amy E. Beverlin, SBN 284745
Kerri H. Sakaue, SBN 301043
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone:  310.820.8800
Facsimile:  310.820.8859
Emails:    mkane@bakerlaw.com
           abeverlin@bakerlaw.com
           ksakaue@bakerlaw.com

**BAKER & HOSTETLER LLP**
Sylvia J. Kim, SBN 258363
Transamerica Pyramid
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone:  415.659.2600
Facsimile:  415.659.2601
Email:    sjkim@bakerlaw.com

Attorneys for Defendant
McLANE FOODSERVICE, INC.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN OROZCO MADERO and ESTEBAN OROSCO on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>McLANE FOODSERVICE, INC., a Texas Corporation, and DOES 1-10, inclusive,<br><br>    Defendants. | CASE NO. 5:24-cv-00073-KK-DTB<br><br>**DEFENDANT'S RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES, SET ONE** |

**PROPOUNDING PARTY:**    PLAINTIFFS JORDAN OROZCO MADERO AND ESTEBAN OROSCO

**RESPONDING PARTY:**    DEFENDANT McLANE FOODSERVICE, INC.

**SET NO.:**    ONE (1)

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant McLANE FOODSERVICE, INC. ("Defendant"), on behalf of itself and no other person or entity, hereby responds and objects to the SPECIAL INTERROGATORIES, SET ONE (the "Interrogatories" or, individually, "Interrogatory") propounded by PLAINTIFFS JORDAN OROZCO MADERO ("Madero") and ESTEBAN OROSCO ("Orosco," and collectively with Madero, "Plaintiffs") as follows:

## PRELIMINARY STATEMENT

Defendant has not fully completed its investigation, discovery, analysis, legal research and preparation for trial. The objections and responses contained herein are based only upon the information and documentation presently available and known to Defendant. It is possible that further investigation, discovery, analysis, legal research and/or preparation may result in the ascertainment of additional information or documentation, or provide additional meaning to known factual conclusions and legal contentions, all of which may result in the modification of these objections. Accordingly, Defendant's responses are made in a good faith effort to reasonably respond to the Interrogatories based upon presently available information and documentation. These objections and responses should not be construed to prejudice Defendant's right to conduct further investigation, discovery, analysis, legal research and/or preparation, or to limit Defendant's right to utilize any additional evidence that may be developed.

By making these objections and responses, Defendant does not concede that the information sought is relevant. Each of these objections or responses is based on Defendant's understanding of each individual Interrogatory herein. To the extent that Plaintiffs assert an interpretation of any Interrogatory that is inconsistent with Defendant's understanding, Defendant reserves the right to supplement or amend its objections and responses as appropriate.

The objections and responses are made without intending to waive or waiving but, on the contrary, intending to preserve and preserving: (1) the right to raise in any

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

2

subsequent proceeding or in the trial of this or any other action all questions of relevancy, materiality, privilege, and evidentiary admissibility of any response herein; (2) the right to object on any ground to the use or introduction into evidence of said responses in any subsequent proceeding or in the trial of this or any other action on any ground; (3) the right to object on any ground at any time to Interrogatories or other discovery involving said responses or the subject matter thereof; and (4) the right to seek entry of an appropriate protective order.

## **RECURRING OBJECTIONS**

In addition to those objections which may be specifically set forth in response to a particular Interrogatory, Defendant incorporates into each of the individual responses the recurring objections set forth below to the extent applicable. Each response herein is made subject to and reserving the applicable recurring objections.

1.     Defendant objects to the Interrogatories to the extent they seek information and documents outside the scope of the Court's Order (1) GRANTING in Part and DENYING in Part Defendant's Motion to Dismiss [Dkt. 11]; and (2) STAYING Plaintiffs' Motion for Conditional Class Certification [Dkt. 13] (Dkt. #23) (the "Order"), which states that the parties are "to engage in discovery to address the exemption issue," referring to Defendant's Motor Carrier Act ("MCA") exemption defense to Plaintiffs' Fair Labor Standards Act ("FLSA") claims in this case.

2.     Defendant objects to each of the Interrogatories and the Definitions contained therein to the extent they seek information and documents protected from disclosure by various privileges, including, but not limited to, the attorney-client privilege and/or attorney work-product doctrines, all privileges set forth in Federal Rules of Evidence, trade secret, and any other applicable statutory, common law, or constitutional privileges. Nothing contained in these responses is intended to be, or should be construed as, a waiver of the attorney-client privilege, the attorney work product doctrine or any other applicable law, rule, privilege or immunity.

3.     Defendant objects to each of the Interrogatories and the Definitions

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  contained therein to the extent each is not reasonably particularized, overbroad,
2  unduly burdensome, harassing and oppressive, and/or seeks information that is not
3  relevant to any party's claim or defense and proportional to the needs of the case,
4  considering the importance of the issues at stake in the action, the amount in
5  controversy, the parties' relative access to relevant information, the parties' resources,
6  the importance of the discovery in resolving the issues, and whether the burden or
7  expense of the proposed discovery outweighs its likely benefit.

8        4.    Defendant objects to each of the Interrogatories and the Definitions
9  contained therein to the extent they are vague and ambiguous in that the manner in
10  which each is phrased creates confusion given the issues involved in the litigation.

