1  Desai Law Firm, P.C.
   Aashish Y. Desai, Esq. (SBN 187394)
2  Adrianne De Castro, Esq. (SBN 238930)
   3200 Bristol St., Suite 650
3  Costa Mesa, CA 92626
   Telephone: (949) 614-5830
4  Facsimile: (949) 271-4190
   aashish@desai-law.com
5  adrianne@desai-law.com

6  Attorneys for Plaintiffs

7
                 **UNITED STATES DISTRICT COURT**
8
                 **CENTRAL DISTRICT OF CALIFORNIA**
9

10  JORDAN OROZCO MADERO and          Case No. 5:24-cv-00073-KK-DTB
    ESTEBAN OROSCO on behalf of
11  themselves and all others similarly   **PLAINTIFFS' RESPONSES TO**
    situated,                              **DEFENDANT'S STATEMENT OF**
12                                         **UNCONTROVERTED FACTS**

13              Plaintiffs,              **[Filed concurrently with Plaintiffs'**
                                         **Opposition to Defendant's Partial**
14  v.                                   **Motion for Summary Judgment]**

15  McLANE FOODSERVICE, INC., a
16  Texas Corporation, and DOES 1-10,             **HEARING:**
    inclusive,
17                                       Judge:    Hon. Kenly Kiya Kato
                Defendants.              Date:     September 19, 2024
18                                       Time:     9:30 a.m.
                                         Location: Courtroom 3
19

20
                                         Complaint Filed: January 12, 2024
21  _____

22

23

24

25

26

27

28

1

Plaintiffs submit this Statement of Genuine Issues pursuant to Central District of California Local Rule 56-2 in opposition to the Motion for Summary Judgment filed by Defendant McLane.

Facts 1-49 below correspond with the evidence submitted by the moving party. The facts are followed by additional material facts and supporting evidence showing genuine issues where appropriate.

| No. | Defendant's Alleged Uncontroverted Facts and Supporting Evidence | Plaintiffs' Response and Evidence |
|-----|------------------------------------------------------------------|-----------------------------------|
| 1. | McLane Foodservice, Inc. ("MFS") is a nationwide foodservice distributor. | Undisputed. However, this is not a material fact. |
| 2. | MFS maintains a nationwide network of distribution centers ("DCs"), one of which is located in Riverside, CA (the "Riverside DC"). | Undisputed. However, this is not a material fact. |
| 3. | MFS's customers supplied from the Riverside DC are (1) national restaurant chains or their affiliated cooperative purchasing entity ("Chain Customers"), including but not limited to Chick-Fil-A ("CFA"), Kentucky Fried Chicken, Long John Silvers, A&W, Taco Bell, Pizza Hut, and Buffalo Wild Wings ("BWW"), and (2) those chains' respective affiliated franchisee and corporate-owned restaurant locations ("Restaurant Customers"). | Undisputed. However, this is not a material fact |
| 4. | MFS procures and distributes food, | Undisputed that McLane distributes food, produce, supplies and |

1

| | | |
|---|---|---|
| | produce, supplies, and promotional and other items on behalf of its Chain Customers to sell and distribute them to their affiliated Restaurant Customers throughout the country. | promotional and other items for sale and distribution. Disputed that McLane does this "on behalf of its Chain Customers." |
| 5. | During the time period of January 2021 through the present, MFS has distributed and delivered products from the Riverside DC to Restaurant Customers in California, Arizona, Nevada and Utah. | Undisputed. |
| 6. | MFS operates under national distribution agreements with each of its Chain Customers to supply and distribute proprietary and non-proprietary food, produce, supplies, promotional items, and other products to their discrete populations of affiliated Restaurant Customers. | Undisputed that MFS has some distribution agreements.<br><br>Disputed as to "each of its Chain Customers" statement because MFS only disclosed a sampling of these agreements.<br><br>Disputed to the extent that this statement assumes MFS is a "supplier." MFS' corporate testimony is that MFS is a "distributor." Hayes Depo., 11:15-13:16. |
| 7. | Based on its national distribution agreements with its Chain Customers, MFS purchases products from suppliers and resells and distributes them to the Restaurant Customers. | Undisputed that McLane resells and distributes them to restaurants. Disputed as to the applicability of this statement to all "its Chain Customers" because MFS only disclosed a sampling of these agreements. |
| 8. | MFS's procurement department is responsible for ordering products on behalf of Chain Customers to be purchased by their respective affiliated Restaurant Customers from MFS's DCs, including the | Disputed. *See* Response to No. 4.<br><br>Disputed as to "last mile delivery", which is a legal conclusion and not a "fact."<br><br>*See also* Plaintiffs' Evidentiary |

