UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | EDCV 24-0073-KK-DTBx | Date: | October 17, 2024 |
|---|---|---|---|
| Title: | *Jordan Orozco Madero, et al. v. McLane Foodservice, Inc.* | | |

Present: The Honorable **KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE**

| Noe Ponce | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **(In Chambers) Order DENYING Plaintiffs' Motion for Partial Summary Judgment [Dkt. 81] and GRANTING Defendant's Motion for Partial Summary Judgment [Dkt. 83]**

## I.
## INTRODUCTION

On August 21, 2024, plaintiffs Jordan Orozco Madero and Esteban Orosco ("Plaintiffs") filed a Motion for Partial Summary Judgment against their former employer, defendant McLane Foodservice, Inc. ("Defendant"). ECF Docket No. ("Dkt.") 81. On August 22, 2024, Defendant filed a Motion for Partial Summary Judgment against Plaintiffs. Dkt. 83.

The Court finds these matters appropriate for resolution without oral argument. See Fed. R. Civ. P. 78(b); L.R. 7-15. For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**, and Defendant's Motion for Partial Summary Judgment is **GRANTED**.

///

///

///

///

///

## II.

# RELEVANT BACKGROUND

## A.   PROCEDURAL HISTORY

On January 12, 2024, Plaintiffs filed a Class Action Complaint arising out of their former employment with Defendant, alleging violations of the Fair Labor Standards Act ("FLSA"), California Labor Code, and California Business and Professions Code.[1] Dkt. 1, Complaint at 1-16. Relevant here, Plaintiffs allege Defendant failed to pay Plaintiffs overtime wages in violation of the FLSA. Id.

On March 14, 2024, Plaintiffs filed the operative First Amended Complaint raising the following causes of action:

1. **Cause of Action One:** Failure to pay overtime wages in violation of 29 U.S.C. § 207;
2. **Cause of Action Two:** Failure to pay minimum wage in violation of Sections 1194, 1194.2, 1197, and 1197.1 of the California Labor Code and Wage Order 9;
3. **Cause of Action Three:** Failure to provide itemized pay statements and time/pay records in violation of Sections 226 and 226.3 of the California Labor Code and Wage Order 9;
4. **Cause of Action Four:** Failure to indemnify for all necessary expenditures in violation of Section 2802 of the California Labor Code; and
5. **Cause of Action Five:** Unfair Competition in violation of Section 17200 of the California Business and Professions Code.

Dkt. 24, FAC.

On June 3, 2024, Defendant filed an Answer. Dkt. 46.

On August 21, 2024, Plaintiffs filed the instant Motion for Partial Summary Judgment ("Plaintiffs' Motion"). Dkt. 81. In support of Plaintiffs' Motion, Plaintiffs filed the declarations of Aashish Desai, dkt. 81 at 30-31; Jordan Orozco Madero, dkt. 81-1; Esteban Orosco, dkt. 81-2; Donald Lyon, dkt. 81-3; Jose Rea, dkt. 81-4; Anthony Klish, dkt. 81-5; and Lenny Fleschler, dkt. 81-6; and Exhibits A-E, dkt. 81 at 32-140.[2] Plaintiffs argue they are entitled to summary judgment because Defendant "cannot meet its burden to establish its affirmative defense that Plaintiffs were exempt from the FLSA overtime requirements under the Motor Carrier Act exemption." Dkt. 81.

On August 22, 2024, Defendant filed a Motion for Partial Summary Judgment against Plaintiffs ("Defendant's Motion"). Dkt. 83. In support of Defendant's Motion, Defendant filed the declarations of Marcus Tiblier, dkt. 83-1; Michael Taub, dkts. 83-2, 94-1; and Jeff Hayes, dkts. 83-3,

---

[1] Plaintiffs maintain this is a "hybrid action" in which the federal claims are "brought under the FLSA as an 'opt-in' collective action, while the California claims are brought under [Federal Rule of Civil Procedure] 23 as an 'opt-out' class action." Dkt. 1 at 2.

[2] Plaintiffs additionally provide their Statement of Genuine Dispute of Material Fact with an additional section titled "Conclusions of Law." Dkt. 82, Plaintiffs' Statement of Uncontroverted Facts. However, "Conclusions of Law" are not permitted as part of a party's Statement of Uncontroverted Facts, see L.R. 56-1, hence, the Court will consider the "Conclusions of Law" only as argument in support of Plaintiffs' Motion.

94-2[3]; and Exhibits A-B, dkt. 83-1.  Defendant argues the undisputed facts establish Plaintiffs were exempt from the FLSA's overtime requirements under the Motor Carrier Act's exemption, and thus Defendant is entitled to partial summary judgment with respect to Cause of Action One, failure to pay overtime wages in violation of the FLSA.  Dkt. 83.