11       5.    Defendant objects to each of the Interrogatories and the Definitions
12  contained therein to the extent they seek information and/or documents that are
13  private, personal, confidential, sensitive or proprietary or that constitutes a trade
14  secret. To the extent each or any Interrogatory seeks disclosure of Defendant's trade
15  secrets, commercial information, and/or proprietary information, such information
16  will only be produced, if responsive, subject to the entry of an appropriate protective
17  order.

18       6.    Defendant objects to each of the Interrogatories and the Definitions
19  contained therein to the extent they seek class-wide and/or collective-wide merits-
20  based discovery prior to certification of a class or an FLSA collective. Further,
21  Plaintiffs have not made the requisite *prima facie* showing that the class action
22  requirements of Fed. R. Civ. P. ("Rule") 23 or the FLSA collective action
23  requirements of 29 U.S.C. § 216(b) are met or that discovery is likely to substantiate
24  a representative action. *See, e.g., Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir.
25  1985) ("[T]he plaintiff bears the burden of advancing a *prima facie* showing that the
26  class action requirements of Rule 23 are satisfied or that discovery is likely to produce
27  substantiation of the class allegations."). Defendant reserves the right to assert
28  additional objections to any Interrogatories that seek information regarding the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES –

4

1 putative class and/or collective members once/if such a *prima facie* showing is made
2 and/or a class and/or collective is certified by the Court.

3     7.    Defendant objects to each of the Interrogatories and the Definitions
4 contained therein to the extent they seek discovery regarding putatively-represented
5 non-parties who are barred from pursuing any claims against Defendant by one or
6 more settlement agreements and/or releases executed by and/or applicable to any of
7 them, and/or are subject to mandatory final and binding individual arbitration under
8 binding arbitration agreements.

9     8.    Defendant objects to each of the Interrogatories and the Definitions
10 contained therein to the extent they seek information and/or documents that are not
11 presently within Defendant's possession, custody or control and/or are publicly
12 available and/or equally available to Plaintiffs and/or already in Plaintiffs' possession,
13 custody, or control.  Defendant reserves the right to produce additional material that
14 may in the future come to its attention or become available, and to use such
15 information in any hearing or proceeding in this matter.  Defendant further reserves
16 the right to supplement or amend these responses upon, among other things further
17 investigation, discovery of additional facts, discovery of additional persons with
18 relevant material, developments in this action or other proceedings or the rebuttal of
19 any of Plaintiffs' evidence in this case.

20     9.    Defendant objects to each of the Interrogatories and the definitions
21 contained therein to the extent they seek employee information or personal contact
22 information on the grounds that it seeks information in violation of the privacy rights
23 of non-parties.

24     10.    Defendant objects to each of the Interrogatories and the definitions
25 contained therein to the extent they seek Defendant to answer regarding a legal
26 conclusion. *Cent. Valley Chrysler Valley Jeep, Inc. v. Witherspoon*, 2006 WL
27 2619962, at *7 (E.D. Cal. Aug. 25, 2006) ("Rule 33 does not permit interrogatories
28 directed to issues of 'pure law.'").

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

5

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

11. Defendant objects to each of the Interrogatories and the Definitions contained therein to the extent they are premature, burdensome and oppressive, and/or impose obligations inconsistent with or in addition to the Federal Rules of Civil Procedure and the applicable Local Rules on Defendant. Defendant further objects to the Definition of "DOCUMENT(S)," "WRITINGS," "RECORDS" because it purports to import California Rule of Evidence 250, when this case is in federal court.

12. Defendant objects to each of the Interrogatories and the Definitions contained therein to the extent compliance would require retrieval of electronically-stored information ("ESI") that is not reasonably accessible due to undue burden or cost, pursuant to Fed. R. Civ. P. 26(b)(2)(B).

13. Defendant objects to the Interrogatories and the Definitions contained therein to the extent they are compound and contain subparts that may count against and exceed the requesting party's 25-interrogatory limit pursuant to Fed. R. Civ. P. 33(a)(1).

14. Defendant objects to the Interrogatories to the extent they would necessitate the preparation of a compilation, abstract, audit or summary from documents that, depending on the outcome of further proceedings in this action, may be produced hereafter, and the burden of deriving the answer will be the same for either party. *See* Fed. R. Civ. P. 33(d).

15. Defendant has not completed its discovery, investigation, or trial preparation in this case. Therefore, these Recurring Objections are made without prejudice to Defendant's right to present additional evidence or contentions in this action based upon information hereinafter obtained or evaluated. Defendant reserves the right to supplement or amend its responses or present additional evidence of contentions at a later date.

16. All additional objections are reserved and may be interposed at the time of trial or at any other time. Defendant is not making any incidental or implied admissions herein. The fact that Defendant has objected to any of the Interrogatories

6

1    should not be taken as an admission that it admits the existence of any fact set forth
2    in or assumed by the Interrogatories, or that it constitutes admissible evidence.  The
3    fact that Defendant has objected to any of the Interrogatories is not intended, nor shall
4    be construed, to be a waiver by it of all or any part of any objection to any of the
5    Interrogatories.

6    **FURTHER OBJECTIONS AND RESPONSES TO REQUESTS**

7    The foregoing Preliminary Statement and Recurring Objections are
8    incorporated into each response below, regardless of whether specifically mentioned.
9    The further objections set forth below are not a waiver, in whole or part, of any of the
10    foregoing Recurring Objections or objections to the form and content of the
11    Interrogatories and the Definitions contained therein.  Subject to and without waiving
12    any of these Recurring Objections, Defendant further objects and responds as set forth
13    below:

14    **SPECIAL INTERROGATORY NO. 1:**

15    If you maintain that a fixed and persistent transportation intent for a practical
16    continuity of movement in interstate commerce concerning any goods that Plaintiffs
17    transported throughout the duration of their employment with Defendant, identify the
18    name, address, telephone numbers and title for those who possessed this fixed and
19    persistent intent, as well as the date these individuals possessed the fixed and persistent
20    transportation intent.