2

| | | | |
|---|---|---|---|
| | | Riverside DC, for last mile delivery by MFS to those Restaurant Customers.<br><br>Taub Decl., ¶ 6. | Objections filed separately. |
| 9. | | While some of the products ordered for the Riverside DC for delivery by MFS to Restaurant Customers originate in California, the majority of the products are ordered from suppliers in states outside of California. | Undisputed that MFS has some distribution agreements.<br><br>Disputed as to the applicability of this statement to all "Restaurant Customers" because MFS only disclosed a sampling of these agreements.<br><br>Disputed because McLane's corporate witness said he did not know the breakdown of out-of-state and in-state products that were shipped into the distribution center. Tiblier Depo., 14:4-15.<br><br>*See also* Plaintiffs' Evidentiary Objections filed separately. |
| 10. | | Under its national distribution agreements with its Chain Customers, MFS purchases products to fulfill the anticipated orders for those products from the Chain Customers' affiliated Restaurant Customers, and MFS purchases the products only from designated suppliers specified or approved by the Chain Customer. | Disputed. *See* Response to No. 4. Disputed as to "its National distribution agreements with its Chain Customers" statement because MFS only disclosed a sampling of these agreements.<br><br>Disputed that McLane "anticipates" any ordering. McLane's corporate witnesses testified that products it receives at its Riverside distribution center remain in "general inventory" *unless and until* the local franchises in California place *separate* orders for those products, which McLane then resells on the retail market for a profit. *See* Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., |

3

| | | | |
|---|---|---|---|
| | | | 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Tiblier Dep., 44:1-17.<br><br>*See also* Plaintiffs' Evidentiary Objections filed separately. |
| 11. | | Each Chain Customer designates various suppliers from which MFS is required to purchase the food, produce, supplies, and promotional and other items that MFS will be distributing to the Chain Customer's affiliated Restaurant Customers. | Disputed as to what "each Chain Customer" does since McLane only produced samples of various master services agreements.<br>*See* Response to No. 4, 10. |
| 12. | | The Chain Customer, in turn, enters into agreements or understandings with those suppliers for them to supply a certain volume of their product for the Chain Customer's affiliated Restaurant Customers— which MFS purchases from those suppliers to fulfill orders from those Restaurant Customers. | Undisputed that Chain Customers enter into agreements with suppliers that ship directly to McLane where they are then inventoried and stored for general inventory. *See* Response to No. 4, 10. Tiblier Depo., 40:22-24, 43:4-7, 47:4-24 (confirming that McLane's suppliers ship directly to the distribution center; 43:4-7, 46:4-24, 48:4-10. (explaining explained that shipper, Simmons Foods, Inc. according to **one order** ships boxes of chicken wings from Gentry, Arkansas **directly to** Defendant's distribution center in Riverside, California); Hayes Dep., 24:2-5 (all products are for resale); Corporate FRCP 30(b)(6) Representative Mike Taub Deposition ("Taub Dep."), 36:3-7 (same).<br><br>Disputed that McLane is a "purchaser." *See* Response to No. 4. Declaration of Anthony Klish ISO Plaintiffs MSA, ¶ 3 (Restaurants do not have pre-set orders to McLane |

| | | | |
|---|---|---|---|
| | | | for products...A Restaurant employee looks at the inventory in their individual store and then determines what products are needed to replenish the inventory based upon needs and expected business...Typically, the Restaurant's orders are fulfilled by McLane within 2-3 days."). |
| 13. | If a Chain Customer has designated more than one supplier for a particular product (e.g., fresh chicken), it dictates and allocates how much of that product MFS can purchase from each such supplier for the Chain Customer's affiliated Restaurant Customers. | | Disputed that McLane is a "purchaser." *See* Response to No. 4<br><br>*See also* Plaintiffs' Evidentiary Objections filed separately. |
| 14. | A majority of the products MFS orders for sale and delivery to the Restaurant Customers that are supplied by the Riverside DC are proprietary products, which are specific to and can only be purchased by and delivered to a Chain Customer's affiliated Restaurant Customers (*e.g.*, BWW or CFA restaurants). | | Undisputed that some of the items are proprietary but this is not material.<br><br>Disputed to the extent that this statement assumes MFS is a "supplier." MFS' corporate testimony is that MFS is a "distributor." Hayes Depo., 11:15-13:16.<br><br>*See also* Plaintiffs' Evidentiary Objections filed separately. |
| 15. | For example, when MFS orders chicken wings for BWW, it orders them from a supplier designated and approved by BWW. | | Undisputed. |
| 16. | BWW's designated supplier typically packages the chicken wings MFS orders in BWW-branded cases (*i.e.*, boxes). | | Undisputed. |

5

| | | | |
|---|---|---|---|
| 17. | MFS can only sell and deliver those BWW-branded cases of chicken wings it purchases to BWW-affiliated Restaurant Customers and not to any non-affiliated Restaurant Customers that are supplied by the Riverside DC. | Undisputed that certain cases may be branded. Disputed that McLane tracks any single case of chicken wings to any one restaurant. McLane's corporate witnesses testified that after McLane receives and stores the shipped products, it does not track the actual products in their interstate journey (only the pallets or boxes they come in) or know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 18. | MFS does not and cannot repackage proprietary products at the Riverside DC because they must be delivered to the affiliated Restaurant Customer in their proprietary packaging. | Disputed. MFS own Separate Statement includes a contrary "fact": "The cases of product on the pallet received at the Riverside DC are usually shrink wrapped together to avoid cases moving during transit." Since products are not delivered to restaurants in shrink wrapped pallets, then they are "repackaged." |
| 19. | MFS places product purchase orders with Chain Customers' designated suppliers across the United States to fulfill orders projected to be placed by Restaurant Customers supplied by the Riverside DC. | **Disputed.** *See* Response to No. 4. <br><br> Disputed to the extent that this statement assumes MFS is a "purchasers." MFS' corporate testimony is that MFS is a "distributor." Hayes Depo., 11:15-13:16. MFS' corporate witness testified that RSCS, not McLane, is the "exclusive domestic purchasing agent" for all the products and "negotiates agreements with suppliers providing for price and other terms." Hayes Depo., 11:15- |