On August 29, 2024, Defendant filed an Opposition to Plaintiffs' Motion, and Plaintiffs filed an Opposition to Defendant's Motion.  Dkts. 87, 89.  On September 4, 2024, Plaintiffs filed a Reply to Defendant's Motion.  Dkt. 91.  On September 5, 2024, Defendant filed a Reply to Plaintiffs' Motion.  Dkt. 94.

These matters, thus, stand submitted.

**B.     MATERIAL FACTS**

In ruling on Plaintiffs' and Defendant's Cross-Motions for Partial Summary Judgment, the Court has reviewed the evidence, objections, and Statements of Uncontroverted Facts submitted by both parties.  Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) ("In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion.").  The Court only cites the evidence relevant to determining the merits of each motion.[4]  To the extent certain facts are not referenced in this Order, the Court has not relied on such facts to reach its decision.

---

[3] As to Plaintiffs' objections to the declarations of Marcus Tiblier, Jeff Hayes, and Anthony Taub, dkt. 89-1 – specifically that they include information Defendant "failed to disclose in discovery," and are "sham affidavits" because they contradict deposition testimony – the Court **OVERRULES** Plaintiffs' objections.

First, with respect to Plaintiffs' arguments that the declarations rely on information Defendant failed to disclose in discovery, the Court notes that on July 31, 2024, Plaintiffs "reported that the pending discovery disputes had been resolved," and thus, the Court terminated Plaintiffs' Motion to Compel.  Dkts. 77, 78.  Plaintiffs apparently have not "requested any additional documents or information based on either [Defendant's] discovery responses and document production, as supplemented, or the testimony by Mr. Tiblier, Mr. Hayes or Mr. Taub at their respective Rule 30(b)(6) depositions."  Dkt. 94 at 4, 13; Second Supplemental Declaration of Matthew Kane, ¶ 13.  Second, with respect to the allegedly sham affidavit arguments, Plaintiffs, at minimum, have failed to identify "clear and unambiguous" inconsistencies to justify striking the declarations of Marcus Tiblier, Jeff Hayes, or Michael Taub.  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009).  Accordingly, Plaintiffs' objections are meritless and **OVERRULED**.

[4] To the extent Plaintiffs rely on legal arguments as facts to support their Motion, "improper legal conclusions, or argumentative statements, are not facts and . . . will not be considered on a motion for summary judgment."  Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

Further, unless otherwise indicated, the following facts are uncontroverted.[5]  In addition, the Court considers the parties' evidentiary objections only where necessary.[6]  All other objections are **OVERRULED AS MOOT**.

Defendant is a "motor carrier" and "a nationwide foodservice distributor" that "maintains a nationwide network of distribution centers," including one in Riverside, California ("RDC").  Dkt. 84, Defendant's Statement of Uncontroverted Facts ("DSUF"), ¶¶ 1-2, 75; Dkt. 82, Plaintiffs' Statement of Uncontroverted Facts ("PSUF"), ¶ 8.  Plaintiffs worked for Defendant as truck drivers, and their "primary duties were safely delivering products to Defendant's clients."  DSUF ¶¶ 90, 91, 94; PSUF ¶ 2.  Plaintiff Madero worked from January 2019 to September 2023.  DSUF ¶ 90.  Plaintiff Orosco worked from August 2018 to November 2023.  Id. ¶ 91.  "As drivers, Plaintiffs' primary job duty was to operate large [commercial motor vehicles] on public roads and highways to deliver products to [Defendant's] Restaurant Customers."  Id. ¶ 95.

From January 2021 to at least September 2024, Defendant "has distributed and delivered products from the [RDC] to Restaurant Customers in California, Arizona, Nevada[,] and Utah."  Id. ¶ 5.  The RDC "has had on average approximately 30 weekly routes delivering orders to Restaurant Customers outside California, including in Utah, Nevada, and Arizona" driven by Defendant's employee-drivers.  Id. ¶ 76.  Currently, the RDC "runs approximately 300 delivery routes per week that deliver to Restaurant Customers within California" and "approximately 32 routes per week that deliver to Restaurant Customers outside of California."  Id. ¶¶ 77, 78.

---

[5] To the extent Plaintiffs "dispute" facts without citing any evidence in the record to support the dispute, the Court deems these facts as undisputed.  Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]"); see also Orr v. Bank of Am., NT & SA, 285 F.3d 764, 775 (9th Cir. 2002) ("We hold that when a party relies on deposition testimony in a summary judgment motion without citing to page and line numbers, the trial court may in its discretion exclude the evidence."); Beard v. Banks, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement.").

Additionally, to the extent Plaintiffs dispute Defendant's facts by relying on legal arguments as opposed to citing any evidence, those "disputed" facts are deemed undisputed.  S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982) ("[A] party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda.").

Lastly, to the extent Plaintiffs argue facts are disputed by pointing to minor discrepancies within the deposition testimony and declarations of Marcus Tiblier, Michael Taub, and Jeff Hayes, the Court deems those facts undisputed.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

[6] "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself[.]"  Burch, 433 F. Supp. 2d at 1119.  The Court thus declines to address such objections.