21    **RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

22    In addition to Defendant's Recurring Objections set forth above, which are
23    expressly incorporated herein by reference, Defendant objects to this Interrogatory on
24    the grounds that it is overbroad, vague, ambiguous and/or unintelligible as to the
25    terms/phrases "fixed and persistent [transportation] intent," "practical continuity of
26    movement in interstate commerce," and "date these individuals possessed," as well as
27    one or more words that may be missing from the Interrogatory. Defendant further
28    objects to the Definition of "identify" as overbroad, vague, and/or ambiguous.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

7

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Defendant also objects that the timeframe of this Interrogatory is overbroad as it
2  exceeds the FLSA's statute of limitations. Further, Defendant objects to this
3  Interrogatory on grounds that it not reasonably particularized and seeks information
4  that is not relevant and/or not proportionate to the needs of this case. Defendant also
5  objects that this Interrogatory seeks the personal and private contact information of
6  third parties, which is protected by a right to privacy under applicable state and/or
7  federal law and which Defendant is not authorized to waive. Defendant also objects
8  to this Interrogatory on the grounds that it would necessitate the preparation of a
9  compilation, abstract, audit or summary from documents that may be produced
10  hereafter, and the burden of deriving the answer will be substantially the same for
11  either party. See Fed. R. Civ. P. 33(d). Defendant also objects to this Interrogatory to
12  the extent that it purports to require the search and identification of ESI which is not
13  reasonably searchable or accessible because of undue burden and expense, and
14  Defendant will not search or produce such data in the absence of an agreement or court
15  order. See Fed. R. Civ. P. 26(b)(2)(B). Defendant further objects to this Interrogatory
16  on grounds that it is compound and contains subparts that may count against and
17  exceed each requesting party's 25-interrogatory limit. Defendant further objects to
18  this Interrogatory to the extent it may invade the attorney-client privilege and/or the
19  attorney work-product doctrine. Defendant further objects to this Interrogatory
20  because it misstates the applicable legal standard: "Whether transportation is interstate
21  or intrastate is determined by the essential character of the commerce, manifested by
22  shipper's fixed and persisting transportation intent at the time of the shipment, and is
23  ascertained from all of the facts and circumstances surrounding the transportation."
24  *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997) (int. quot. & emph.
25  omitted). Thus, the Interrogatory's reference to "individuals" is misplaced and makes
26  the Interrogatory impossible to answer.

27  **SPECIAL INTERROGATORY NO. 2:**

28      If Defendant maintains that Plaintiffs transported goods as part of a practical

8

1  continuity of movement in interstate commerce, identify:

2      a. The goods the Plaintiffs transported as part of a practical continuity of
3  movement in interstate commerce;

4      b. The date the goods were transported across state lines;

5      c. The origin of the goods and the date the goods left their place of origin; and

6      d. The date Defendant became aware of the interstate journey.

7  **RESPONSE TO SPECIAL INTERROGATORY NO. 2:**

8      In addition to Defendant's Recurring Objections set forth above, which are
9  expressly incorporated herein by reference, Defendant objects to this Interrogatory on
10 the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases
11 "practical continuity of movement in interstate commerce," "origin," and "became
12 aware of the interstate journey." Defendant further objects to the Definition of
13 "identify" as overbroad, vague, and/or ambiguous. Defendant also objects that the
14 timeframe of this Interrogatory is overbroad as it exceeds the FLSA's statute of
15 limitations. Further, Defendant objects to this Interrogatory on grounds that it is not
16 reasonably particularized and seeks information that is not relevant and/or not
17 proportionate to the needs of this case. Defendant also objects to this Interrogatory on
18 the grounds that it would necessitate the preparation of a compilation, abstract, audit
19 or summary from documents that may be produced hereafter, and the burden of
20 deriving the answer will be substantially the same for either party. See Fed. R. Civ. P.
21 33(d). Defendant also objects to this Interrogatory to the extent that it purports to
22 require the search and identification of ESI which is not reasonably searchable or
23 accessible because of undue burden and expense, and Defendant will not search or
24 produce such data in the absence of an agreement or court order. See Fed. R. Civ. P.
25 26(b)(2)(B). Defendant further objects to this Interrogatory on grounds that it is
26 compound and contains subparts that constitute at least 4 separate Interrogatories per
27 Plaintiff and count against and exceed each requesting party's 25-interrogatory limit.
28 Defendant further objects to this Interrogatory to the extent it may invade the attorney-

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

client privilege and/or the attorney work-product doctrine. Defendant also objects to the extent the Interrogatory seeks or would require disclosure of Defendant's trade secrets, commercial information, and/or proprietary information, which will only be produced, if at all, subject to the entry of an appropriate protective order.

Subject to and without waiving the foregoing recurring and further objections, Defendant responds as follows: Pursuant to Fed. R. Civ. P. 33(d), Defendant refers Plaintiffs to documents that will be produced in response to Plaintiffs' Request for Production of Documents, Set One, from which information sought by this Interrogatory may be ascertained. Discovery and investigation are ongoing. Therefore, Defendant reserves its right to supplement this response, its responses to any other discovery requests and/or its production(s) of documents at a later date.