| | | | |
|---|---|---|---|
| | | | 13:6. |
| | | | Disputed as to the applicability of this to all "Chain Customers" because MFS only disclosed a sampling of these agreements. |
| | | | Disputed that McLane uses "projections". McLane's corporate witnesses testified that products it receives at its Riverside distribution center remain in "general inventory" *unless and until* the local franchises in California place *separate* orders for those products, which McLane then *resells* on the retail market for a profit. *See* Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Tiblier Dep., 44:1-17. |
| | | | *See also* Plaintiffs' Evidentiary Objections filed separately. |
| 20. | | Although MFS may not know the specific Restaurant Customer locations to which the products it purchases will ultimately be delivered when they are ordered and shipped by a Chain Customer's designated suppliers, it does know at that time that they will be sold and delivered to the Restaurant Customers affiliated with a specific Chain Customer. | Undisputed that McLane **does not know** which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 21. | | All purchase orders placed by MFS's procurement department with Chain Customers' designated suppliers are placed to fulfill orders that MFS and/or the Chain Customer projects will be placed by affiliated | Disputed that McLane makes orders based on "projections." *See* Responses to No. 4, 10, 13. Declaration of Anthony Klish ISO Plaintiffs MSA, ¶ 3 (Restaurants do not have pre-set orders to McLane |

| | | |
|---|---|---|
| Restaurant Customers. | | for products...A Restaurant employee looks at the inventory in their individual store and then determines what products are needed to replenish the inventory based upon needs and expected business...Typically, the Restaurant's orders are fulfilled by McLane within 2-3 days."). |
| | | Disputed to the extent that this statement assumes MFS is a "purchaser." MFS' corporate testimony is that MFS is a "distributor." Hayes Depo., 11:15-13:16. MFS' corporate witness testified that RSCS, not McLane, is the "exclusive domestic purchasing agent" for all the products and "negotiates agreements with suppliers providing for price and other terms." Hayes Depo., 11:15-13:6. |
| | | See also Plaintiffs' Evidentiary Objections filed separately. |
| 22. | Each purchase order for a product MFS places with suppliers for the Riverside DC is based on historical aggregate sales information for the Restaurant Customers that order that product from the Riverside DC, which takes into consideration the weighted moving average of MFS's product sales to them over the prior eight weeks as well as MFS's and/or the Chain Customer's institutional knowledge of the Restaurant Customers' past seasonal and anticipated promotional product | Disputed that McLane's customers dictate the amount McLane purchases from suppliers since these needs change weekly so McLane has a general inventory of items. See Responses to No. 4, 10. See Declaration of Anthony Klish ISO Plaintiffs MSA, ¶ 3 (Restaurants do not have pre-set orders to McLane for products...A Restaurant employee looks at the inventory in their individual store and then determines what products are needed to replenish the inventory based upon needs and expected |

8

| | | |
|---|---|---|
| | needs. | business…Typically, the Restaurant's orders are fulfilled by McLane within 2-3 days."). |
| | | Disputed to the extent that this statement assumes MFS is a "purchaser." MFS' corporate testimony is that MFS is a "distributor." Hayes Depo., 11:15-13:16 |
| | | *See also* Plaintiffs' Evidentiary Objections filed separately. McLane produced no actual projections. |
| 23. | All orders placed by MFS for products that will be sold and delivered to Restaurant Customers supplied by the Riverside DC are based on MFS's and/or the Chain Customer's forecasting of such purchases that will made by those Restaurant Customers | Disputed that McLane's customers dictate the amount McLane purchases from suppliers since these needs change weekly so McLane has a general inventory of items. *See* Responses to No. 4, 10. |
| | | **Objection:** This evidence should be stricken because MFS failed to disclose any information or produce any documents related to forecasting and customer projections and purchase orders, in response to discovery, despite several meet and confers and hearings to resolve Plaintiffs' motion to compel discovery related to the MCA exemption. *See* Fed. R. Civ. P. 37(c)(1); *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). |
| 24. | MFS's distribution agreements with its Chain Customers require that MFS order products for the Riverside DC based on orders projected to be placed by the | Disputed as to the applicability o this statement to all of "its Chain Customers" since McLane only produced a sampling of agreements. |

| | | | |
|---|---|---|---|
| | | Restaurant Customers supplied by the Riverside DC. | Disputed that McLane's uses projections since the supplies it receives are placed in general inventory. *See* Responses to No. 4, 10. |
| | 25. | MFS bears the cost of the inbound and outbound transportation of products at the Riverside DC. | Disputed. MFS' corporate witness testified that McLane is reimbursed for these costs. Hayes Dep., 26:2-15. |
| | 26. | MFS pays carriers for inbound shipments of products to the Riverside DC, and it pays its employee drivers for the outbound shipments of products to Restaurant Customers. | Disputed. MFS' corporate witness testified that McLane is reimbursed for transportation charges. Hayes Dep., 26:2-15. |
| | 27. | MFS also manages the transportation of certain products from suppliers shipped to the Riverside DC by using its own in-house third-party freight provider, Vantix. | Disputed that MFS uses "Vantix" or any other in-house third-party freight provider. MFS' corporate witnesses made no mention about this when asked about McLane as a distributor, and McLane disclosed no information about this in discovery. Moreover, the McLane does not manage or control any out of state suppliers. The terms of any management or control of these suppliers are set by the Master Services Agreement. Hayes Dep., 14:14-24 (RCSC "both negotiates agreements with suppliers providing for the price and other terms pursuant to which suppliers will sell products to operators for use in retail outlets.").<br><br>*See also* Plaintiffs' Evidentiary Objections filed separately. |
| | 28. | Approximately 40-50% of inbound | Undisputed but not material. |