"Plaintiff Madero drove interstate routes for [Defendant] on over 10 occasions between January 2020 and March 2022." Id. ¶ 98. "Plaintiff Orosco drove interstate routes for [Defendant] on over 20 occasions between December 2019 and November 2021." Id. ¶ 99. Of the California intrastate delivery routes completed by Plaintiffs "[d]uring their employment in the applicable limitations period, plaintiff Madero delivered 495,943 total cases of product and plaintiff Orosco delivered 402,499 total cases of product to Restaurant Customers from the RDC on California intrastate delivery routes. DSUF ¶ 105; Tiblier Decl., ¶ 30. "During their employment in the applicable limitations period, over 50% of those cases originated from suppliers outside of California." DSUF ¶ 106. Those cases "had been temporarily stored in the [RDC]" for an average of 13 days before being transported to its final destination in California. Id. ¶ 105.

### 1. Defendant's policy for assigning routes to its employee-drivers

With respect to assignment of routes, Defendant's employee-drivers "bid on the regular workdays and scheduled delivery routes they want to be assigned on a semi-annual basis" according to seniority. Id. ¶ 80. Any employee-drivers "who did not get assigned any routes or a full schedule of routes during the bid process[]" are designated as "Bracket Drivers[.]" Id. ¶ 81. Bracket Drivers are responsible for covering open routes and "can be asked to cover any route, including an interstate route, at any time." DSUF ¶ 82; dkt. 83-1 Declaration of Marcus Tiblier ("Tiblier Decl."), ¶ 17. "If there are no bracket drivers available to cover an open route, another driver – including a driver who bid on and received a regular route – must cover the open route." DSUF ¶ 83; Tiblier Decl., ¶ 17. "If a driver is unavailable to drive either their regular route or an open route, and does not have personal time off available to cover that time, they will be assigned points for lack of attendance, which points can lead to discipline, up to and including termination." DSUF ¶ 82; Tiblier Decl., ¶ 18. All drivers "can be assigned to cover any route at any time during holidays, natural disasters, emergencies, or otherwise as [Defendant] deems necessary to achieve consistent deliveries to its customers." DSUF ¶ 85; Tiblier Decl., ¶ 18.

Additionally, drivers may be asked to work at another distribution center, including those in other states, "because, for example, the [distribution center] does not have enough drivers to cover its routes." Tiblier Decl., ¶ 19; DSUF ¶ 86. If there is a sufficient need and no volunteers, "a driver from [RDC] will be temporarily assigned to work at another [distribution center]." Tiblier Decl., ¶ 19; DSUF ¶ 86.

### 2. Defendant's services as a food distributor

According to Michael Taub – Defendant's Senior Director, Chain Management – Defendant serves two customers out of the RDC: (1) "national restaurant chains or their affiliated cooperative purchasing entity" ("Chain Customers"); and (2) "those chains' respective affiliated franchisee and corporate-owned restaurant locations" ("Restaurant Customers"). DSUF ¶ 3. Defendant's Chain Customers include Chick-Fil-A, Kentucky Fried Chicken, Long John Silvers, A&W, Taco Bell, Pizza Hut, and Buffalo Wild Wings. Id. Defendant "procures and distributes food, produce, supplies, and promotional and other items on behalf of its Chain Customers to sell and distribute them to their affiliated Restaurant Customers throughout the country." Id. ¶ 4. Defendant "operates under national distribution agreements with each of its Chain Customers to supply and distribute proprietary and non-proprietary food" and other products to their affiliated Restaurant Customers. DSUF ¶ 6; dkt. 83-2 Declaration of Michael Taub ("Taub Decl."), ¶ 7. A majority of the products

ordered are from suppliers in states outside of California.  DSUF ¶ 9; Tiblier Decl., ¶ 9; Taub Decl., ¶ 11.

Defendant's "procurement department is responsible for ordering products on behalf of Chain Customers to be purchased by" their Restaurant Customers "for last mile delivery by [Defendant] to those Restaurant Customers."  DSUF ¶ 8, Taub Decl., ¶ 6.  Defendant "operates under national distribution agreements with each of its Chain Customers to supply and distribute proprietary and non-proprietary food, produce, supplies, promotional and other items to their discrete population of affiliated Restaurant Customers."  DSUF ¶ 6; Taub Decl., ¶ 7.  Pursuant to the national distribution agreements ("Distribution Agreements") with Defendant and its Chain Customers, "[e]ach Chain Customer designates various suppliers from which [Defendant] is required to purchase the food, produce, supplies, and promotional and other items that [Defendant] will be distributing to the Chain Customer's affiliated Restaurant Customers."  DSUF ¶ 11.  "The Chain Customer, in turn, enters into agreements or understanding[s] with those suppliers for them to supply a certain volume of their product for the Chain Customer's affiliated Restaurant Customers – which [Defendant] purchases from those suppliers to fulfill orders from those Restaurant Customers."  DSUF ¶ 12; Taub Decl., ¶ 8.  The Distribution Agreements "require that [Defendant] order products for the [RDC] based on orders projected to be [placed by] the Restaurant Customers supplied by the [RDC]."  DSUF ¶ 24; Taub Decl., ¶¶ 12-14.  Thus, "[e]ach purchase order for a product [Defendant] places with suppliers is based on historical aggregate sales information for the Restaurant Customers that order that product from the [RDC]."  DSUF ¶ 22; Taub Decl., ¶¶ 12-14.