**SPECIAL INTERROGATORY NO. : 3**

Were any of the goods identified in your Answer to Interrogatory No. 2 indefinitely stored at Defendant's facilities? If your answer to No. 2 is no with respect to any of the goods that Defendant maintains were not indefinitely stored in Defendant's facility, identify:

a. How long these goods were stored in Defendant's Riverside facility before being transported;

b. How is/was this information tracked; and

c. Provide the bates stamp numbers for the documentation evidencing your answer to this interrogatory.

**RESPONSE TO SPECIAL INTERROGATORY NO. : 3**

In addition to Defendant's Recurring Objections set forth above, which are expressly incorporated herein by reference, Defendant objects to this Interrogatory on the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases "indefinitely stored," "Defendant's facility" / "Defendant's facilities," "[i]f your answer to No. 2 is no," and "information tracked." Defendant further objects to the Definition of "identify" as overbroad, vague, and/or ambiguous. Defendant also

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

10

1  objects that the timeframe of this Interrogatory is overbroad as it exceeds the FLSA's

2  statute of limitations. Further, Defendant objects to this Interrogatory on grounds that

3  it is not reasonably particularized and seeks information that is not relevant and/or not

4  proportionate to the needs of this case. Defendant also objects to this Interrogatory on

5  the grounds that it would necessitate the preparation of a compilation, abstract, audit

6  or summary from documents that may be produced hereafter, and the burden of

7  deriving the answer will be substantially the same for either party. See Fed. R. Civ. P.

8  33(d). Defendant also objects to this Interrogatory to the extent that it purports to

9  require the search and identification of ESI which is not reasonably searchable or

10 accessible because of undue burden and expense, and Defendant will not search or

11 produce such data in the absence of an agreement or court order. See Fed. R. Civ. P.

12 26(b)(2)(B). Defendant further objects to this Interrogatory on grounds that it is

13 compound and contains subparts that constitute at least 3 separate Interrogatories per

14 Plaintiff and count against and exceed each requesting party's 25-interrogatory limit.

15 Defendant further objects to this Interrogatory to the extent it may invade the attorney-

16 client privilege and/or the attorney work-product doctrine. Defendant also objects to

17 the extent the Interrogatory seeks or would require disclosure of Defendant's trade

18 secrets, commercial information, and/or proprietary information, which will only be

19 produced, if at all, subject to the entry of an appropriate protective order. Defendant

20 also objects to this Interrogatory's request for bates labels as imposing obligations

21 inconsistent with or in addition to the Federal Rules of Civil Procedure on Defendant.

22        Subject to and without waiving the foregoing recurring and further objections,

23 Defendant responds as follows: Pursuant to Fed. R. Civ. P. 33(d), Defendant refers

24 Plaintiffs to documents that will be produced in response to Plaintiffs' Request for

25 Production of Documents, Set One, from which information sought by this

26 Interrogatory may be ascertained. Discovery and investigation are ongoing. Therefore,

27 Defendant reserves its right to supplement this response, its responses to any other

28 discovery requests and/or its production(s) of documents at a later date.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## SPECIAL INTERROGATORY NO. : 4

Explain the method by which Defendant assigned its routes to its California truck drivers during the employment dates of Plaintiffs. In answering this interrogatory, identify the route(s) and route number(s) Plaintiffs were assigned for each workweek of their employment with Defendant.

## RESPONSE TO SPECIAL INTERROGATORY NO. : 4

In addition to Defendant's Recurring Objections set forth above, which are expressly incorporated herein by reference, Defendant objects to this Interrogatory on the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases "method," "assigned" and "California truck drivers." Defendant further objects to the Definition of "identify" as overbroad, vague, and/or ambiguous. Defendant also objects that the timeframe of this Interrogatory is overbroad as it exceeds the FLSA's statute of limitations. Defendant also objects to this Interrogatory to the extent it seeks information about individuals other than Plaintiffs, as such information is outside the scope of the Court's Order, irrelevant, unduly burdensome, and improperly seeks class-wide and/or collective-wide merits-based discovery prior to certification of a class or an FLSA collective. Further, Defendant objects to this Interrogatory on grounds that it is not reasonably particularized and seeks information that is not relevant and/or not proportionate to the needs of this case. Defendant also objects to this Interrogatory on the grounds that it would necessitate the preparation of a compilation, abstract, audit or summary from documents that may be produced hereafter, and the burden of deriving the answer will be substantially the same for either party. See Fed. R. Civ. P. 33(d). Defendant also objects to this Interrogatory to the extent that it purports to require the search and identification of ESI which is not reasonably searchable or accessible because of undue burden and expense, and Defendant will not search or produce such data in the absence of an agreement or court order. See Fed. R. Civ. P. 26(b)(2)(B). Defendant further objects to this Interrogatory on grounds that it is compound and contains subparts that constitute at least 2 if not

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

12

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  dozens of separate Interrogatories per Plaintiff and count against and exceed each

2  requesting party's 25-interrogatory limit.

3       Subject to and without waiving the foregoing recurring and further objections,

4  Defendant responds as follows: Pursuant to Fed. R. Civ. P. 33(d), Defendant refers

5  Plaintiffs to documents that will be produced in response to Plaintiffs' Request for

6  Production of Documents, Set One, from which information sought by this

7  Interrogatory may be ascertained. Discovery and investigation are ongoing. Therefore,

8  Defendant reserves its right to supplement this response, its responses to any other

9  discovery requests and/or its production(s) of documents at a later date.