| | | | |
|---|---|---|---|
| | | freight to the Riverside DC is managed by Vantix. | *See also* Plaintiffs' Evidentiary Objections filed separately. |
| | 29. | MFS can and does track the products received from suppliers and delivered to Restaurant Customers from the Riverside DC, including without limitation: date received at the Riverside DC, shipment and delivery date to the Restaurant Customer, vendor and source location, purchasing Restaurant Customer and location, and product purchased and delivered including type, size, weight, quantity and expiration or use by date (the "Tracking Data"). | Disputed. Defendant does not track or otherwise maintain records regarding the date a particular product from outside the state of California leaves for delivery to its Riverside distribution center.11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| | 30. | Depending on the carrier transporting ordered products to the Riverside DC, MFS may also be able to track the location of the truck carrying those inbound products. | Disputed. *See* Response to No. 29. |
| | 31. | Products ordered by MFS typically are received at the Riverside DC in cases on pallets. | Undisputed. |
| | 32. | Upon arrival of a product shipment at the Riverside DC, a MFS receiver unloads the pallets from the truck. | Undisputed. |
| | 33. | The cases of product on the pallet received at the Riverside DC are usually shrink wrapped together to avoid cases moving during transit. | Undisputed. |
| | 34. | At least one adhesive label with a scannable barcode has been affixed by the supplier to the shrink-wrapped pallet received at the Riverside DC (*i.e.*, the "pallet tag"). | Undisputed. |

| 35. | The MFS receiver receiving the supplier shipment at the Riverside DC uses a handheld scanner to scan the barcode on the pallet tag to identify the product on the pallet, the supplier location, and the expiration or use-by date for the product. | Undisputed. |
| --- | --- | --- |
| 36. | The information scanned from the supplier's pallet tag on product shipments received at the Riverside DC is saved in MFS's JD Edwards inventory management system. | Undisputed. However, this information should be stricken since no information was disclosed about "JD Edwards inventory management system." *See also* Plaintiffs' Evidentiary Objections filed separately. |
| 37. | The MFS receiver will then generate an internal pallet label (a "license plate") for the product shipment received at the Riverside DC that includes a unique "lot" number, which is a unique MFS- created next-number identifier for products, and it ties back to the supplier, the inbound purchase order, and the receipt date of a product. | Disputed. Defendant does not track or otherwise maintain records regarding the date a particular product from outside the state of California leaves for delivery to its Riverside distribution center.11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 38. | The MFS-generated license plate tracks the item number, lot number, receipt date, expiration or use-by date, inbound purchase order number, and DC location. | Disputed. Defendant does not track or otherwise maintain records regarding the date a particular product from outside the state of California leaves for delivery to its Riverside distribution center.11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 39. | The license plate is affixed by the MFS receiver to the bottom right case on the unwrapped pallet for each lot received at the Riverside | Undisputed that McLane only tracks products by their lot. |

| | | |
|---|---|---|
| | DC. | |
| 40. | The license plate is scanned by Riverside DC personnel and tracked in MFS's JD Edwards inventory management system each time the product is moved or selected for delivery within the Riverside DC. | Undisputed that McLane only tracks products by their lot. Disputed that McLane tracks each product case. McLane does not know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Defendant does not track or otherwise maintain records regarding the date a particular product from outside the state of California leaves for delivery to its Riverside distribution center.11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 41. | There may be more than one lot number assigned to a single pallet of products received at the Riverside DC where, for example, there are different types of products or products with different expiration dates on a single pallet. | Undisputed that McLane only tracks products by their lot. Disputed that McLane tracks each product case. McLane does not know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Defendant does not track or otherwise maintain records regarding the date a particular product from outside the state of California leaves for delivery to its Riverside distribution center.11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 42. | The MFS receiver typically would separate different lots received at the Riverside DC on one supplier pallet onto separate pallets. | Undisputed. |
| 43. | No processing, repacking, or modification of products received from suppliers occurs at the | Disputed. As McLane's own facts establish, McLane separates products into lots, labels them, |