Defendant "bears the costs of the inbound and outbound transportation of products at the [RDC]."  DSUF ¶ 25; Taub Decl., ¶ 15; Tiblier Decl., ¶¶ 11-14.  Specifically, Defendant "pays carriers for inbound shipments . . . and it pays its employee drivers for the outbound shipments of products to Restaurant Customers."  DSUF ¶ 26; Taub Decl., ¶ 15; Tiblier Decl., ¶¶ 11-14, 23.  For approximately 40%-50% of inbound products to the RDC, Defendant "manages the transportation" from suppliers "by using its own in-house third party freight provider, Vantix."  DSUF ¶¶ 27, 28; Taub Decl., ¶ 15.

With respect to products, Defendant ships both propriety and non-proprietary products.  Taub Decl., ¶ 7.  Proprietary Products "are specific to and can only be purchased by and delivered to a Chain Customer's affiliated Restaurant Customers."  DSUF ¶ 14; Taub Decl., ¶ 9.  For example, Defendant's Chain Customer, Buffalo Wild Wings ("BWW"), has designated suppliers for its chicken wings, many of which are in Georgia, Arkansas, and Texas.  DSUF ¶ 15; Taub Decl., ¶ 11.  When Defendant orders chicken wings for BWW, it orders them from BWW's designated supplier.  DSUF ¶ 15.  Defendant may deliver those BWW chicken wings only to BWW-affiliated Restaurant Customers.  DSUF ¶ 17; Taub Decl., ¶ 9.  Although Defendant may not know the specific BWW location to which the chicken wings will be delivered when Defendant places its order from BWW's designated supplier, Defendant knows the BWW chicken wings will be delivered to a BWW location.  DSUF ¶ 20.

When products are received at RDC for delivery to Restaurant Customers, the products "are temporarily stored in aisles of inventory racks while awaiting distribution to the Restaurant Customers."  DSUF ¶ 47; Taub Decl., ¶ 19.  Defendant "does not and cannot repackage" any proprietary products received at the RDC because those products "must be delivered to the affiliated Restaurant Customer in their proprietary packaging."  DSUF ¶ 18; Taub Decl., ¶ 9.  "No

processing, repacking, or modification of products received from suppliers occurs at the [RDC]." DSUF ¶ 43; Taub Decl., ¶ 21.

## III.
## LEGAL STANDARD

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotations and citation omitted). Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit[.]" Nat'l Ass'n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of production by "producing evidence, or showing the absence of evidence, on the motion for summary judgment[.]" Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]he ultimate burden of persuasion can refer either to the burden of persuasion on the motion or to the burden of persuasion at trial." Id. A moving party without the ultimate burden of persuasion at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. "[T]o carry its ultimate burden of persuasion on the motion, the moving party must" establish "there is no genuine issue of material fact." Id.

If the moving party meets its initial burden of production, the burden then shifts to the non-moving party to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party "cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982).

In deciding a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587. Summary judgment is, therefore, not proper "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts[.]" Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 (9th Cir. 1980). Furthermore, the court does not make credibility determinations with respect to the evidence offered. See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

## IV.
## DISCUSSION

**A.     APPLICABLE LAW**

"The FLSA sets a national minimum wage and requires overtime pay of one and a half times an employee's hourly wage for every hour worked over 40 hours in a week." Landers v. Quality Commc'ns, Inc., 771 F.3d 638, 640 (9th Cir. 2014), as amended (Jan. 26, 2015) (internal brackets, ellipses, and citations omitted); Probert v. Family Centered Servs. of Alaska, Inc., 651 F.3d 1007, 1009-10 (9th Cir. 2011); 29 U.S.C. § 206(a)(1) (minimum wage); 29 U.S.C. § 207(a)(1) (overtime). However, under the Motor Carrier Act safety exemption ("Motor Carrier Exemption"), "any motor carrier that engages in interstate commerce is subject to the Secretary of Transportation's jurisdiction, and is thus exempt from the maximum hours provisions of the FLSA[.]" Reich v. Am. Driver Serv., Inc., 33 F.3d 1153, 1155 (9th Cir. 1994) (emphasis added). In contrast, "[a]ny motor carrier that engages in wholly intrastate commerce . . . is subject to the Secretary of Labor's jurisdiction, and consequently, to the maximum hours provisions of the FLSA." Reich, 33 F.3d at 1155 (emphasis added). "It is the nature of both the employer's and the employee's activities that is determinative of this exemption." Bishop v. Petro-Chem. Transp., LLC, 582 F. Supp. 2d 1290, 1299 (E.D. Cal. 2008).

"Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation." S. Pac. Transp. Co. v. I.C.C., 565 F.2d 615, 617 (9th Cir. 1977). A driver engages in interstate commerce when the driver (1) transported goods "within a state that 'is a practical continuity of movement from the manufacturers or suppliers without the state, through [a] warehouse and on to customers whose prior orders or contracts are being filled . . . .'" Klitzke v. Steiner Corp., 110 F.3d 1465, 1469 (9th Cir. 1997) (quoting Walling v. Jacksonville Paper Co., 317 U.S. 546, 569 (1943); or (2) "can reasonably be expected to drive across state lines[,]" Bishop, 582 F. Supp. 2d at 1298.

"An employer who claims an exemption from the FLSA has the burden of showing that the exemption applies[.]" Donovan v. Nekton, Inc., 703 F.2d 1148, 1151 (9th Cir. 1983). The exemption must "be narrowly construed" and "withheld except as to persons plainly and unmistakably within their terms and spirit." Solis v. Washington, 656 F.3d 1079, 1083 (9th Cir. 2011) (internal citation and quotation marks omitted).

### 1.     Intrastate Commerce Constituting Interstate Commerce

Intrastate deliveries are considered part of interstate commerce "if the property in question was originally delivered from out-of-state and the intrastate route is merely part of the final phase of delivery." Watkins v. Ameripride Servs., 375 F.3d 821, 826 (9th Cir. 2004). "Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation." Southern Pac. Trans. Co. v. ICC, 565 F.2d 615, 617 (9th Cir. 1977) (emphasis in original).

"[I]f a company places orders with an out-of-state vendor for delivery to specified intrastate customers, a temporary holding of the goods within an intrastate warehouse for processing does not alter the interstate character of the transportation chain culminating in delivery to the customer." Watkins, 375 F.3d at 826; Walling, 317 U.S. at 568 ("The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their

transit does not mean that they are no longer 'in commerce' within the meaning of the Act.").

Additionally, even if a company does not know the ultimate destination of its ordered goods, courts find those goods may still be in continuous transportation where "the orders were placed and the goods were shipped to satisfy contracts between [defendant] and its customers that specified a final place of delivery within [the relevant state] <u>other than [defendant's] warehouse</u>." <u>Klitzke</u>, 110 F.3d at 1470 (emphasis in original). However, if "a company places orders with an out-of-state vendor, with delivery to the company's intrastate warehouse for future delivery to customers yet to be identified, the transportation chain culminating in delivery to the customer is considered intrastate in nature." <u>Watkins</u>, 375 F.3d at 826; see <u>I.C.C.</u>, 565 F.2d at 618 (holding that goods retained their intrastate character when they were delivered to and stored in the in-state company warehouse, with no designated designation at the time of delivery to the warehouse).

### 2. Interstate Commerce

In addition to intrastate deliveries as described above, interstate commerce also includes driver-employees who are "called upon to drive in interstate commerce as part of the driver's regular employment[.]" <u>Bishop</u>, 582 F. Supp. 2d at 1298. If a motor-carrier employer "does interstate work and assigns drivers randomly to that driving, all of its drivers are considered subject to the Motor Carrier [Exemption]." <u>Id.</u>; see also <u>Morris v. McComb</u>, 332 U.S. 422, 433 (1947) (finding the Motor Carrier Exemption applicable where the "interstate commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers"). However, "if there is no possibility of driving interstate or the possibility is remote," the driver is not subject to the Motor Carrier Exemption. <u>Bishop</u>, 582 F. Supp. 2d at 1298; <u>Reich</u>, 33 F.3d at 1155-56 ("[I]f the employee's minor involvement can be characterized as de minimis, that employee may not be subject to the Secretary of Transportation's jurisdiction at all[.]").

Additionally, where a driver "has not personally driven in interstate commerce," but "because of company policy and activity, the driver could reasonably be expected to drive in interstate commerce," this is still sufficient to meet the Motor Carrier Exemption. <u>Bishop</u>, 582 F. Supp. 2d at 1298; <u>Reich</u>, 33 F.3d at 1157 (observing the "reasonable expectations" analysis "concerns claims of jurisdiction over a motor carrier's drivers who have not driven in interstate commerce when there is evidence that other drivers employed by the motor carrier <u>have</u> driven in interstate commerce"). To determine "whether the drivers had reasonable expectations of interstate driving, courts look at whether the carrier conducted interstate work or whether the carrier actively attempted to obtain interstate work during the period in question." <u>Bishop</u>, 582 F. Supp. 2d at 1301.