10  **SPECIAL INTERROGATORY NO. : 5**

11       Identify the vin number, make and model for all vehicles Plaintiffs drove to

12  transport goods during their employment with Defendant.

13  **RESPONSE TO SPECIAL INTERROGATORY NO. : 5**

14       In addition to Defendant's Recurring Objections set forth above, which are

15  expressly incorporated herein by reference, Defendant objects to the Definition of

16  "identify" as overbroad, vague, and/or ambiguous. Defendant also objects that the

17  timeframe of this Interrogatory is overbroad as it exceeds the FLSA's statute of

18  limitations. Further, Defendant objects to this Interrogatory on grounds that it is not

19  reasonably particularized and seeks information that is not relevant and/or not

20  proportionate to the needs of this case. Defendant also objects to this Interrogatory on

21  the grounds that it would necessitate the preparation of a compilation, abstract, audit

22  or summary from documents that may be produced hereafter, and the burden of

23  deriving the answer will be substantially the same for either party. See Fed. R. Civ. P.

24  33(d). Defendant also objects to this Interrogatory to the extent that it purports to

25  require the search and identification of ESI which is not reasonably searchable or

26  accessible because of undue burden and expense, and Defendant will not search or

27  produce such data in the absence of an agreement or court order. See Fed. R. Civ. P.

28  26(b)(2)(B).

13

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Subject to and without waiving the foregoing recurring and further objections,
2  Defendant responds as follows: Pursuant to Fed. R. Civ. P. 33(d), Defendant refers
3  Plaintiffs to documents that will be produced in response to Plaintiffs' Request for
4  Production of Documents, Set One, from which information sought by this
5  Interrogatory may be ascertained. Discovery and investigation are ongoing. Therefore,
6  Defendant reserves its right to supplement this response, its responses to any other
7  discovery requests and/or its production(s) of documents at a later date.

8  **SPECIAL INTERROGATORY NO. : 6**

9  Explain the method by which Defendant assigned its vehicles to its truck drivers
10 in California on any particular workday during the employment dates of Plaintiffs.

11 **RESPONSE TO SPECIAL INTERROGATORY NO. : 6**

12 In addition to Defendant's Recurring Objections set forth above, which are
13 expressly incorporated herein by reference, Defendant objects to this Interrogatory on
14 the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases
15 "method," "assigned" and "truck drivers in California." Defendant also objects that
16 the timeframe of this Interrogatory is overbroad as it exceeds the FLSA's statute of
17 limitations. Defendant also objects to this Interrogatory to the extent it seeks
18 information about individuals other than Plaintiffs, as such information is outside the
19 scope of the Court's Order, irrelevant, unduly burdensome, and improperly seeks
20 class-wide and/or collective-wide merits-based discovery prior to certification of a
21 class or an FLSA collective. Further, Defendant objects to this Interrogatory on
22 grounds that it is not reasonably particularized and seeks information that is not
23 relevant and/or not proportionate to the needs of this case. Defendant also objects to
24 this Interrogatory on the grounds that it would necessitate the preparation of a
25 compilation, abstract, audit or summary from documents that may be produced
26 hereafter, and the burden of deriving the answer will be substantially the same for
27 either party. See Fed. R. Civ. P. 33(d). Defendant also objects to this Interrogatory to
28 the extent that it purports to require the search and identification of ESI which is not

1  reasonably searchable or accessible because of undue burden and expense, and
2  Defendant will not search or produce such data in the absence of an agreement or court
3  order. See Fed. R. Civ. P. 26(b)(2)(B).

4  Subject to and without waiving the foregoing recurring and further objections,
5  Defendant responds as follows: Pursuant to Fed. R. Civ. P. 33(d), Defendant refers
6  Plaintiffs to documents that will be produced in response to Plaintiffs' Request for
7  Production of Documents, Set One, from which information sought by this
8  Interrogatory may be ascertained. Discovery and investigation are ongoing. Therefore,
9  Defendant reserves its right to supplement this response, its responses to any other
10 discovery requests and/or its production(s) of documents at a later date.

11 **SPECIAL INTERROGATORY NO. : 7**

12 Explain the method by which Defendant assigned its vehicles to Plaintiffs on
13 any particular workday during their employment.

14 **RESPONSE TO SPECIAL INTERROGATORY NO. : 7**

15 In addition to Defendant's Recurring Objections set forth above, which are
16 expressly incorporated herein by reference, Defendant objects to this Interrogatory on
17 the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases
18 "method" and "assigned." Defendant also objects that the timeframe of this
19 Interrogatory is overbroad as it exceeds the FLSA's statute of limitations. Defendant
20 also objects to this Interrogatory to the extent it seeks information about individuals
21 other than Plaintiffs, as such information is outside the scope of the Court's Order,
22 irrelevant, unduly burdensome, and improperly seeks class-wide and/or collective-
23 wide merits-based discovery prior to certification of a class or an FLSA collective.
24 Further, Defendant objects to this Interrogatory on grounds that it is not reasonably
25 particularized and seeks information that is not relevant and/or not proportionate to
26 the needs of this case. Defendant also objects to this Interrogatory on the grounds that
27 it would necessitate the preparation of a compilation, abstract, audit or summary from
28 documents that may be produced hereafter, and the burden of deriving the answer will

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

15

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  be substantially the same for either party. See Fed. R. Civ. P. 33(d). Defendant also
2  objects to this Interrogatory to the extent that it purports to require the search and
3  identification of ESI which is not reasonably searchable or accessible because of
4  undue burden and expense, and Defendant will not search or produce such data in the
5  absence of an agreement or court order. See Fed. R. Civ. P. 26(b)(2)(B). Defendant
6  further objects that this Interrogatory is unreasonably duplicative and/or cumulative
7  of Interrogatory No. 6.