13

| | | | |
|---|---|---|---|
| | | Riverside DC. | assigns them to a pallet, and places them in in "general inventory" *unless and until* the local franchises in California place *separate* orders for those products, which McLane then **resells** on the retail market for a profit. Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Tiblier Dep., 44:1-17. |
| | 44. | Products selected for delivery to Restaurant Customers at the Riverside DC are generally full case picks— meaning order selectors pick an entire case of product from a rack storage location. | Undisputed. |
| | 45. | If a product is ordered by a Restaurant Customer and sold to them in a quantity of less than a full case (which is rare), the products may be removed from a case as necessary, but they are not processed, repackaged, or modified in any way at the Riverside DC. | Disputed. As McLane's own facts establish, McLane separates products into lots, labels them, assigns them to a pallet, and places them in in "general inventory" *unless and until* the local franchises in California place *separate* orders for those products, which McLane then resells on the retail market for a profit. Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Tiblier Dep., 44:1-17. |
| | 46. | Products are delivered by MFS to Restaurant Customers in the same packaging in which they are received from the suppliers. | Disputed. McLane's UF included a contrary statement: "The cases of product on the pallet received at the Riverside DC are usually shrink wrapped together to avoid cases moving during transit." Since products are not delivered to McLane's customers in shrink |

| | | | |
|---|---|---|---|
| | | | wrapped pallets, they cannot be delivered in the "same packaging as they are received from the suppliers." |
| 47. | | Products received by MFS from suppliers at the Riverside DC for delivery to Restaurant Customers are temporarily stored in aisles of inventory racks while awaiting distribution to the Restaurant Customers. | Undisputed that items from suppliers are stored in general inventory. Disputed that storage is "temporary." After McLane receives and stores the shipped products, it does not track the actual products in their interstate journey (only the pallets or boxes they come in) or know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18.<br><br>McLane corporate witness also testified that he did not know how long items are stored in the distribution center. Hayes Depo., 21:14-22:16. |
| 48. | | The Riverside DC temporarily stores most of the products it receives from suppliers by the Chain Customer's brand for which those products have been ordered, so the majority of those aisles of inventory racks in the Riverside DC are generally dedicated to the temporary storage of products only for a Chain Customer's particular brand of affiliated Restaurant Customers. | Disputed. *See* Response to No. 47. |
| 49. | | For example, BWW-branded chicken wings that are received at the Riverside Distribution Center from a supplier in response to an MFS order for that product are | Undisputed that items from suppliers are stored in a specific area in the warehouse. But this is not material. |

| | | stored in an aisle in which only other products that MFS has ordered for purchase by and delivery to BWW-affiliated Restaurant Customers are generally stored. | |
|---|---|---|---|
| 50. | | Only non-proprietary items that are used by multiple Chain Customers' restaurants (e.g., Coke or Pepsi soft drinks) are stored in "common" aisles in the Riverside DC. | Undisputed that items from suppliers are stored in a specific area in the warehouse. But this is not material. |
| 51. | | MFS order selectors at the Riverside DC pick products ordered by Restaurant Customers for delivery to them by MFS. | Undisputed but not material. |
| 52. | | Selectors wear a wrist device that tells them which and how many cases of each product to pick, and where the product is in the Riverside DC. | Undisputed but not material. |
| 53. | | The selector scans each case of product as it is picked and places each case on a pallet for delivery to the Restaurant Customer from the Riverside DC. | Undisputed but not material. |
| 54. | | The Riverside DC selector's wrist device prints the number of labels corresponding to the Restaurant Customer's ordered case quantity for that product (*i.e.*, the number of cases of that item ordered). | Undisputed but not material. |
| 55. | | The Riverside DC selector affixes the printed labels to each selected case placed on the pallet for the order by the Restaurant Customer to be delivered from the Riverside DC. | Undisputed as this is part of McLane's processing of the products it receives. |

| | | |
|---|---|---|
| 56. | Each printed label affixed by the MFS selector on each of the cases selected by them at the Riverside DC has a unique barcode on it that ties back to the lot number for the selected case. | Disputed. After McLane receives and stores the shipped products, it does not track the actual products in their interstate journey (only the pallets or boxes they come in). McLane does not know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 57. | When a MFS driver delivers ordered cases of products to the Restaurant Customer from the Riverside DC, the driver scans the barcode on each of the printed labels affixed by the selector on each of the cases they are delivering, capturing the delivery time and location for each case— which information is saved in MFS's JD Edwards system. | Disputed. After McLane receives and stores the shipped products, it does not track the actual products in their interstate journey (only the pallets or boxes they come in). McLane does not know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18 |
| 58. | MFS can and does track on which truck and on which route each product was delivered to the Restaurant Customers' locations from the Riverside DC. | Disputed. After McLane receives and stores the shipped products, it does not track the actual products in their interstate journey (only the pallets or boxes they come in). McLane does not know which McLane customer received which particular bottle of water, chicken wing or box of waffle fries. Taub Depo., 11:11-13:1, 36:8-25; Tiblier Dep., 61:21-62:18. |
| 59. | Products received at the Riverside DC from out-of-state suppliers and bound for a Restaurant Customer have an average days in inventory ("DII") count of 13 days. | Undisputed that products sit in general inventory at the McLane distribution center. The products McLane receives at its Riverside distribution center remain in "general inventory" *unless and until* the local franchises in California place *separate* orders for those |