Unlike the employment situations above, where interstate commerce is <u>not</u> part of an employee's regular employment, an employee's minor involvement in interstate commerce may trigger the exemption, but it "does not necessarily subject that employee to the Secretary of Transportation's jurisdiction for an unlimited period of time." <u>Reich</u>, 33 F.3d at 1155. "Evidence of driving in interstate commerce . . . should be accepted as proof that the driver is subject to [the Motor Carrier Exemption] for a 4-month period from the date of the proof." <u>Id.</u> at 1156; see also <u>Williams v. Tri-State Biodiesel, L.L.C.</u>, No. 13-CIV.-5041-GWG, 2015 WL 305362, at *11 (S.D.N.Y. Jan. 23, 2015) (listing cases where other courts have applied the four-month rule); 29 C.F.R. § 782.2 ("[W]here the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no

change in his duties . . . . If in particular workweeks other duties are assigned to him [specifically those] affecting the safety of operation of motor vehicles in interstate commerce . . ., the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.").

**B.     ANALYSIS**

Here, the undisputed facts establish Plaintiffs are subject to the Motor Carrier Exemption. First, it is undisputed Defendant is a motor carrier, and Plaintiffs, as drivers for Defendant, operated commercial motor vehicles.  DSUF ¶¶ 75, 94.  The parties are, therefore, subject to regulation by the Secretary of Transportation.  See 29 U.S.C. § 213 (instructing the Motor Carrier Act exemption applies to motor carrier employees for "whom the Secretary of Transportation has power to establish qualifications and maximum hours of services") (citing 49 U.S.C.A. § 31502 (b)(1)). Second, the undisputed facts establish Plaintiffs engaged in interstate commerce because their intrastate deliveries constituted a "practical continuity of movement" from out-of-state suppliers. Watkins, 375 F.3d at 826.  Additionally, the undisputed facts establish Plaintiffs engaged in interstate commerce from at least January 2020 to March 2022 for plaintiff Madero, and December 2019 to November 2021 for plaintiff Orosco, because they covered routes that traveled outside California during those limited periods.  DSUF ¶¶ 90, 91.

> **1.     Plaintiffs engaged in interstate commerce by transporting goods within California, which constituted the practical continuity of movement from out-of-state suppliers to a California Restaurant Customer**

The undisputed material facts establish Defendant engages in interstate commerce because its intrastate deliveries are a "practical continuity of movement" from its out-of-state suppliers to its in-state customers.  Watkins, 375 F.3d at 826.  The undisputed facts establish Defendant enters into Distribution Agreements with its Chain Customers "to supply and distribute proprietary and non-proprietary food" and other products to Chain Customers' affiliated Restaurant Customers.  DSUF ¶ 6; Taub Decl., ¶ 7.  Defendant purchases products "to fulfill the anticipated orders" from Restaurant Customers, and it bases its purchase order on "historical aggregate sales information for the Restaurant Customers."  DSUF ¶ 22; Taub Decl., ¶¶ 12-14.  Under the Distribution Agreements, Defendant may purchase products only from designated suppliers approved by Chain Customers. DSUF ¶ 10.  With respect to Plaintiffs, the undisputed facts establish "over 50%" of Plaintiffs intrastate delivery routes were for products that originated from suppliers outside of California.  Id. ¶ 106.

Defendant's Distribution Agreements with its Chain Customers establish Defendant's intent that products from out-of-state distributors, purchased on behalf of Chain Customers, remain in interstate commerce beyond their temporary delivery to the RDC.[7]  DSUF ¶¶ 6, 8; Taub Decl., ¶¶ 6,

---

[7] To the extent Plaintiffs argue Restaurant Supply Chain Solutions ("RSCS"), and not Defendant, "actually controlled and directed the shipment of products across state lines," the evidence does not support this argument.  Dkt. 89 at 18.  RSCS is a Cooperative Purchasing Entity, and Defendant occasionally enters into Master Distribution Agreements with a Chain Customer's affiliated Cooperative Purchasing Entity.  Dkt. 83-3 Declaration of Jeff Hayes ("Hayes Decl."), ¶¶ 6, 7.  However, these Master Distribution Agreements "follow a similar general framework and include (continued . . . )

7; see Walling, 317 U.S. at 569 ("The contract or understanding pursuant to which goods are ordered . . . indicates where it was intended that the interstate movement should terminate."); Klitzke, 110 F.3d at 1470 ("[T]he orders were placed and the goods were shipped to satisfy contracts between [defendant] and its customers that specified a final place of delivery within [the forum state] other than the [defendant's] warehouse."); Veliz v. Cintas Corp., No. C-03-1180RS, 2009 WL 1107702, at *4 (N.D. Cal. Apr. 23, 2009) ("[T]he existence of a … contract, or understanding prior to shipment supplied the requisite intent that the goods move in interstate commerce."). For example, Defendant's Distribution Agreement with BWW requires Defendant order BWW's chicken from a BWW-designated and approved supplier. Taub Decl., ¶ 9. BWW's designated and approved chicken suppliers "are mainly in Georgia, Arkansas, and Texas and none of them are in California." Taub Decl., ¶ 11. Under the Distribution Agreement, Defendant may deliver BWW chicken only to BWW-affiliated Restaurant Customers. DSUF ¶ 17. Thus, the Distribution Agreement between Defendant and BWW demonstrates the intent to have the out-of-state delivery of BWW chicken terminate at the California-based BWW Restaurant Customer.