8      Subject to and without waiving the foregoing recurring and further objections,
9  Defendant responds as follows: Pursuant to Fed. R. Civ. P. 33(d), Defendant refers
10  Plaintiffs to documents that will be produced in response to Plaintiffs' Request for
11  Production of Documents, Set One, from which information sought by this
12  Interrogatory may be ascertained. Discovery and investigation are ongoing. Therefore,
13  Defendant reserves its right to supplement this response, its responses to any other
14  discovery requests and/or its production(s) of documents at a later date.

15  **SPECIAL INTERROGATORY NO.: 8**

16      If Defendant claims that Plaintiffs were not entitled to be paid time and one-
17  half premium for every hour worked in excess of forty (40) hours per work week,
18  please set forth the reason for your claim, the specific factual basis upon which you
19  rely upon to make this claim, and describe the documents that you rely upon in
20  supporting this claim and/or responding to this Interrogatory.

21  **RESPONSE TO SPECIAL INTERROGATORY NO.: 8**

22      In addition to Defendant's Recurring Objections set forth above, which are
23  expressly incorporated herein by reference, Defendant objects to this Interrogatory on
24  the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases
25  "reason for your claim," "specific factual basis upon which you rely upon," and
26  "documents that you rely upon." Defendant also objects that this Interrogatory
27  constitutes an improper marshaling request. *E.g.*, *Aldapa v. Fowler Packing Co.*, 310
28  F.R.D. 583, 591 (E.D. Cal. 2015) ("Contention interrogatories should not require a

16

1  party to provide the equivalent of a narrative account of its case, including every
2  evidentiary fact, details of testimony of supporting witnesses, and the contents of
3  supporting documents."). Further, Defendant objects to this Interrogatory on grounds
4  that it is not reasonably particularized and seeks information that is not relevant and/or
5  not proportionate to the needs of this case. Defendant also objects to this Interrogatory
6  on the grounds that it would necessitate the preparation of a compilation, abstract,
7  audit or summary from documents that may be produced hereafter, and the burden of
8  deriving the answer will be substantially the same for either party. See Fed. R. Civ. P.
9  33(d). Defendant also objects to this Interrogatory to the extent that it purports to
10  require the search and identification of ESI which is not reasonably searchable or
11  accessible because of undue burden and expense, and Defendant will not search or
12  produce such data in the absence of an agreement or court order. See Fed. R. Civ. P.
13  26(b)(2)(B). Defendant further objects to this Interrogatory on grounds that it is
14  compound and contains subparts that constitute at least 3 separate Interrogatories per
15  Plaintiff and count against and exceed each requesting party's 25-interrogatory limit.
16  Defendant further objects to this Interrogatory to the extent it may invade the attorney-
17  client privilege and/or the attorney work-product doctrine. Defendant also objects to
18  the extent the Interrogatory seeks or would require disclosure of Defendant's trade
19  secrets, commercial information, and/or proprietary information, which will only be
20  produced, if at all, subject to the entry of an appropriate protective order.

21      Subject to and without waiving the foregoing recurring and further objections,
22  Defendant responds as follows: Plaintiffs were not entitled to be paid overtime
23  because they were correctly classified by Defendant as exempt from the overtime pay
24  requirements of the FLSA pursuant to the Motor Carrier Act ("MCA") exemption.
25  Plaintiffs were employed by an interstate motor carrier registered with the Department
26  of Transportation, Defendant, and engaged in activities directly affecting the safety of
27  operation of motor vehicles in the transportation on public highways of property in
28  interstate or foreign commerce, including by driving trucks that weighed over 10,000

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

17

1 | pounds on public highways from Defendant's distribution centers to Defendant's
2 | customers, physically crossing state lines on numerous occasions throughout their
3 | employment and reasonably expecting to cross state lines as part of their work for
4 | Defendant at all times during their employment, and regularly transporting products
5 | that were in a continuous movement in interstate or foreign commerce from suppliers
6 | outside of the state in which Plaintiffs were transporting them to customers inside the
7 | state in which Plaintiffs were transporting them. Pursuant to Fed. R. Civ. P. 33(d),
8 | Defendant further refers Plaintiffs to documents that will be produced in response to
9 | Plaintiffs' Request for Production of Documents, Set One, from which information
10 | sought by this Interrogatory may be ascertained. Defendant has not attempted to
11 | marshal in this response all evidence that may be offered at trial or other proceedings
12 | in this case to support its MCA exemption defense or any other defense to Plaintiffs'
13 | FLSA claims in this case, and Defendant reserves the right to right to utilize additional
14 | information and evidence at trial or other proceedings in this case. Discovery and
15 | investigation are ongoing. Therefore, Defendant reserves its right to supplement this
16 | response, its responses to any other discovery requests and/or its production(s) of
17 | documents at a later date.