| | | | |
|---|---|---|---|
| | | | products, which McLane then **resells** on the retail market for a profit. *See* Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Tiblier Dep., 44:1-17. |
| | 60. | Many products received from suppliers at the Riverside DC with short shelf lives, such as produce and meat, have a maximum shelf life of between 2 and 7 days during which they can be sold and delivered to Restaurant Customers. | Undisputed that products sit in general inventory at the McLane distribution center *unless and until* the local franchises in California place *separate* orders for those products, which McLane then **resells** on the retail market for a profit. *See* Hayes Depo., 17:15-23, 18:20-21:13, 25:21-26:15, 37:11-14; Taub Dep., 8:17-10:12, 19:12-17, 20:9-22:14, 36:3-7. Tiblier Dep., 44:1-17. |
| | 61. | MFS owns the Riverside DC. | Undisputed. |
| | 62. | MFS employs all of the individuals who work at the Riverside DC (including receivers, selectors and drivers). | Undisputed. |
| | 63. | MFS determines the delivery routing of ordered products from the Riverside DC to the Restaurant Customers and actually performs such transportation using drivers like Plaintiffs employed by MFS. | Undisputed. |
| | 64. | MFS's transportation operations are conducted directly or indirectly through its 100% commonly owned affiliates, MFS Fleet, Inc. ("MFS Fleet") and/or Transco, Inc. ("Transco"), which are consolidated fleet entities that support MFS's | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities. |

| | | | |
|---|---|---|---|
| | | foodservice delivery operations at its DCs nationwide, including the Riverside DC. | |
| | 65. | MFS Fleet is an interstate motor carrier registered with the U.S. Department of Transportation ("DOT"). | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities. |
| | 66. | Transco is an interstate motor carrier registered with the DOT. | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities. |
| | 67. | MFS Fleet owns and/or operates the tractors and trailers that are exclusively used by MFS in its foodservice delivery operations. | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities. |
| | 68. | A portion of the tractors and trailers operated by MFS Fleet are owned and titled, or leased from third party vendors, in the name of Transco, which in turn leases (or subleases) that equipment to MFS Fleet. | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities. |
| | 69. | MFS Fleet operates as MFS's in-house motor carrier. | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities. |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5 | 70. | Drivers employed by MFS at the Riverside DC are leased to MFS Fleet and drive the commercial motor vehicles ("CMVs") operated by MFS Fleet for MFS's foodservice delivery operations. | Disputed. *See* Plaintiffs' Evidentiary Objections filed separately. This information should be stricken because McLane failed to disclose any information about MFS Fleet, Transco, or any other entities |
| 6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14 | 71. | Because the CMVs used by MFS in its foodservice delivery operations are operated by a DOT federally-regulated motor carrier, MFS is required to outfit its trucks with an electronic logging device ("ELD") used by its drivers to accurately record their duty status, along with other data elements such as the date, time and geographic location information of the truck when it is in transit. | Undisputed that McLane's trucks have ELD. |
| 15<br>16<br>17<br>18 | 72. | MFS utilizes the PeopleNet fleet management software and a global positioning system ("GPS") that provides end-to-end tracking of the CMVs used by MFS in its foodservice delivery operations. | Undisputed that McLane's trucks have GPS. |
| 19<br>20<br>21<br>22<br>23<br>24 | 73. | The information collected by the ELD and PeopleNet software includes, among other things, the date, time and GPS coordinates (including city and state) associated with each activity a driver logs into the ELD and/or that is automatically logged by the ELD. | Undisputed that McLane collects data with ELD and PeopleNet. |
| 25<br>26<br>27 | 74. | MFS provides transportation of goods from the Riverside DC to Restaurant Customers for compensation. | Undisputed. |
| 28 | | | |

| 75. | MFS is a motor carrier. | Undisputed. |
|---|---|---|
| 76. | Since January 2021, the Riverside DC has had on average approximately 30 weekly routes delivering orders to Restaurant Customers outside California, including in Utah, Nevada, and Arizona, which routes are assigned to and driven by dozens of MFS drivers. | Undisputed that McLane has interstate routes. Disputed that these routes are just randomly assigned to its drivers. More specifically, drivers bid on these routes and 280-290 of other intrastate routes. Tiblier Dep., 20:12-21. McLane drivers do not have to bid on interstate routes – it is voluntary. Tiblier Dep., 21:6-17; 22:11-19 (no discipline for not taking such routes). Defendant's drivers are not required or expected to take any route they are assigned. *Id.* at 25:12-20, 29:2-25. |
| 77. | The Riverside DC currently runs approximately 32 routes per week that deliver to Restaurant Customers outside of California, including in Nevada and Utah. | Undisputed. |
| 78. | The Riverside DC runs approximately 300 delivery routes per week that deliver to Restaurant Customers within California. | Undisputed. |
| 79. | MFS's drivers working out of the Riverside DC bid on the regular workdays and scheduled delivery routes they want to be assigned on a semi-annual basis. | Undisputed. |
| 80. | MFS drivers at the Riverside DC with the most seniority get to bid on their preferred workdays and routes first, followed by drivers with progressively less seniority until all of the required workdays and routes are chosen. | Undisputed. |