In addition to the Distribution Agreements, other undisputed facts related to the handling of proprietary products demonstrate that intrastate deliveries of proprietary goods for Restaurant Customers are a practical continuity of movement from the out-of-state suppliers, and therefore, constitute activity in interstate commerce. For example, the undisputed facts establish Defendant pays carriers for inbound shipments and temporarily stores the products, for on average less than two weeks, before delivering the products to the specific Restaurant Customer. DSUF ¶ 10; Villalpando v. Exel Direct Inc., No. 12-CV-04137-JCS, 2015 WL 5179486, at *30 (N.D. Cal. Sept. 3, 2015) ("A finding of fixed and persistent intent is supported where the shipper must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.") (internal quotation marks, ellipses, and citation omitted); see I.C.C., 921 F.2d at 910 (finding interstate commerce despite goods being stored at a distribution center based on facts like the goods were kept in "separate and distinct stock-keeping unit numbers, which ensures that out-of-state goods will not be commingled with California-produced products" and only in "temporary storage" to allow defendant to "coordinate deliver of its products"); cf. Watkins v. Ameripride Servs., 375 F.3d 821, 826 (9th Cir. 2004) ("Indefinite storage in a warehouse may transform goods shipped from out-of-state into intrastate deliveries."). Further, Defendant does not repackage proprietary goods that are ordered for Restaurant Customers and typically keeps those proprietary goods on separate shelves from other Restaurant Customers' proprietary goods. DSUF ¶ 10; see I.C.C., 921 F.2d at 910.

Lastly, contrary to Plaintiffs' argument, the fact that Defendant does not place orders with suppliers based on specific orders from its Restaurant Customers and, therefore, "may not know the specific Restaurant Customer locations to which the products it purchases will ultimately be delivered when they are ordered and shipped," Taub Decl., ¶ 12, does not preclude a finding that

---

many of the same general terms and conditions" as a Distribution Agreement directly with a Chain Customer – including the Chain Customer's designated supplier, how and when the affiliated Restaurant Customers will place orders, how and when Defendant will deliver products to the Restaurant Customers, the agreed upon cost for moving a load of product, and the agreed-upon pricing methods for products to be purchased by Defendant and distributed to a Chain Customer's affiliated Restaurant Customers. Id. ¶ 8. Thus, the fact that Defendant occasionally works with a RSCS does not alter the Court's analysis.

these orders on behalf of Chain Customers do not qualify as interstate commerce.  See I.C.C., 921 F.2d at 908-09 (observing that defendant engaged in interstate commerce when it shipped goods to its distribution center "based on specific anticipated demands of [defendant's] customers drawn from their past ordering practices and long-term supply contracts).

Therefore, the undisputed facts establish Plaintiffs engaged in interstate commerce when they delivered out-of-state products within California, DSUF ¶ 106, because Defendant's Distribution Agreements with Chain and Restaurant Customers demonstrated that the subsequent intrastate deliveries are a "practical continuity of movement" from the out of state suppliers to its in-state customers.  Watkins, 375 F.3d at 826

### 2. Plaintiffs engaged in interstate commerce during the limited time they drove routes out of state

In light of the finding in B.1., the Court need not decide whether Plaintiffs also engaged in interstate commerce because they were "called upon to drive in interstate commerce as part of [their] regular employment[.]"  Bishop, 582 F. Supp. 2d at 1298.  Nonetheless, in light of the cross-motions for partial summary judgment, the Court will address the issue.  Applying this second test, the Court finds the undisputed material facts fail to establish Plaintiffs are subject to an exemption under the Motor Carrier Act for the entire period of their employment with Defendants, because interstate driving was not a reasonably expected part of Plaintiffs' employment.  However, the undisputed material facts establish Plaintiffs are exempt during the limited time they were actually driving routes outside of California and, therefore, engaging in interstate commerce.

#### a. Interstate driving is not a part of Defendant's employee-drivers' regular employment duties

The Court first finds that interstate driving is not part of Defendant's employee-drivers' regular employment duties.  Although the undisputed facts establish Defendant provides weekly deliveries to Restaurant Customers out-of-state, the facts do not establish Defendant distributed its interstate commerce trips "indiscriminately" and "generally throughout the year" amongst its employee-drivers.  Morris, 332 U.S. at 433; DSUF ¶¶ 5, 77, 78 (Defendant provides approximately 32 interstate delivery routes per week and approximately 300 intrastate delivery routes per week.).