18 | **SPECIAL INTERROGATORY NO. : 9**

19 | Identify all person(s) who were involved in the decision-making process to
20 | classify Plaintiffs as exempt from the overtime provisions of the FLSA.

21 | **RESPONSE TO SPECIAL INTERROGATORY NO. : 9**

22 | In addition to Defendant's Recurring Objections set forth above, which are
23 | expressly incorporated herein by reference, Defendant objects to this Interrogatory on
24 | the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases
25 | "involved in the decision-making process." Defendant also objects to the Definition
26 | of "identify" as overbroad, vague, and/or ambiguous. Defendant also objects to this
27 | Request on the grounds that it seeks information that is outside the scope of the Court's
28 | Order. Further, Defendant objects to this Interrogatory on grounds that it is not

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

18

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1 reasonably particularized and seeks information that is not relevant and/or not
2 proportionate to the needs of this case. Defendant also objects to this Interrogatory on
3 the grounds that it would necessitate the preparation of a compilation, abstract, audit
4 or summary from documents that may be produced hereafter, and the burden of
5 deriving the answer will be substantially the same for either party. See Fed. R. Civ. P.
6 33(d). Defendant also objects to this Interrogatory to the extent that it purports to
7 require the search and identification of ESI which is not reasonably searchable or
8 accessible because of undue burden and expense, and Defendant will not search or
9 produce such data in the absence of an agreement or court order. See Fed. R. Civ. P.
10 26(b)(2)(B). Defendant further objects to this Interrogatory to the extent it may invade
11 the attorney-client privilege and/or the attorney work-product doctrine.

12 **SPECIAL INTERROGATORY NO. : 10**

13      Explain why Defendant made the decision to classify Plaintiffs as exempt from
14 the overtime provisions of the FLSA.

15 **RESPONSE TO SPECIAL INTERROGATORY NO. : 10**

16      In addition to Defendant's Recurring Objections set forth above, which are
17 expressly incorporated herein by reference, Defendant objects to this Interrogatory on
18 the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases
19 "[e]xplain why Defendant made the decision." Defendant also objects that this
20 Interrogatory constitutes an improper marshaling request. *E.g., Aldapa*, 310 F.R.D. at
21 591 ("Contention interrogatories should not require a party to provide the equivalent
22 of a narrative account of its case, including every evidentiary fact, details of testimony
23 of supporting witnesses, and the contents of supporting documents."). Defendant also
24 objects to this Request on the grounds that it seeks information that is outside the
25 scope of the Court's Order. Further, Defendant objects to this Interrogatory on
26 grounds that it is not reasonably particularized and seeks information that is not
27 relevant and/or not proportionate to the needs of this case. Defendant also objects to
28 this Interrogatory on the grounds that it would necessitate the preparation of a

1  compilation, abstract, audit or summary from documents that may be produced
2  hereafter, and the burden of deriving the answer will be substantially the same for
3  either party. See Fed. R. Civ. P. 33(d). Defendant also objects to this Interrogatory to
4  the extent that it purports to require the search and identification of ESI which is not
5  reasonably searchable or accessible because of undue burden and expense, and
6  Defendant will not search or produce such data in the absence of an agreement or court
7  order. See Fed. R. Civ. P. 26(b)(2)(B). Defendant further objects to this Interrogatory
8  to the extent it may invade the attorney-client privilege and/or the attorney work-
9  product doctrine. Defendant also objects to the extent the Interrogatory seeks or would
10 require disclosure of Defendant's trade secrets, commercial information, and/or
11 proprietary information, which will only be produced, if at all, subject to the entry of
12 an appropriate protective order.

13      Subject to and without waiving the foregoing recurring and further objections,
14 Defendant responds as follows: Plaintiffs were correctly classified by Defendant as
15 exempt from the overtime pay requirements of the FLSA pursuant to the Motor Carrier
16 Act ("MCA") exemption. Plaintiffs were employed by an interstate motor carrier
17 registered with the Department of Transportation, Defendant, and engaged in
18 activities directly affecting the safety of operation of motor vehicles in the
19 transportation on public highways of property in interstate or foreign commerce,
20 including by driving trucks that weighed over 10,000 pounds on public highways from
21 Defendant's distribution centers to Defendant's customers, physically crossing state
22 lines on numerous occasions throughout their employment and reasonably expecting
23 to cross state lines as part of their work for Defendant at all times during their
24 employment, and regularly transporting products that were in a continuous movement
25 in interstate or foreign commerce from suppliers outside of the state in which Plaintiffs
26 were transporting them to customers inside the state in which Plaintiffs were
27 transporting them. Pursuant to Fed. R. Civ. P. 33(d), Defendant further refers Plaintiffs
28 to documents that will be produced in response to Plaintiffs' Request for Production

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S RESPONSES TO PLAINTIFFS'
SPECIAL INTERROGATORIES, SET ONE
CASE NO. 5:24-CV-00073-KK-DTB

1  of Documents, Set One, from which information sought by this Interrogatory may be
2  ascertained. Defendant has not attempted to marshal in this response all evidence that
3  may be offered at trial or other proceedings in this case to support its MCA exemption
4  defense or any other defense to Plaintiffs' FLSA claims in this case, and Defendant
5  reserves the right to right to utilize additional information and evidence at trial or other
6  proceedings in this case. Discovery and investigation are ongoing. Therefore,
7  Defendant reserves its right to supplement this response, its responses to any other
8  discovery requests and/or its production(s) of documents at a later date.