| | | | |
|---|---|---|---|
| 81. | "Bracket drivers" are drivers at the Riverside DC who did not get assigned any routes or a full schedule of routes during the bid process. | Undisputed that McLane has "bracket drivers." |
| 82. | Bracket drivers at the Riverside DC are responsible for covering open routes as and when available and thus can be asked to cover any route, including an interstate route, at any time. | Disputed. Defendant's drivers, including bracket drivers, are not required or expected to take any route they are assigned. *Id.* at 25:12-20, 29:2-25. |
| 83. | If there are no bracket drivers available to cover an open route at the Riverside DC, another driver – including a driver who bid on and received a regular route – must cover the open route. | Disputed. Defendant's drivers are not required or expected to take any route they are assigned. *Id.* at 25:12-20, 29:2-25. |
| 84. | In addition to, or at times in lieu of, their regular workdays and routes, non-bracket drivers at the Riverside DC may be required to cover open routes due to vacation, call-offs, injuries, and other circumstances that cause the driver that typically drives the route to be unavailable to do so. | Disputed. Defendant's drivers are not required or expected to take any route they are assigned. *Id.* at 25:12-20, 29:2-25. |
| 85. | All Riverside DC drivers (*i.e.*, bracket and non-bracket drivers) can be assigned to cover any route at any time during holidays, natural disasters, emergencies, or otherwise as MFS deems necessary to achieve consistent deliveries to its customers. | Disputed. Defendant's drivers are not required or expected to take any route they are assigned. *Id.* at 25:12-20, 29:2-25. Tiblier Dep., 29:19-31:1. Bidding occurred every six months and once drivers accepted their local routes, they were expected to stay on that route for a six-month period. Tiblier Dep., 29:19-31:1. |
| 86. | Riverside DC drivers may be | Undisputed that drivers may be |

| | | | |
|---|---|---|---|
| | | temporarily assigned to work at another MFS DC outside of California. | temporarily assigned to work at another MFS DC outside of California. Disputed that driver must work this assignment. Defendant's drivers are not required or expected to take any route they are assigned. *Id.* at 25:12-20, 29:2-25. Bidding occurred every six months and once drivers accepted their local routes, they were expected to stay on that route for a six-month period. Tiblier Dep., 29:19-31:1. |
| | 87. | Riverside DC drivers, including Plaintiffs during their employment with MFS, bid on the trucks (i.e., tractors) that they wanted to drive. | Disputed. Drivers do not pick their trucks. McLane assigns drivers truck based on a driver's weekly mileage for the route and then drivers keep the same truck for the 6-month duration of their route assignment. Tiblier Depo., 31:7-33:17. |
| | 88. | Riverside DC drivers must meet a minimum miles per week threshold, which changes for each bid depending on staffing levels, route volume, and fleet size, in order to qualify for the tractor bid. | Undisputed but not material. |
| | 89. | Depending on the number of weekly miles driven by drivers at the time of the tractor bid and their seniority in comparison to other drivers employed at the Riverside DC, drivers (including Plaintiffs during their employment) can bid on tractors in one of three classes (which are based on the age and milage of the tractors). | Undisputed but not material. |
| | 90. | Plaintiff Jordan Orozco Madero | Undisputed. |

| | | |
|---|---|---|
| | ("Madero") was employed by MFS and worked as a driver at the Riverside DC from January 2019 to September 2023. | |
| 91. | Plaintiff Esteban Orosco ("Orosco") was employed by MFS and worked as a driver at the Riverside DC from August 2018 to November 2023. | Undisputed. |
| 92. | All truck drivers employed by MFS, including Plaintiffs during their employment, are required to have and maintain a valid Commercial Driver License ("CDL"). | Undisputed. |
| 93. | All truck driver employed by MFS, including Plaintiffs during their employment, were required to maintain electronic logs of their duty status pursuant to the Federal Motor Carrier Safety Administration's Hours of Service ("HOS") regulations and to use the electronic logging devices in their trucks to accurately record their duty status. | Undisputed that McLane drivers maintained electronic logs using the electronic logging devices in their trucks. Disputed that these logs are accurate. Plaintiffs allege that they were required to log out for their meal periods even though they did not actually take their meal period. Plaintiffs further alleged that the records do not reflect work done before they entered their truck and after they left their trailer. This work was unreported and uncompensated – i.e., paperwork, key checks, routing, and waiting for the load. [So-called "off the clock" work]. First Amended Complaint, ¶¶ 25-44. |
| 94. | Throughout their employment with MFS, Plaintiffs were employed as drivers. | Undisputed. |
| 95. | As drivers, Plaintiffs' primary job duty was to operate large CMVs on public roads and highways to deliver | Undisputed. |

| | | | |
|---|---|---|---|
| | | products to MFS's Restaurant Customers. | |
| | 96. | The CMVs driven by drivers at the Riverside DC all have a gross vehicle weight rating of over 10,000 pounds— and usually 33,000 to 80,000 pounds. | Undisputed. |
| | 97. | At no time during their employment did Plaintiffs drive a CMV or other vehicle weighing less than 10,000 pounds. | Undisputed. |
| | 98. | Plaintiff Madero drove interstate routes for MFS on over 10 occasions between January 2020 and March 2022. | Undisputed. However, Plaintiffs Madero and Orosco last out-of-state trip was on March 3, 2022 and November 28, 2021 respectively. *See* HOS records attached to McLane's Motion to Dismiss, Decl. of Marcus Tiblier. Exh. C. |
| | 99. | Plaintiff Orosco drove interstate routes for MFS on over 20 occasions between December 2019 and November 2021. | Undisputed. However, Plaintiffs Madero and Orosco last out-of-state trip was on March 3, 2022 and November 28, 2021 respectively. *See* HOS records attached to McLane's Motion to Dismiss, Decl. of Marcus Tiblier. Exh. C. |
| | 100. | During his employment with MFS, Orosco routinely traveled to MFS distribution centers in other states on temporary assignments to work as a driver at those distribution centers. | Disputed. Orosco did not "routinely travel" to MFS distribution centers in other states. There was only a handful of times that he drove for McLane outside of California. In 2019, he drove one route that went to St. George in Utah, and Las Vegas, Nevada. I drove this route for about a month. During that time, my other routes were still local, within the state of California. Orosco Decl. ¶ 4. Any assignments out of state were for a limited time |