Similarly, the undisputed facts do not establish that defendant's employee-drivers' "could reasonably be expected to drive in interstate commerce" as part of their employment with Defendant.  Bishop, 582 F. Supp. 2d at 1298.  According to Defendant's route assignment process, employee-drivers bid on their desired routes on a semi-annual basis, based on seniority.  Tiblier Decl., ¶ 16.  However, this system does not create an environment where "all of [Defendant's] drivers reasonably could have been expected to engage in interstate commerce."  Reich, 33 F.3d at 1154.  In fact, the bidding system combined with the relatively low number of interstate routes compared to intrastate routes suggests there are several employee-drivers – for example, those with a high level of seniority – that could reasonably expect they may never have to cover interstate routes.  McGee v. Corp. Express Delivery Sys., No. 01-C-1245, 2003 WL 22757757, at *7 (N.D. Ill. Nov. 20, 2003) (declining to apply the exemption based in part on evidence that defendant "assigned drivers to routes on a permanent or quasi-permanent basis, and routes were randomly reassigned only when a driver did not come in to work").

Further, while Defendant has a policy that any driver can be assigned to cover any route, including interstate routes, during holidays, emergencies, or other necessary times, the fact "[t]hat unexpected vacancies may be filled indiscriminately does not establish that all drivers could at some time travel interstate routes." DSUF ¶ 85; McGee, No. 01C1245, 2003 WL 22757757 at *6 (citation omitted); Sturm v. CB Transp., Inc., 943 F. Supp. 2d 1102, 1114 (D. Idaho 2013) ("[A]n employer does not establish that there was a reasonable expectation that its employees could drive interstate when it merely indiscriminately fills vacant interstate routes with drivers who otherwise have regular, intrastate routes.").

Thus, because Defendant's employee-drivers are not engaged in interstate commerce as part of their regular employment and interstate driving is not a duty they could reasonably expect or were indiscriminately assigned, the Motor Carrier Exemption is not applicable to Plaintiffs' entire period of employment.[8]

        **b.**    **Plaintiffs engaged in interstate commerce by driving interstate routes, but only for a discrete, limited period of time**

Plaintiffs, however, are qualified for an exemption for the limited period of time they engaged in interstate commerce by driving out-of-state routes. It is undisputed Plaintiffs drove multiple interstate routes while employed for Defendant – plaintiff Madero drove interstate routes "on over 10 occasions between January 2020 and March 2022," and plaintiff Orosco drove interstate "on over 20 occasions between December 2019 and November 2021." DSUF ¶¶ 98, 99. This evidence is sufficient to show that Plaintiffs were exempt under the Motor Carrier Act from: (1) for plaintiff Madero, January 2020 to March 2022, plus an additional four months; and (2) for plaintiff Orosco, December 2019 to November 2021, plus an additional four months. Reich, 33 F.3d at 1156 ("Evidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to [the Motor Carrier Exemption] for a 4-month period from the date of the proof.") (quoting 46 Fed. Reg. 37,902, 37,903 (1981)); Veliz, 2009 WL 1107702, at *11 ("Where a plaintiff's participation in interstate commerce triggers the MCA exemption, it will be applied for a four month period.").

Thus, applying the four-month rule, the undisputed facts establish Plaintiffs are subject to the Motor Carrier Exemption based on their interstate delivery routes from at most: (1) for plaintiff Madero, January 2020 to July 2022; and (2) for plaintiff Orosco, December 2019 to March 2022.

\* \* \*

---

[8] To the extent Defendant argues Plaintiffs' interstate deliveries show that interstate travel was more than a "de minimis" portion of their work, thereby subjecting Plaintiff's entire period of employment to the Motor Carrier exemption, there is insufficient evidence for the Court to determine what percentage of Plaintiffs' deliveries during the course of their employment was comprised of interstate routes compared to intrastate routes. Reich, 33 F.3d at 1155-56 ("[I]f the employee's minor involvement can be characterized as de minimis, that employee may not be subject to the Secretary of Transportation's jurisdiction at all[.]"); Veliz, 2009 WL 1107702, at *9 (holding interstate activity of "1% or less of plaintiffs' deliveries . . . is not sufficient as a matter of law to trigger the MCA exemption").

Accordingly, viewing the evidence in the light most favorable to Plaintiffs, Defendant has met its burden to establish Plaintiffs are subject to the Motor Carrier Exemption and, therefore, exempt from the FLSA's overtime compensation requirements.

# V.
# CONCLUSION

For the reasons set forth above, Plaintiffs' Partial Motion for Partial Summary Judgment is **DENIED** and Defendant's Motion for Partial Summary Judgment is **GRANTED**. Accordingly, Cause of Action One, Failure to Pay Overtime Wages in violation of 29 U.S.C. § 207, is **DISMISSED with PREJUDICE**.

In light of the dismissal of the only federal claim, Plaintiffs are ordered to show cause why this Court should retain jurisdiction over the instant action no later than **October 24, 2024**. Plaintiffs' response and any corresponding response from Defendant is limited to five pages each.

**IT IS SO ORDERED.**