9  **SPECIAL INTERROGATORY NO. : 11**

10  　　　If you believe that Plaintiffs are exempt from the FLSA based on the Motor
11  Carrier Act exemption, provide the exact factual basis that you rely upon to make this
12  claim, and identify the evidence you rely upon in support of this claim.

13  **RESPONSE TO SPECIAL INTERROGATORY NO. : 11**

14  　　　In addition to Defendant's Recurring Objections set forth above, which are
15  expressly incorporated herein by reference, Defendant objects to this Interrogatory on
16  the grounds that it is overbroad, vague, and/or ambiguous as to the terms/phrases "[i]f
17  you believe," "exact factual basis that you rely upon," and "evidence you rely upon."
18  Defendant also objects to the Definition of "identify" as overbroad, vague, and/or
19  ambiguous. Defendant further objects that this Interrogatory constitutes an improper
20  marshaling request. *E.g.*, *Aldapa*, 310 F.R.D. at 591 ("Contention interrogatories
21  should not require a party to provide the equivalent of a narrative account of its case,
22  including every evidentiary fact, details of testimony of supporting witnesses, and the
23  contents of supporting documents."). Further, Defendant objects to this Interrogatory
24  on grounds that it is not reasonably particularized and seeks information that is not
25  relevant and/or not proportionate to the needs of this case. Defendant also objects to
26  this Interrogatory on the grounds that it would necessitate the preparation of a
27  compilation, abstract, audit or summary from documents that may be produced
28  hereafter, and the burden of deriving the answer will be substantially the same for

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    either party. See Fed. R. Civ. P. 33(d). Defendant also objects to this Interrogatory to
2    the extent that it purports to require the search and identification of ESI which is not
3    reasonably searchable or accessible because of undue burden and expense, and
4    Defendant will not search or produce such data in the absence of an agreement or court
5    order. See Fed. R. Civ. P. 26(b)(2)(B). Defendant further objects to this Interrogatory
6    to the extent it may invade the attorney-client privilege and/or the attorney work-
7    product doctrine.  Defendant also objects to the extent the Interrogatory seeks or would
8    require disclosure of Defendant's trade secrets, commercial information, and/or
9    proprietary information, which will only be produced, if at all, subject to the entry of
10   an appropriate protective order.

11           Subject to and without waiving the foregoing recurring and further objections,
12   Defendant responds as follows: Plaintiffs were correctly classified by Defendant as
13   exempt from the overtime pay requirements of the FLSA pursuant to the Motor Carrier
14   Act ("MCA") exemption. Plaintiffs were employed by an interstate motor carrier
15   registered with the Department of Transportation, Defendant, and engaged in
16   activities directly affecting the safety of operation of motor vehicles in the
17   transportation on public highways of property in interstate or foreign commerce,
18   including by driving trucks that weighed over 10,000 pounds on public highways from
19   Defendant's distribution centers to Defendant's customers, physically crossing state
20   lines on numerous occasions throughout their employment and reasonably expecting
21   to cross state lines as part of their work for Defendant at all times during their
22   employment, and regularly transporting products that were in a continuous movement
23   in interstate or foreign commerce from suppliers outside of the state in which Plaintiffs
24   were transporting them to customers inside the state in which Plaintiffs were
25   transporting them. Pursuant to Fed. R. Civ. P. 33(d), Defendant further refers Plaintiffs
26   to documents that will be produced in response to Plaintiffs' Request for Production
27   of Documents, Set One, from which information sought by this Interrogatory may be
28   ascertained. Defendant has not attempted to marshal in this response all evidence that

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

22

1  may be offered at trial or other proceedings in this case to support its MCA exemption

2  defense or any other defense to Plaintiffs' FLSA claims in this case, and Defendant

3  reserves the right to right to utilize additional information and evidence at trial or other

4  proceedings in this case. Discovery and investigation are ongoing. Therefore,

5  Defendant reserves its right to supplement this response, its responses to any other

6  discovery requests and/or its production(s) of documents at a later date.

7

8  Dated:  April 24, 2024                **BAKER & HOSTETLER LLP**

9
                                          By:   */s/ Matthew C. Kane*
10                                                   Matthew C. Kane
                                                      Sylvia J. Kim
11                                                    Amy E. Beverlin
                                                      Kerri H. Sakaue
12                                             Attorneys for Defendant
                                               McLANE FOODSERVICE, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  **PROOF OF SERVICE**

2

3    I am employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is

4  1900 Avenue of the Stars, Suite 2700, Los Angeles, CA 90067-4301.

5    On April 24, 2024, I served a copy of the within document(s):

6  **DEFENDANT'S RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES, SET ONE**

7

8  ☑  **U.S. MAIL:** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at Los Angeles, California addressed as set forth below.

9  DESAI LAW FIRM, P.C.

10  Aashish Y. Desai, Esq. (SBN 187394)
Adrianne De Castro, Esq. (SBN 238930)

11  3200 Bristol St., Suite 650
Costa Mesa, CA 92626

12  Telephone: (949) 614-5830
Facsimile: (949) 271-4190

13  aashish@desai-law.com

14  adrianne@desai-law.com
*Attorneys for Plaintiffs*

15

16    I declare under penalty of perjury under the laws of the State of California that

17  the above is true and correct. Executed on April 24, 2024, at Los Angeles, California.

18

19            */s/ Tyler Patton*
          Tyler Patton

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

24