| | | | |
|---|---|---|---|
| 1 | | | period and only at the beginning of their employment. |
| 2 | | | |
| 3 | 101. | During his employment with MFS, Madero also traveled to MFS distribution centers in other states on temporary assignments to work as a driver at those distribution centers. | Disputed. Madero's out of state travel was very limited at the beginning of his employment. At the start of his employment, he worked out of Wisconsin for a month. Then he drove a route to Utah and Las Vegas as part of his training, for about 2 weeks, for 2-3 days a week. Around 2020, he also drove in Kansas for about a month. Approximately two years ago, he drove in Nevada for about a month. Madero Decl. ¶ 4. However, he was not required to take these routes and was simply offered them. Defendant's drivers are not required or expected to take any route they are assigned. Tiblier Depo., 25:12-20, 29:2-25. |
| 16 | 102. | Products ordered by MFS and received at the Riverside DC from out-of-state suppliers for delivery to its Restaurant Customers therefrom were transported by Plaintiffs on every California | Disputed that these goods were in "interstate travel." McLane's suppliers/shippers lack the requisite fixed and persistent intent for a **continuous** movement in interstate commerce concerning any goods that Plaintiffs transported *beyond* the distribution center. Tiblier Dep. 40:22-24, 43:4-7, 46:4-24, 47:4-24, 48:4-10; Hayes Dep., 24:2-5 (all products are for resale); Corporate FRCP 30(b)(6) Representative Mike Taub Deposition ("Taub Dep."), 36:3-7 (same). All of McLane's suppliers intended to ship products directly to McLane's distribution center in Riverside, California. Tiblier Depo., 40:22-24, 43:4-7. ., 47:4-24 (confirming that McLane's |

| | | | |
|---|---|---|---|
| | | | suppliers ship directly to the distribution center; 43:4-7, 46:4-24, 48:4-10. (explaining explained that shipper, Simmons Foods, Inc. according to **one order** ships boxes of chicken wings from Gentry, Arkansas **directly to** Defendant's distribution center in Riverside, California). |
| 103. | | As an example, on August 18, 2021, Madero drove a California intrastate delivery route on which (a) he delivered 1,202 cases of product to Restaurant Customers from the Riverside DC that had been temporarily stored in the Riverside DC for an average of 11.5 days, (b) 686 or 57.1% of those 1,202 cases had been received at the Riverside DC from non- California suppliers, (c) those 686 cases received from non-California suppliers had been temporarily stored at the Riverside DC for an average of 12.0 days, and (d) 548 or 45.6% of those 1,202 cases received from non- California Suppliers had been temporarily stored in the Riverside DC for up to 12.0 days. | | Disputed. *See* Response to No. 102. |
| 104. | | As an example, on April 26, 2021, Orosco drove a California intrastate delivery route on which (a) he delivered 937 cases of product to Restaurant Customers from the Riverside DC that had been temporarily stored in the Riverside DC for an average of 11.8 days, (b) 492 or 52.5% of those 937 cases had been received at the Riverside DC from non-California suppliers, (c) | | Disputed. *See* Response to No. 102. |

| | | | |
|---|---|---|---|
| | | those 492 cases received from non-California suppliers had been temporarily stored at the Riverside DC for an average of 13.9 days, and (d) 388 or 41.4% of those 937 cases received from non-California Suppliers. | |
| | 105. | During their employment in the applicable limitations period, Madero and Orosco delivered 495,943 and 402,499 total cases of product, respectively, to Restaurant Customers from the Riverside DC on California intrastate delivery routes, which cases had been temporarily stored in the Riverside DC for an average of 13.2 and 13.3 days, respectively. | Disputed. *See* Response to No. 102. |
| | 106. | With respect to the cases of product that Plaintiffs delivered to Restaurant Customers from the Riverside DC on California intrastate delivery routes during their employment in the applicable limitations period, over 50% of those cases originated from suppliers outside of California. | Disputed. *See* Response to No. 102. |
| | 107. | With respect to the cases of product that Plaintiffs delivered to Restaurant Customers from the Riverside DC on California intrastate delivery routes during their employment in the applicable limitations period, those cases were in the Riverside DC for an average of 13.9 and 14.2 days as to Madero's and Orosco's routes, respectively, before being delivered | Disputed. *See* Response to No. 102. |

28

| | | |
|---|---|---|
| | to the Restaurant Customers. | |
| 108. | With respect to the cases of product that Plaintiffs delivered to Restaurant Customers from the Riverside DC on California intrastate delivery routes during their employment in the applicable limitations period, 218,426 or 44.0% of those cases delivered by Madero were in the Riverside DC for up to 13.9 days and 170,794 or 42.4% of those cases delivered by Orosco were in the Riverside DC for up to 14.2 days before being delivered to the Restaurant Customers. | Disputed. *See* Response to No. 102. |

Respectfully Submitted,

Dated: August 29, 2024

DESAI LAW FIRM, P.C.

By: _____/s/Aashish Y. Desai_____
Aashish Y. Desai
Adrianne De Castro
DESAI LAW FIRM, P.C.